NON-CONFIDENTIAL

2014-1812

—————————————————————

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

—————————————————————

REMBRANDT SOCIAL MEDIA, LP,

*Plaintiff-Appellant*,

V.

FACEBOOK, INC.,

*Defendant-Appellee*.

—————————————————————

Appeal From The United States District Court
For The Eastern District Of Virginia
In Case No. 1:13-CV-00158-TSE-TRJ, Judge T.S. Ellis, III

————————————————

## NON-CONFIDENTIAL
## BRIEF FOR DEFENDANT-APPELLEE

————————————————

Heidi L. Keefe
Mark R. Weinstein
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304
(650) 843-5000

Michael G. Rhodes
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111
(415) 693-2000

Thomas G. Hungar
    *Principal Attorney*
Lucas C. Townsend
Blair A. Silver
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500

*Counsel for Facebook, Inc.*

## CERTIFICATE OF INTEREST

Counsel for Defendant-Appellee Facebook, Inc. certifies the following:

1.    The full name of every party or amicus represented by me is:

    Facebook, Inc.

2.    The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    The party named in the caption, Facebook, Inc., is the real party in interest.

3.    All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    There are no such corporations or companies.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| **Gibson, Dunn & Crutcher LLP** | **Cooley LLP** |
| --- | --- |
| Thomas G. Hungar | Stephen C. Neal |
| Lucas C. Townsend | Michael G. Rhodes |
| Blair A. Silver | Heidi L. Keefe |
| | Mark R. Weinstein |
| | Stephen R. Smith |
| | Jonathan G. Graves |
| | Phillip E. Morton |
| | John S. Kyle |
| | Elizabeth L. Stameshkin |
| | Paul Batcher |

May 18, 2015                      /s/ *Thomas G. Hungar*

Date                             Thomas G. Hungar

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................1

COUNTERSTATEMENT OF THE ISSUES...........................................................2

COUNTERSTATEMENT OF THE CASE AND FACTS ......................................3

SUMMARY OF ARGUMENT ..............................................................................14

ARGUMENT ........................................................................................................17

I.     SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S
       NONINFRINGEMENT VERDICT ............................................................17

       A.     Legal Standard...................................................................................17

       B.     The Jury Properly Found The '316 Patent Not Infringed. ..................18

              1.     "Fully Integrated For Display" ................................................18

              2.     "Completely Defines"..............................................................23

       C.     The Jury Properly Found The '362 Patent Not Infringed. ..................26

II.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S
       INVALIDITY VERDICT.............................................................................29

       A.     The Jury Properly Found The '362 Patent Invalid.............................29

       B.     The Jury Properly Found The '316 Patent Invalid.............................33

III.   THE DISTRICT COURT'S CLARIFYING QUESTIONS TO A
       FACEBOOK WITNESS DO NOT NECESSITATE A NEW
       TRIAL........................................................................................................38

IV.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION
       BY PRECLUDING REMBRANDT'S INVALIDITY EXPERT
       FROM CHANGING THE CLAIM CONSTRUCTION ..............................46

       A.     Legal Standard...................................................................................46

# TABLE OF CONTENTS
### (continued)

| | | Page |
|---|---|---|
| B. | Golbeck's Alternative Claim Construction Was Confusing, Prejudicial, And Irrelevant. | 46 |

V.  MALACKOWSKI'S DAMAGES OPINION WAS PROPERLY EXCLUDED ..............................................................................49

A.  The District Court Properly Excluded Malackowski's Unreliable, Prejudicial, And Legally Erroneous Damages Calculations That Were Based On The Value Of Noninfringing Components.[*] ......................................................................49

B.  The District Court Properly Excluded Malackowski's Damages Theory Because It Relied On Consumer Surveys That Were Not Tied To Damages. ..........................................................55

C.  The District Court Properly Exercised Its Discretion In Preventing Rembrandt From Delaying Trial With A New Damages Theory That Rembrandt Had Chosen Not To Present.[†] ......59

CONCLUSION ............................................................................................66

[*] Rembrandt's damages estimate is confidential and has been redacted on page 51 of the non-confidential version of Facebook's brief.  Fed. Cir. R. 28(d)(1)(B).

[†] The exhibits quoted on page 62 describe an internal Facebook study on site speed. That information is confidential and has been redacted in the non-confidential version of Facebook's brief.  Fed. Cir. R. 28(d)(1)(B).

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Abbott Labs. v. Andrx Pharm., Inc.*,
  473 F.3d 1196 (Fed. Cir. 2007) ..........................................................45

*Aero Prods. Int'l, Inc. v. Intex Recreation Corp.*,
  466 F.3d 1000 (Fed. Cir. 2006) ..................................................... 47-48

*Apple Inc. v. Motorola, Inc.*,
  757 F.3d 1286 (Fed. Cir. 2014) ..........................................................54

*Cephalon, Inc. v. Watson Pharm., Inc.*,
  707 F.3d 1330 (Fed. Cir. 2013) ..........................................................28

*Conopco, Inc. v. May Dep't Stores Co.*,
  46 F.3d 1556 (Fed. Cir. 1994) ............................................................43

*CytoLogix Corp. v. Vertana Med. Sys., Inc.*,
  424 F.3d 1168 (Fed. Cir. 2005) ................................................... 46, 48

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ...........................................................................56

*Dawn Equip. Co. v. Ky. Farms Inc.*,
  140 F.3d 1009 (Fed. Cir. 1998) ..........................................................28

*DDR Holdings, LLC v. Hotels.com, L.P.*,
  773 F.3d 1245 (Fed. Cir. 2014) ..........................................................28

*Dow Chem. Co. v. Mee Indus., Inc.*,
  341 F.3d 1370 (Fed. Cir. 2003) ..........................................................65

*EEOC v. Freeman*,
  778 F.3d 463 (4th Cir. 2015) ..............................................................52

*Ericsson, Inc. v. D-Link Sys., Inc.*,
  773 F.3d 1201 (Fed. Cir. 2014) ................................................... 52, 53

# TABLE OF AUTHORITIES
(continued)

Page(s)

*Gemalto S.A. v. HTC Corp.*,
754 F.3d 1364 (Fed. Cir. 2014) ........................................................29

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997)............................................................... 56, 58

*Georgia-Pacific v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................51

*Hill-Rom Servs., Inc. v. Stryker Corp.*,
755 F.3d 1367 (Fed. Cir. 2014) ........................................................37

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
688 F.3d 1342 (Fed. Cir. 2012) ........................................................33

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ...................................................... 53, 58

*Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*,
714 F.3d 1289 (Fed. Cir. 2013) ........................................................45

*Liquid Dynamics Corp. v. Vaughan Co.*,
449 F.3d 1209 (Fed. Cir. 2006) ........................................................46

*Liteky v. United States*,
510 U.S. 540 (1994)............................................................................44

*Lucent Techs., Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ........................................................53

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.*,
244 F.3d 1365 (Fed. Cir. 2001) ........................................................18

*MicroStrategy Inc. v. Bus. Objects, S.A.*,
429 F.3d 1344 (Fed. Cir. 2005) ........................................................66

*Mirror Worlds, LLC v. Apple, Inc.*,
692 F.3d 1351 (Fed. Cir. 2012) ........................................................49

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Network Prot. Scis., LLC v. Fortinet, Inc.*,
2013 WL 5402089 (N.D. Cal. Sept. 26, 2013)....................................63

*Norsk Hydro Can., Inc. v. United States*,
472 F.3d 1347 (Fed. Cir. 2006) ................................................... 45-46

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012) .........................................................60

*In re Pennington Seed, Inc.*,
466 F.3d 1053 (Fed. Cir. 2006) .........................................................46

*Pregis Corp. v. Kappos*,
700 F.3d 1348 (Fed. Cir. 2012) ................................................. 18, 23

*Presidio Components, Inc. v. Am. Technical Ceramics Corp.*,
702 F.3d 1351 (Fed. Cir. 2012) .........................................................21

*Seidman v. Fishburne-Hudgins Educ. Found., Inc.*,
724 F.2d 413 (4th Cir. 1984) ............................................................40

*SmithKline Beecham Corp. v. Apotex Corp.*,
439 F.3d 1312 (Fed. Cir. 2006) ................................................. 45, 49

*Solvay S.A. v. Honeywell Int'l Inc.*,
742 F.3d 998 (Fed. Cir. 2014) ..........................................................25

*Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*,
318 F.3d 592 (4th Cir. 2003) ...................................................... 59, 63

*Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*,
655 F.3d 1364 (Fed. Cir. 2011) ................................................. 22-23

*Stillman v. Norfolk & W. Ry. Co.*,
811 F.2d 834 (4th Cir. 1987) ............................................................44

*Sulzer Textil A.G. v. Picanol N.V.*,
358 F.3d 1356 (Fed. Cir. 2004) ................................................. 46, 48

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*Thornhill v. Donnkenny, Inc.*,
823 F.2d 782 (4th Cir. 1987) ...................................................................18

*United States v. Cole*,
491 F.2d 1276 (4th Cir. 1974) ...............................................................39

*United States v. Cunningham*,
423 F.2d 1269 (4th Cir. 1970) ...............................................................43

*United States v. Durham*,
319 F.2d 590 (4th Cir. 1963) .................................................................40

*United States v. Ecklin*,
528 F. App'x 357 (4th Cir. 2013) .........................................................42

*United States v. Head*,
697 F.2d 1200 (4th Cir. 1982) ...............................................................39

*United States v. Lott*,
751 F.2d 717 (4th Cir. 1985) .................................................................41

*United States v. North Carolina*,
180 F.3d 574 (4th Cir. 1999) .................................................................45

*United States v. Parodi*,
703 F.2d 768 (4th Cir. 1983) ......................................................... 12, 38

*United States v. Seck*,
48 F. App'x 827 (2d Cir. 2002) .............................................................40

*United States v. Seeright*,
978 F.2d 842 (4th Cir. 1992) .................................................................41

*United States v. Susi*,
378 F. App'x 277 (4th Cir. 2010) ...........................................................11

*United States v. Villarini*,
238 F.3d 530 (4th Cir. 2001) ......................................................... 39, 43

# TABLE OF AUTHORITIES
### (continued)

Page(s)

*United States v. Wheeler*,
    444 F.2d 385 (10th Cir. 1971) ..........................................................40

*United States v. Wilkerson*,
    84 F.3d 692 (4th Cir. 1996) ...............................................................46

*Univ. of Pittsburgh v. Varian Med. Sys., Inc.*,
    561 F. App'x 934 (Fed. Cir. 2014) .............................................. 54-55

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ................................................. 52, 53

*W. Union Co. v. MoneyGram Payment Sys., Inc.*,
    626 F.3d 1361 (Fed. Cir. 2010) .......................................................33

*Willingham v. Crooke*,
    412 F.3d 553 (4th Cir. 2005) .............................................................21

*ZF Meritor, LLC v. Eaton Corp.*,
    696 F.3d 254 (3d Cir. 2012) .............................................................64

*Zygo Corp. v. Wyko Corp.*,
    79 F.3d 1563 (Fed. Cir. 1996) ..........................................................55

## **Rules**

Fed. R. Civ. P. 37(c)(1) .........................................................................59

Fed. R. Evid. 103(d) .............................................................................11

Fed. R. Evid. 611(a) .............................................................................44

Fed. R. Evid. 614(b) .............................................................................39

## STATEMENT OF RELATED CASES

On April 7, 2014, the Court issued an order denying a Petition For Allowance Of An Interlocutory Appeal, filed by Plaintiff Rembrandt Social Media, LP. *See Rembrandt Social Media, LP v. Facebook, Inc.*, 561 F. App'x 909 (Fed. Cir. 2014) (Prost, O'Malley, Taranto).

On July 7, 2014, the Patent Trial and Appeal Board ("PTAB") instituted *inter partes* review of all asserted claims of U.S. Patent No. 6,415,316. Those proceedings are ongoing before the PTAB, and a decision is expected in 2015. *See Facebook, Inc. v. Rembrandt Social Media, LP*, Case No. IPR2014-00415 (PTAB) (Patent 6,415,316).

# INTRODUCTION

Plaintiff Rembrandt Social Media, LP, a non-practicing entity, is the owner by assignment of two patents that allegedly claim two minor features added to Facebook's website in 2009.  The district court properly excluded Rembrandt's deeply flawed damages theory, and the jury found that the asserted patents were invalid and not infringed.  Rembrandt now advances a plethora of meritless challenges to the judgment below, but cannot show reversible error.

Despite ample record support for the jury's noninfringement and invalidity findings, Rembrandt asserts that the jury's verdict lacked substantial evidence.  But Rembrandt's own evidence is sufficient to justify the verdict; Facebook's additional evidence simply confirms that conclusion.  Rembrandt's invitation to second-guess the jury's factfinding by reading new limitations into the uncontested claim construction is waived, inappropriate, and meritless.

Also waived and baseless is Rembrandt's attempt to win a new trial before a new judge by exploiting a few insignificant questions that the district judge asked a Facebook witness in order to clarify a confusing and highly technical record. Those questions were entirely proper, did not prejudice Rembrandt, and were unnecessary to the jury's verdict.  Moreover, any conceivable prejudice was cured in multiple ways—including an explicit charge to the jury not to infer any

significance from the court's questions.   Rembrandt's questionable blame-the-judge tactic should be rejected.

Rembrandt also cannot show that the district court abused its discretion by precluding Rembrandt's invalidity expert from redefining a claim term "in a manner inconsistent with" the court's claim construction.  A33.  The court properly found that such testimony "is not relevant and likely to cause jury confusion." A34.

Finally, Rembrandt asserts that the district court abused its discretion by excluding Rembrandt's prejudicial damages theory and by preventing Rembrandt from introducing a new damages theory on the eve of trial.  This Court need not reach those rulings, but they were fully consistent with precedent and well within the district judge's sound discretion.

## COUNTERSTATEMENT OF THE ISSUES

**I.**    Whether substantial evidence supports the jury's finding that Facebook did not infringe the asserted claims.

**II.**    Whether substantial evidence supports the jury's finding that the asserted claims are invalid.

**III.**    Whether the district court acted within its discretion in denying Rembrandt a new trial based on the court's clarifying questions to a Facebook trial witness, where (1) Rembrandt did not timely object to the questions, (2)

Rembrandt was permitted to cross-examine the witness and introduce rebuttal evidence, and (3) the jury was instructed not to assume that the questions reflected the court's views.

IV.    Whether the district court acted within its discretion in excluding testimony by Rembrandt's invalidity expert that was inconsistent with the court's unchallenged claim construction.

V.    Whether the district court acted within its discretion in (1) excluding the testimony of Rembrandt's damages expert for failing to apportion his damages base and rate to the allegedly infringing technology and failing to perform a necessary analysis tying customer surveys with damages, and (2) disallowing a new damages theory late in the case after carefully weighing all the factors required under Fourth Circuit law.

## COUNTERSTATEMENT OF THE CASE AND FACTS

**A.    The Relevant Technology.**    Facebook provides a free Internet-based service through its web address, <http://www.facebook.com>, as well as various mobile platforms.    A60; A10634; A10760.    Users logging into Facebook can access web pages and use numerous components of the website that allow users to share photos, videos, and information about themselves; receive updates on recent activities that have occurred on Facebook; or create pages for businesses and groups.    A60.    Facebook has developed and introduced these components over

time.  *See* A60.  For example, in 2006 Facebook introduced the component known as "News Feed," which displays updates, known as "stories," of the recent activities that have occurred on Facebook.  A60; A10683; A10689-90.  Another component, "Timeline," displays basic information about each user and a history of his or her activities on Facebook; Facebook introduced this functionality before 2009 under its former name, "Wall."  A60; A10682; A10716; A10738.  Facebook users before 2009 could also upload photos and specify privacy settings.  A10716.

Rembrandt is the owner by assignment of two patents, U.S. Patent Nos. 6,415,316 (the "'316 patent") and 6,289,362 (the "'362 patent").  A55; A75-113; A114-143.  Rembrandt sued Facebook in the Eastern District of Virginia, claiming that two minor technologies added to Facebook's software in 2009—known as BigPipe and Audience Symbol—infringe the '316 and '362 patents when used in conjunction with certain components of Facebook, including Timeline and News Feed.  There is no dispute that those components of the website successfully and independently existed on Facebook before the allegedly infringing add-on technologies were introduced in 2009, and that Facebook's mobile applications continue to provide those components today without infringing.  A69; A10715-16.

**BigPipe.**    BigPipe is a software program developed by Facebook and introduced in 2009 that optimizes the speed at which portions of certain Facebook pages are delivered from Facebook's server to computer users' web browsers.

4

A61; A10749; A10762. BigPipe does not deliver Facebook pages to applications for smartphones and tablets, and Rembrandt does not contend that those mobile applications infringe. A10713. It is undisputed that BigPipe is "necessary" to all of Rembrandt's infringement theories. A10713-15; *see also* A61; A69; A4031. BigPipe does not affect what content is displayed on any Facebook web page; rather, it merely decreases the time—on average, by less than a second—for portions of a Facebook page ("pagelets") to appear on a user's computer screen in an interactive manner. *See* A10636; A10762; A10765; A10776; *see also* A4031; A4053.

BigPipe's code is sent to the user's browser, where it acts as a "transfer mechanism" for pagelet information (in the form of HTML computer code created at Facebook's server) to pass to the web browser on the user's computer. A10716; A10765. BigPipe has no other role. *See* A10718 ("Once [BigPipe] passes the pagelet, it's essentially done with that."). It does not generate Facebook content. A10768. The browser must then "parse" (translate) the HTML instructions and request content data—such as images and stories—and page design instructions from Facebook's server. *See* A10721-22; A10766. The additional content data and page design are sent directly from Facebook's server to the browser, bypassing BigPipe. A10722. Only then does the browser have sufficient content and page design to assemble a cohesive Facebook page for display on the user's computer.

A10722; A10724.    The process is illustrated in the following demonstrative exhibit:



A16468.

The HTML code that BigPipe hands to the browser does not form a fully integrated Facebook page.    Rather, it forms a "broken" Facebook page—a page lacking content, such as messages and images, and page design, such as formatting and font.  *See* A10768.  A broken Facebook page is shown below:



A16044.  Facebook users would see a broken page if they could view exactly what came out of BigPipe.  A10723-24.  The browser, not BigPipe, retrieves the missing content and design information to assemble the fully formed webpage.  *See* A10722-23.  A fully integrated Facebook page is shown below:



A16045.

**Audience Symbol.**   Audience Symbol, also introduced in 2009, is a small graphical icon displayed on certain Facebook pages that signifies the audience of users allowed to view individual stories.   A62; *see also* A10635; A10731.   As with BigPipe, Rembrandt's infringement expert admitted that Rembrandt's infringement theories depend on the display of Audience Symbol on preexisting stories.   A61; A10715.

**B. Rembrandt's Lawsuit.** Rembrandt asserted BigPipe and the display of Audience Symbol infringed dependent claims 4, 20, and 26 of the '316 patent and dependent claim 8 of the '362 patent. *See* A207; A10624. In particular, Rembrandt accused BigPipe of qualifying as the "diary program" claimed by the '316 patent and the "applet" claimed by the '362 patent. A10713-14. In addition, Rembrandt accused Audience Symbol of providing the "privacy level information" claimed by the '316 patent, as well as the "restriction" on presentation of an object claimed by the '362 patent. A10683; A10706.

The parties stipulated to definitions for most of the relevant claim terms. A145-48; A12939-41. The district court construed the remaining, disputed terms in Rembrandt's favor. *Compare* A13158-59, *with* A148.

**1. Motions *In Limine*.**

The district court excluded testimony of Dr. Jennifer Golbeck, Rembrandt's infringement and invalidity expert, regarding the term "privacy level information." A32. Golbeck had sought to proffer opinions based on her own definitions of that term that differed from, and substantially narrowed, the court's claim construction. *See* A33. Finding Golbeck's challenged testimony "not relevant and likely to cause jury confusion," the court excluded that testimony pursuant to Federal Rule of Evidence 702. A34.

9

In addition, the district court excluded the expert report of James Malackowski, Rembrandt's damages expert, on two independent grounds. First, Malackowski's report failed to apportion damages to Facebook's revenue from BigPipe and Audience Symbol—the add-on technologies that Rembrandt claims give rise to the infringement—and instead calculated damages based on the entire perceived value of an array of Facebook components that can be used independently without infringing. A66-70. Second, Malackowski's opinion was inadmissible because it employed a "suspect and unreliable" methodology that assumed, without analysis, that survey results ranking the perceived "importance" of various Facebook components were a reliable proxy for Facebook's revenue from those components. A70-71.

The district court certified its ruling on Malackowski's damages opinion for interlocutory appeal. A12663-64. This Court denied review. A22-29.

**2. Trial.** A jury trial was held in June 2014 to address infringement and invalidity. A10624.

Rembrandt presents a highly misleading portrayal of the five-day trial, suggesting that the district court "biased the jury against Rembrandt." Br. 20. In fact, the proceedings were a textbook example of how district courts should manage highly technical trials to *prevent* unfair prejudice. Rembrandt deployed a strategy of injecting evidence and argument outside the relevant issues and

advancing a view of the claims-in-suit at odds with the court's claim construction. *See, e.g.*, A10641-44; A10646; A10677-78; A10771-73; A10777-78; A10831. Far from efforts to "undermine" witnesses or engage in "advocacy" (Br. 20, 21), the district court's interventions were a necessary response to improper conduct by Rembrandt.

For example, the district court interrupted Rembrandt's opening statement after Rembrandt's attorney made an improper "Golden Rule" argument by telling the jury that "if you or a family member or close friend ever found yourself trying to protect an idea that you created from someone else using it without your permission, you might find yourself bringing a similar case in front of a jury just like this." A10627.[1]  And the court interrupted the opening statements of *both* parties to ensure that they were not veering beyond evidence that would be admitted. A10628; A10629; A10632; A10634; *see also* Fed. R. Evid. 103(d) ("the court must conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means").

The district court also asked several clarifying questions (without objection from Rembrandt) when Rembrandt, in an obvious play to the jury's sympathy,

---

[1] "'Such an argument is universally recognized as improper because it encourages the jury to depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence.'" *United States v. Susi*, 378 F. App'x 277, 283 n.5 (4th Cir. 2010) (per curiam) (unpublished) (citation omitted).

elicited testimony from the late inventor's widow and a former colleague that they were testifying "to honor Jos' legacy" and to describe "experiences with . . . him." A10648; A10658. Rembrandt's questioning concealed the relevant fact that the inventor's widow stood to collect a portion of any money judgment for Rembrandt. *See* A10667. The court's clarifying questions merely reflected the fact that Facebook would be prejudiced by its understandable reluctance to cross-examine the inventor's widow and former colleague on their financial motives after their sympathy-seeking testimony, as well as the need to avoid leaving the jury with the misimpression that the witnesses had no financial stake in the outcome.[2]

In a particularly trifling episode, the district court, Golbeck, and Rembrandt's counsel engaged in a "lighthearted" exchange (A12651) about the inventors of the Internet. A10674-75. Rembrandt now suggests that this fleeting banter "only served to embarrass" its expert (Br. 21), but Rembrandt never raised that objection at trial. The district court also asked several questions that helped to establish Golbeck's credentials in a favorable light. *See* A10670-71.

At times, the district court appropriately intervened to focus the testimony on the relevant issues—patent infringement and invalidity—or to prevent delay. For example, the court questioned Rembrandt's attempt to elicit testimony on how

---

[2] In the Fourth Circuit, "it is entirely proper for the district judge to intervene with pertinent questions" when "there is a seeming inadequacy of examination or cross-examination by counsel." *United States v. Parodi*, 703 F.2d 768, 775 (4th Cir. 1983) (quotation marks omitted).

the late inventor and his widow met (A10639), and the diary she kept as a teenager (A10646). Other times, the court interrupted whenever counsel *for either side* coached or led witnesses (A10652; A10672; A10687; A10707), asked compound questions (A10651; A10683; A10693; A10714; A10723; A10800; A10813), failed to lay an evidentiary foundation for questions (A10639-40), or departed from the question-and-answer format (A10689; A10692-93; A10694; A10701; A10719; A10721). Rembrandt tallies these instances in asserting that the court interrupted Rembrandt more frequently than it interrupted Facebook (Br. 21-22), but ignores the court's legitimate *reasons* for intervening. Rembrandt also overlooks the many times the court overruled Facebook's objections, belying any appearance of favoritism. *See*, *e.g.*, A10647-48; A10650; A10651; A10674; A10676; A10681-82; A10711-12; A10775; A10776; A10807; A10830-31.

Much of the trial concerned whether BigPipe or the user's browser performed the step of assembling a cohesive diary page. Golbeck testified that "BigPipe is used to assemble all the parts of" Timeline and News Feed into a "cohesive whole." A10683. She admitted, however, that the HTML code that emerged from BigPipe, if displayed before the browser could retrieve additional resources from Facebook's server, would appear as a *broken* Facebook page. A10723-24.

Rembrandt challenges a few questions that the district court asked of Stefan Parker, a Facebook engineer proffered as a percipient witness to explain in detail how BigPipe operates. Parker responded affirmatively when the court asked whether it would be "fair then to say that the browser assembles a cohesive diary page but BigPipe sends to the browser instructions on how to do it." A10769. Rembrandt belatedly asserted that this questioning was "prejudicial" because Parker was "using words" that were "construed by the Court" (A10772), and moved for a mistrial (*see* A10820). The court denied the motion, noting that it asked the question "for the purpose of clarifying matters," but nevertheless allowed Rembrandt to recall Golbeck to rebut Parker's testimony. A10823. The court also instructed the jury not to assume that the court's questions reflected its views on the merits. A10868.

The jury found the asserted claims not infringed and invalid. A3-4. The district court denied all post-trial motions. *See* A12635-61.

## SUMMARY OF ARGUMENT

The judgment should be affirmed.

**I.** Substantial evidence supports the jury's verdict of noninfringement. Based on Golbeck's testimony alone, the jury was entitled to find that BigPipe does not assemble a "cohesive diary page"—a page in which content data and page design are "fully integrated for display." Golbeck admitted that the HTML code

14

that BigPipe passes to the browser lacks the images, media files, and formatting information needed to generate the Facebook page, and that the *browser* must retrieve those resources directly from Facebook's server. There was substantial evidence for the jury to find that what emerges from BigPipe, if rendered on the user's system, generates only a broken Facebook page, not the "cohesive diary page" required by the claims-in-suit.

The jury was also entitled to reject Rembrandt's argument that BigPipe generates a "page definition." Only "information that completely defines the appearance of a page" satisfies this limitation (A147), and Rembrandt's expert admitted that the HTML code passed on by BigPipe lacks critical content data and page design needed to display a complete Facebook page. The user's browser retrieves those missing resources directly from Facebook's server, not from BigPipe.

**II.** Substantial evidence also supports the jury's invalidity verdict. The jury was entitled to find that the prior-art Renshaw reference taught every element of claim 8 of the '362 patent. David Klausner, Facebook's invalidity expert, walked the jury through each claim element and explicitly testified that the applet disclosed in Renshaw dynamically assembles the information that completely defines the appearance of a web page. Similarly, the jury was entitled to find that the combination of the Rasansky and Wang prior-art references taught every

15

element of the asserted claims of the '362 patent, and that a person skilled in the art would have been motivated to combine those references to achieve the claimed invention.

**III.** The district court did not abuse its discretion by denying Rembrandt's request for a new trial in light of a few questions that the court asked a Facebook witness. Those questions merely clarified a confusing and technical record, and moreover the court expressly instructed the jury not to assume the court's views based on its questions. There is no requirement that a lay witness must avoid using words or phrases that appear in the patent or claim construction, and Rembrandt had ample opportunity to question the witness on his answers and present rebuttal testimony. Rembrandt's one-sided portrayal of the trial cannot alter this conclusion; the court's conscientious supervision of the proceedings was necessary to prevent jury confusion and unfair prejudice. Rembrandt is not entitled to a new trial, let alone to the extraordinary remedy of reassignment to a new judge.

**IV.** The district court also did not abuse its discretion in excluding Golbeck's confusing and irrelevant testimony on "privacy level information." That testimony would have presented the jury with definitions for "privacy level information" that differed from, and significantly narrowed, the court's claim construction. Because such testimony would have been irrelevant and confusing, it was properly excluded.

16

**V.** In light of the jury's verdict, this Court need not address Malackowski's damages report and testimony. In any event, the district court did not abuse its discretion in excluding that evidence. Malackowski's testimony was unreliable and inadmissible because it included admittedly noninfringing aspects of Facebook's website in its base and rate for calculating a reasonable royalty, in violation of this Court's apportionment precedents. Malackowski's testimony was independently unreliable and inadmissible because he failed to perform the necessary analysis tying survey results to Facebook's advertising revenue. The district court acted within its discretion by disallowing a new damages theory late in the case; and regardless, Rembrandt failed to preserve its challenge to the court's exclusion of the underlying damages computation.

## ARGUMENT

## I. SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S NONINFRINGEMENT VERDICT

In rejecting Rembrandt's motion for judgment as a matter of law ("JMOL"), the district court ruled that "a jury chose to believe Facebook's testimony" and "not to believe or to accept the testimony of Rembrandt's witnesses." A12639. That ruling is unassailable.

### A. Legal Standard

Under Fourth Circuit law, this Court reviews *de novo* the district court's denial of JMOL, and must affirm if "'a jury, viewing the evidence in the light most

17

favorable to [Facebook], could have properly reached the conclusion reached by the jury.'" *Pregis Corp. v. Kappos*, 700 F.3d 1348, 1353 (Fed. Cir. 2012) (quoting *In re Wildewood Litig.*, 52 F.3d 499, 502 (4th Cir. 1995)).   JMOL "is not appropriate when 'there is substantial evidence in the record upon which the jury could find for [Facebook].'" *Id.*   JMOL will be granted for the party bearing the burden of proof "only in extreme cases," *Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 244 F.3d 1365, 1375 (Fed. Cir. 2001), where that party's evidence is "so overwhelming" that a jury could not properly disbelieve it, *Thornhill v. Donnkenny, Inc.*, 823 F.2d 782, 786 (4th Cir. 1987).

### B.    The Jury Properly Found The '316 Patent Not Infringed.

Substantial evidence supports the jury's finding that Facebook did not infringe the '316 patent.

#### 1.    "Fully Integrated For Display"

Asserted claims 4, 20, and 26 require the assembly of a "cohesive diary page" by combining "content data" and "page design." A110 (col. 23 l. 56-57). A "cohesive diary page" is "[a] diary page in which the content data and the page design are fully integrated for display." A145. There was "ample evidence" that BigPipe "did not perform the required steps and does not combine content dat[a] with page design to assemble a cohesive diary page." A12640.

The district court correctly ruled that the jury could have properly found noninfringement "even looking at Golbeck's testimony." A12642. Rembrandt's expert testified that "content data" are images and text, and that "page design" includes Cascading Style Sheets ("CSS") information—a web language that defines the style of the page, such as color and font. A10717-18. Thus, Rembrandt had to show that BigPipe combined content data and page design to form a diary page in which content data and page design are "fully integrated for display."

Golbeck testified that a single "line" of JavaScript code in BigPipe performed the "assembly" step. A10718. According to Golbeck, after that step is performed, BigPipe "passes the pagelet" to the browser, and she agreed that BigPipe does not "have any further role in rendering or displaying of the content." A10718. But Golbeck also admitted that the browser cannot assemble a complete Facebook page until it retrieves *additional* content data and *additional* page design data directly from Facebook's server—*after* BigPipe has completed its role. A10721-22. Thus, the jury could have found that the diary page is not "fully integrated for display" when BigPipe completes its role. As the district court explained, Golbeck's testimony established that "what BigPipe gives to the browser does not include the actual content data such as photos or videos or the page design information, including CSS information." A12642.

Other evidence independently supports the jury's verdict. Rembrandt relied heavily on an article by the Facebook engineer who created BigPipe. *See* A10459-65. The article describes how BigPipe works in eight stages: "[t]he first three stages are executed by the [Facebook] web server and the last four stages are executed by the [user's] browser." A10460. At trial, Parker explained each stage in detail (A10761-65), testifying that the *browser* (not BigPipe) retrieves the CSS resources needed to "visually make the page look and feel the way you would expect the page to look" (A10761), and the JavaScript resources needed to make the Facebook page "interactive" (A10764).

Rembrandt mischaracterizes Parker's testimony, asserting (Br. 30) that he admitted that BigPipe generates all of the "'resources'" needed to build a cohesive diary page. In fact, Parker agreed only that BigPipe generates an HTML file containing "*references*" to external content data and page design "that the *browser* needs to build the page." A10770 (emphases added). A "page that is content ready" is not "complete," Parker explained, because "[t]he browser would still need to do additional work." A10761. That testimony is entirely consistent with the jury's conclusion that it is the browser—not BigPipe—that retrieves external resources needed to "assembl[e]" a "cohesive diary page."

The jury was instructed (without objection) that it could "disregard" any expert's testimony "in part or in its entirety." A10868. Assessments of witness

credibility are the exclusive province of the jury. *See Presidio Components, Inc. v. Am. Technical Ceramics Corp.*, 702 F.3d 1351, 1359 (Fed. Cir. 2012); *Willingham v. Crooke*, 412 F.3d 553, 560 n.7 (4th Cir. 2005). There was ample basis for the jury to find that Golbeck's infringement testimony was not credible and/or was contradicted by other evidence. The centerpiece of her testimony was an engineering blog post by the Facebook engineer who invented BigPipe. A10459-65. But Golbeck ignored the portion of the post entitled "How BigPipe works," which showed that the steps describing the assembly of a Facebook page are performed entirely by the *browser*. A10460-61; *see* A10763-65. It is the browser that "downloads CSS," "downloads JavaScript resources," and "constructs [the] DOM tree"—the browser's method of storing HTML. A10460; *see* A10764. As the blog post explained, these steps "are executed by the browser" (A10460), not BigPipe; yet the jury did not hear this evidence until Parker took the stand for Facebook and explained the document in full. A10761-65.

Likewise, in discussing the same "assembl[y]" limitation, Golbeck simply ignored the court's definition of "cohesive diary page"—the very thing that must be "assembl[ed]" by BigPipe for there to be infringement. *See* A10690 (discussing only "page definition"). Golbeck thus failed to address the requirement that for BigPipe to infringe, it must assemble a diary page that is "fully integrated for display." A145.

Golbeck also ignored the court's construction that assembly of the cohesive diary page must occur "at the time of display." A148. A jury could properly find that display occurs in Facebook's system only after BigPipe has ceased to operate and the *browser* then retrieves the additional content and page design from Facebook's server necessary to display the page. Despite dismissing this limitation as a "linguistic argument" (A10837), Rembrandt has no coherent explanation for how BigPipe could infringe when it ceases operating well before the "time of display."

Golbeck also ignored CSS—a critical resource that defines the appearance of the Facebook page—until Facebook's counsel elicited it on cross-examination. A10717. On direct examination, Golbeck testified only that "page design"—one of the two categories of information that BigPipe must combine in order to infringe—consisted of the "template" into which BigPipe supposedly inserts pagelets. A10690. But on cross-examination, Golbeck admitted that "CSS is part of the page design" (A10718), and further admitted that the browser retrieves additional "CSS files"—and applies "page-level CSS" to "the whole Facebook page"—only "*after* BigPipe has handed off the initial HTML" to the browser. A10723 (emphasis added). The jury was entitled to conclude from these belated concessions that Golbeck had not been forthcoming on a critical issue, and to discount her testimony accordingly. *See Star Scientific, Inc. v. R.J. Reynolds*

*Tobacco Co.*, 655 F.3d 1364, 1378 (Fed. Cir. 2011).   Thus, Rembrandt cannot show, as it must, that "'a jury, viewing the evidence in the light most favorable to [Facebook], could not have properly reached the conclusion reached by the jury.'" *Pregis*, 700 F.3d at 1353 (citation omitted).

### 2.    "Completely Defines"

The evidence also supports noninfringement on an independent ground: BigPipe does not generate a "page definition."   The '362 patent requires "an applet for dynamically generating a page definition" (A140 (col. 19 l. 64-65)), and the district court defined "page definition" as "[i]nformation that completely defines the appearance of a page" (A147).   Ample evidence showed that BigPipe does not "completely define[]" the appearance of a Facebook page; the browser does.

BigPipe cannot "completely define[] the appearance of a page" because it lacks necessary content data and page-design information.   Golbeck conceded that the browser (not BigPipe) downloads "additional CSS" resources (A10722; *accord* A10763-64), and that those resources control the "appearance" of the Facebook page:

> [Q:] So it's really about the way it will look, the appearance after the text comes in, correct?
>
> A. That's right.

A10717; *accord* A10760.    Because the appearance of a Facebook page is controlled by CSS resources that BigPipe cannot obtain, the jury easily could have found that BigPipe cannot generate a "page definition."

Golbeck testified that what qualifies as a "page definition" in the '362 patent "is the same as the technology" that "met the definition of cohesive diary page" in the '316 patent.    A10716.    But there is no dispute that after BigPipe performs its function, the browser must retrieve additional content data and page design directly from Facebook's server (not from BigPipe) before the fully integrated Facebook page can be displayed on the user's monitor.    A10721-23.    Specifically, Golbeck admitted that BigPipe would have to have the content data and page design in order to perform the required combining step that results in a "page definition" or "cohesive diary page":

> [Q:] But before the step of assembling a cohesive diary page by combining content data with page design, BigPipe has to have access to the page design, right?
>
> A.  It does.
>
> ***
>
> [Q:] If it didn't have the content data, it couldn't combine it with the page design; right?
>
> A. Correct.

A10718-19.    She also admitted that content data—images, videos, flash files, etc.—are retrieved by the *browser*.    A10722.    Similarly, Golbeck admitted that

what emerges from BigPipe lacks "the page-level CSS that applies to the whole Facebook page" (A10723), and that in order to display a complete Facebook page, the browser may need additional HTML code and CSS directly from Facebook's server (A10722-23). The jury therefore properly could find that because BigPipe does not "completely define[]" the page, but instead leaves the browser to "fetch" (A10722) the necessary content and format information elsewhere, BigPipe cannot infringe.

Rembrandt's argument that the jury's finding is inconsistent with the patent specifications (Br. 29) is a thinly disguised attempt to read additional limitations into the court's claim construction. The argument is waived. *See Solvay S.A. v. Honeywell Int'l Inc.*, 742 F.3d 998, 1004 (Fed. Cir. 2014). Indeed, when Golbeck attempted to redefine construed terms by reference to the specification (A10829-31), the court ruled that neither side's experts "may dispute or disagree" with the court's construction "or try to indicate that it has some gloss on it." A10831. The court expressly offered that "[i]f the parties need further definition of a claim, I will do that," but Rembrandt's counsel demurred (A10831), thereby leaving the construction for the jury to apply. Thus, Rembrandt may not now attempt to limit the "page definition" construction by reference to the specification.

Rembrandt's specification argument is also meritless. The '362 patent's specification shows only a "browser" performing the step of "downloading the

[content] objects" needed to "generate web pages."  A136 (col. 11 l. 1-4); *see also* A132 (col. 4 l. 10-13).  It does *not* show a browser downloading CSS and other page design information, as the browser in Facebook's system does.  Rather, the claimed applet or diary program has *already* obtained the formatting information.  *E.g.*, A135 (col. 10 l. 23-27).  An applet or diary program obviously cannot generate a "page definition" that "completely defines the appearance of a page"— or a "cohesive diary page" in which "the content data and the page design are fully integrated for display"—when it has not even downloaded the page-design information that controls the appearance of that page.

### C.    The Jury Properly Found The '362 Patent Not Infringed.

Substantial evidence also supported the jury's finding that Facebook did not infringe the '362 patent.  The sole asserted claim of the '362 patent, claim 8, depends from claim 1, which recites "an applet for dynamically generating a page definition for the presentation of the object."  A140.  The claimed "applet" is "[p]rogram code in any downloadable code format" (A146), and has "the same roles and requirements" as the '316 patent's "diary program" (A7688; *see* A10705).  The "page definition" that the applet must generate is "[i]nformation that completely defines the appearance of a page."  A147.  Rembrandt admits that the same infringement analysis regarding BigPipe "applied equally" to both patents (Br. 33) and that the "'316 diary program and the '362 diary applet are the same"

(A7688).    Likewise, Golbeck testified that BigPipe was necessary to her infringement theories for both patents.  *See* A10716.

The "same reasons" that support noninfringement of the '316 patent also support noninfringement of the '362 patent.  A12644; *accord* Br. 33.  Specifically, as shown above (pp. 23-26), a jury was entitled to find that BigPipe does not "completely define[] the appearance of a page," as required by claim 1 of the '362 patent (A140; A147).  Rather, it simply transfers the pagelet HTML it obtained from Facebook's server to the browser—and the *browser* then creates the DOM tree and downloads the additional content data and CSS resources needed to completely define the appearance of the page.  A10764-65.  Thus, as the district court correctly ruled, "the jury could find that BigPipe, at the time it transmitted information to the browser, did not actually have the information necessary to generate a page definition."  A12645.

In order to show infringement of the '362 patent, Rembrandt also had to satisfy claim 1's limitation of an "annotated universal address" ("AUA") that is "present in an AUA database containing at least one AUA."  The district court construed "annotated universal address" to mean "[i]nformation consisting of the universal address and one or more annotations associated with it" and "universal address" to mean a "Uniform Resource Locator (URL)."  A146.  An "AUA database" means "[a] collection of one or more AUAs."  A146.

Golbeck admitted that Facebook does not literally infringe the "AUA database" limitation because "[i]n the Facebook databases, there are no URLs." A10725; *see* A10703. Rembrandt therefore relied on the doctrine of equivalents, asserting that Facebook had an "AUA database" equivalent because its server generated URLs based in part on unique codes, known as Facebook IDs or FBIDs, that Facebook creates and stores in a database. A10703.

"To support a finding of infringement under the doctrine of equivalents, a patentee must provide particularized testimony and linking argument with respect to the 'function, way, result' test." *Cephalon, Inc. v. Watson Pharm., Inc.*, 707 F.3d 1330, 1340 (Fed. Cir. 2013). That test required Rembrandt to prove that "the element of the accused device at issue performs substantially the same function, in substantially the same way, to achieve substantially the same result, as the limitation at issue in the claim." *Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1016 (Fed. Cir. 1998). Because the jury found noninfringement, it is presumed to have resolved all factual disputes in favor of Facebook. *See DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1252 (Fed. Cir. 2014).

Golbeck argued only that Facebook's FBID database and the claimed AUA database were not substantially different because their *output* would "look[] the same" to users. A10704. But the jury was entitled to disbelieve this generalized testimony, or find it insufficient to prove that the two systems performed "the same

function" in "substantially the same way." For example, Golbeck admitted that FBIDs had no function outside of the Facebook system in the way that URLs do—URLs by definition are a "*universal*" means of linking to content, whereas FBIDs are not. *See* A10726; *see also* A12647.

Similarly, the jury could have properly found that undisputed differences between Facebook's FBID database and the claimed AUA database were "substantial." Br. 15, 33. Golbeck admitted that "Facebook code" is needed to "split" a URL linking to Facebook content into "different parts," and that the only part "stored within the Facebook system"—the FBID—does not meet the "very technical definition of what a URL is." A10726. The jury was not required to find these differences "insubstantial."

This Court has repeatedly held that "[g]eneralized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice" to satisfy the doctrine of equivalents. *Gemalto S.A. v. HTC Corp.*, 754 F.3d 1364, 1374 (Fed. Cir. 2014). The district court correctly denied Rembrandt's JMOL motion.

## II.    SUBSTANTIAL EVIDENCE SUPPORTS THE JURY'S INVALIDITY VERDICT

### A.    The Jury Properly Found The '362 Patent Invalid.

Substantial evidence supports the jury's finding that claim 8 of the '362 patent is invalid over the prior-art Renshaw reference (A8228-40). Facebook's

invalidity expert, David Klausner, testified that Renshaw teaches a Java applet that is sent from a server to a user's computer, where it displays multiple "embedded" web pages on the user's screen. A10800-01. With respect to claim 1, Klausner testified that "each page is dynamically generated by the applet that's taught by Renshaw." A10801. And with respect to dependent claim 8—the asserted claim—Klausner testified that Renshaw "by itself" performed the element of disclosing at least one content-provider-authored restriction concerning subsequent presentation of the object. A10804. Thus, Klausner testified, "Renshaw does perform every single element of Claim 8, including Claim 1." *Id.*[3]

There was "ample evidence on which to conclude that Renshaw disclosed all the limitations of Claim 8." A12647. Klausner "was cross-examined," as the district court noted, and "[t]he jury could choose to believe him." A12648. Moreover, Klausner testified that "the Renshaw applet generates a page definition as defined by the claim construction that the Court adopted," a term that the parties "stipulated to." A12648.

Rembrandt's only substantive argument (Br. 37) is that "Klausner never testified that the Renshaw applets generate a new *page definition*." But Klausner

---

[3] Rembrandt does not dispute that Renshaw disclosed "at least one content provider authored restriction concerning subsequent presentation of the object." A141 (claim 8). Accordingly, any contrary argument with respect to that limitation is waived.

answered affirmatively and without reservation when asked point-blank whether

the Renshaw applet generated a page definition.

> Q. For Element lD, did you also find Renshaw disclosed transmitting to the client the presentation context, the AUA, and **an applet for dynamically generating a page definition** for the presentation of the object, **page definition being generated from the presentation context and the AUA**?
>
> A. **Yes.**

A10803 (emphases added). Klausner also testified:

> Q. Based on your analysis, did you form an opinion as to whether or not Renshaw discloses the transmission of the **applet that generates the page definition of Claim 1**?
>
> A. I have.
>
> Q. And what's that opinion?
>
> A. **That Renshaw by itself does perform this element of the claim.**

A10804 (emphases added). Rembrandt thus lacks any good-faith basis for

asserting that Klausner "never testified" to this effect. Br. 37. The jury was

entitled to accept Klausner's testimony on its face, and that testimony constitutes

substantial evidence supporting the jury's finding that claim 8 of the '362 patent is

invalid.

Klausner's testimony was fully consistent with Renshaw. Renshaw teaches

an applet that receives an "HTML file" from the server, "parses and renders the

HTML instructions," and "render[s] text and an accompanying image to the

screen" of the user's computer. A8237. Renshaw's applet thus generates a "page definition" in the form of "information that completely defines the appearance of the page." A147.

Rembrandt argues (Br. 36) that Renshaw's applet "merely" displays web pages generated at the server, without generating page definitions at the user's computer, but that argument is nonsensical. Renshaw's applet *necessarily* generates a page definition when it transforms HTML instructions into a representation of a fully-integrated web page. *See*, *e.g.*, A10803 (Klausner: "So that applet that is sent out of the HTML database can by itself create dynamically what is shown in the web page"). The output of Renshaw's applet is no less "information that completely defines the appearance of a page" (A147) than is a server-generated HTML file. The district court's construction of "page definition" does not even mention HTML, much less exclude the generation of a visual representation of a fully-integrated web page. Rembrandt cannot overcome the jury's invalidity verdict by attempting to modify the claim constructions.

In any event, Klausner's testimony (A10810-13) refutes Rembrandt's "page definition" argument. He testified that Renshaw "can build web pages" (A10811), that the "dimensions" of the page "are part of how the page will appear" (A10813), and that those dimensions are supplied by Renshaw's applet:

> Q. And the dimensions that are part of the page that is appearing --
> those aren't coming from the applet in Renshaw, are they?

32

A. **They are. They are inputs of the applet and the applets draw the web page.**

A10813 (emphasis added).  Thus, even under Rembrandt's modified construction of "page definition," Renshaw's applet would supply information that "completely defines the appearance of a page" (A147), thus anticipating the '362 patent's applet.

## B.    The Jury Properly Found The '316 Patent Invalid.

Substantial evidence also supported the jury's finding that asserted claims 4, 20, and 26 of the '316 patent are invalid as obvious over the prior-art Rasansky (A8163-8210) and Wang (A8211-27) references.

Obviousness is a legal question based on underlying facts.  *W. Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1369 (Fed. Cir. 2010).  Underlying facts include "'(1) the scope and content of the prior art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in the art; and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others.'"  *Id.* (citation omitted).  On appeal, this Court will "presume that the jury resolved the underlying factual disputes in favor of the verdict," and will "leave those presumed findings undisturbed if they are supported by substantial evidence."  *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1356-57 (Fed. Cir. 2012).  The ultimate

conclusion of obviousness is reviewed *de novo* in light of the presumed jury findings. *Id.*

Rembrandt's sole challenge to the jury's obviousness finding is that "neither Rasansky nor Wang" teaches a "diary program" that "[a]ssembl[es] the cohesive diary page" by generating a "page definition," as Rembrandt conceives those terms. Br. 37-38. But Klausner testified that the diary program and assembly steps were satisfied by "the Rasansky and Wang references *in combination*," and that a person of ordinary skill "would have had ample motivation to make the combination of these two" prior-art references. *See* A10788 (emphasis added); A10792-99.

The parties stipulated that a person of ordinary skill in the art "would possess at least a bachelors [degree] in information technology or computer science or equivalent degree or experience with at least two years of practical experience in computer programming and development and implementation of network-based systems, such as, for example, systems for communicating over the Internet or the web." A10872. Klausner explained that such persons would have known how to use "HTML, CSS, JavaScript or the Java programming language," develop "web server and web browser software," and use "off the shelf" software development kits. A10789. Rembrandt did not challenge this testimony. *See* A10813.

Klausner testified that Rasansky teaches an electronic calendar that is assembled at the server and sent over the Internet to the user. A10792. Rasansky "generates the HTML from the database and sends it over to the user's side." A10795. Rasansky's HTML, Klausner explained, includes content data in the form of calendar entries and an associated time. A10796; *see also* A8184. Klausner also testified that Rasansky's HTML contains page design in the form of "templates" that "determine[] the visual appearance" of the web pages. A10796; *see also* A8203 (col. 6 l. 27-29). Klausner testified that these content data and page design were "assembled from the database on the server side" (A10797) and "'delivered to each end user as standard HTML'" (A10795-96). Moreover, the assembled content data and page design defined a "cohesive diary page." A10797; *see also* A8198. Thus, Rasansky discloses all of the elements of the claim except assembly of content data and page design on the user system.

Wang supplies the missing step. Klausner testified that "Wang sends from the web server to the client the applet that draws and assembles the cohesive diary calendar, the page." A10797; *see* A10793-94. Moreover, the server also sends "the schedule, data storage, and group hierarchy information that feeds the client calendar." A10793-94; A8218 (col. 6 l. 16-18). Thus, by combining Rasansky's content data and page design with Wang's applet for performing the assembling step at the user's system, "we end up with a diary program, which is the Wang

applet, generating a cohesive diary page." A10794; *see also* A8213. Both Rasansky and Wang were filed before the filing date of the '316 patent, yet neither was before the examiner who allowed the '316 patent. *See* A75; A10792-93.

Klausner provided a detailed explanation for why a person of skill in the art would have been motivated to combine Rasansky and Wang. *See* A10794. Both patents described analogous and standard technology, he explained: "both references, Rasansky and Wang, are creating calendar programs from servers on clients." A10794. In addition, both HTML and Java applets "naturally work together," and a person of ordinary skill in the art can "just insert a line" in HTML script calling for a particular applet "and the applet will naturally be brought in," without the need to "cobble anything together." A10794. Indeed, Klausner explained that Wang itself provides motivation to combine its teachings with Rasansky by stating that "[i]n contrast to a web calendar implemented in HTML, the applet calendar of Wang provides flexibility and capability where HTML approach is lacking." A10794; *see also* A8218 (col. 6 l. 14-16). This is powerful evidence of a motivation to combine the teachings of Wang and Rasansky.

Despite this overwhelming evidence, Rembrandt argues (Br. 38) that Klausner never explained how Wang assembles content data and page design to form a cohesive diary page. But as noted, Klausner did explain how Rasansky teaches the combination of content data and page design to define a cohesive diary

page that is sent to the user. A10795-97. Klausner also explained that a person of skill in the art would have known how to use and apply HTML and Java programming language (A10789), and would have been motivated to combine the teachings of Rasansky and Wang (A10794). There was thus no need for Wang to spell out the generic steps that were known to persons of skill in the art; a patent "need not disclose or teach what is known in the art." *Hill-Rom Servs., Inc. v. Stryker Corp.*, 755 F.3d 1367, 1373 (Fed. Cir.), *cert. denied*, 135 S. Ct. 719 (2014). Rembrandt asserts that Klausner never identified a teaching for using Rasansky's templates to assemble a diary page, but Rasansky itself states that "such generic tasks as filling in HTML templates" are "lower level routines [that] are known to those of skill in the art." A8203 (col. 6 l. 29-31).

Rembrandt contends (Br. 39) that Klausner's testimony was insufficient because he supposedly never stated that Wang generates a "page definition." The argument ignores Klausner's explicit testimony that the combination of Rasansky and Wang teaches "assembling the cohesive diary page." A10796-97. Under the district court's claim construction, a "page definition" is "information that completely defines the appearance of a page" (A147), and thus Wang's applet, which (unlike Facebook's BigPipe) actually "assembles" a cohesive diary page (A10797), necessarily "completely defines the appearance of" that page. In any event, Klausner's testimony established that Renshaw disclosed "an applet for

dynamically generating a page definition." A10803. There was substantial evidence for the jury to find claims 4, 20, and 26 of the '362 patent obvious over the prior art.

## III. THE DISTRICT COURT'S CLARIFYING QUESTIONS TO A FACEBOOK WITNESS DO NOT NECESSITATE A NEW TRIAL

Rembrandt seeks a new trial before a different judge because the judge below supposedly asked prejudicial questions of a Facebook witness. Br. 43-48. That argument is both waived and meritless.

An appellant cannot claim error from evidence admitted at trial unless that party made a "specific" and "timely" objection "on the record." Fed. R. Evid. 103(a)(1). A "timely" objection must be "'at the time the evidence is offered.'" *United States v. Parodi*, 703 F.2d 768, 783 (4th Cir. 1983) (citation omitted). After the district judge asked the question of which Rembrandt chiefly complains (A10769), Rembrandt's counsel continued his cross-examination of Parker for several transcript pages without objecting to the court's questioning. A10769-70. Meanwhile, *Facebook's* counsel made three objections to Rembrandt's follow-up questioning of Parker, prompting a sidebar. A10770-71. Only at the end of that sidebar did Rembrandt's counsel remark that "[w]e're just worried" the court's questioning was "prejudicial." A10772. Because that statement was neither timely nor specific, Rembrandt's challenge to the court's questioning of Parker is waived.

Rembrandt's challenge is also meritless. "The conduct of a court in questioning witnesses is reviewed for abuse of discretion." *United States v. Villarini*, 238 F.3d 530, 536 (4th Cir. 2001). "A new trial is required only if the resulting prejudice was so great 'that it denied any or all the appellants a fair, as distinguished from a perfect, trial.'" *Id.*

This was a highly technical trial involving extended testimony on computer code. Parker was called, not as a paid expert, but as a percipient witness to explain how BigPipe works from the perspective of a Facebook engineer. The district court had both the right and the responsibility to interrupt periodically to clarify factual issues for the jury. Fed. R. Evid. 614(b); *see*, *e.g.*, A10771-72; A10805; A10823; A10868; A12651-53. It is "settled beyond doubt that in a federal court the judge has the right, and often an obligation, to interrupt the presentations of counsel in order to clarify misunderstandings or otherwise insure that the trial proceeds efficiently and fairly." *United States v. Cole*, 491 F.2d 1276, 1278 (4th Cir. 1974) (per curiam); *see also*, *e.g.*, *United States v. Head*, 697 F.2d 1200, 1212 (4th Cir. 1982) (no unfair prejudice from judge's 2,470 interruptions during five-day trial, where the "'obvious purpose in most instances was to clarify ambiguities or questions raised by the witness' testimony or the counsel's interrogation, which is permissible'") (citation omitted).

It was neither "highly unusual" nor improper for the court to ask Parker "leading questions" about the operation of BigPipe code. Br. 19. The court's questions were entirely appropriate "to develop the witness's testimony," Fed. R. Evid. 611(c), a matter committed to the trial court's sound discretion, *United States v. Durham*, 319 F.2d 590, 592 (4th Cir. 1963); *see also United States v. Wheeler*, 444 F.2d 385, 390 (10th Cir. 1971) ("The trial court may ask a leading question."); *United States v. Seck*, 48 F. App'x 827, 830-31 (2d Cir. 2002) (unpublished) (court's "leading" questions "appropriately sought to clarify factual ambiguities" in a "complex" case; "if anything, confusion that afflicts a significant trial issue is more, not less, deserving of clarification by the trial judge"). Indeed, Rembrandt's strategic decision to await Parker's answers to the court's questions before expressing concern several minutes later (A10769-72) shows that there was nothing inherently prejudicial in the questions.

Also baseless is Rembrandt's assertion that "the district court effectively testified through Mr. Parker." Br. 19. The court did no such thing. A trial judge "has wide latitude to assist juries by explaining, summarizing, and commenting on the evidence." *Seidman v. Fishburne-Hudgins Educ. Found., Inc.*, 724 F.2d 413, 417 (4th Cir. 1984). And although the court never expressed a view on the merits, a trial judge "may even 'express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination.'" *Id.*

Rembrandt argues that it was prejudicial for the district court to use the phrases "assembling a cohesive diary page" or "cohesive diary page," terms derived from the asserted claims. There was nothing improper or prejudicial in these questions, which plainly were designed to help the jury understand the operation of the accused systems. Rembrandt cites no authority for the proposition that asking clarifying questions of a percipient witness using words that appear in the patent or claim construction is grounds for a new trial. Quite the contrary, "a trial court may ask questions of witnesses to bring out needed facts or clarify the presentation of issues." *United States v. Seeright*, 978 F.2d 842, 847 (4th Cir. 1992). If lay witnesses had to avoid uttering any word or phrase appearing in the patent or claim construction, many patent trials would become even more confusing and unworkable.

In any event, Rembrandt grossly overstates the importance of Parker's testimony in describing his answers to the district court's questions as "[t]he pivotal moment" of the trial. Br. 18. As noted, there was substantial evidence for the jury to find non-infringement based on Golbeck's testimony alone. *See supra* 19. Thus, any conceivable error in the court's questioning of Parker would be harmless in light of the overwhelming evidence supporting the jury's verdict. *See United States v. Lott*, 751 F.2d 717, 721 (4th Cir. 1985) (trial judge's remarks were

not prejudicial where defendant's "conviction seems to have been foreordained with or without the judge's questions and comments").

Moreover, any prejudice was cured in multiple ways.  In the course of its questions, the district court encouraged Rembrandt's attorney to "[g]o right ahead" and ask follow-up questions of Parker.  A10770; *see also* A10771-72 (granting permission for Rembrandt's counsel to question Parker on his understanding of certain terms).  Rembrandt's attorney availed himself of the opportunity to cross-examine Parker further, obtaining an admission that Parker was not familiar with the court's claim construction.  A10773-74.  In addition, the court permitted Rembrandt to recall Golbeck to rebut Parker's testimony—an extraordinary remedy, given that Rembrandt had completed its case-in-chief.  *See* A10820-24; A10835-36; *see also United States v. Ecklin*, 528 F. App'x 357, 365 (4th Cir.) (unpublished) (no prejudice from court's judge's questioning where parties had "a chance to address any newly raised issues"), *cert. denied*, 134 S. Ct. 486 (2013). The district court also gave a curative instruction in the jury charge:

> In the course of the trial I occasionally asked questions of a witness. Do not assume that I hold any opinion on the matter to which my questions may relate or may have related.  The court asked questions to clarify matters, not to help one side or to hurt the other.

A10868.  Furthermore, the judge pointedly reminded jurors that "you are the sole judges of the credibility of the witnesses and the evidence and the weight their testimony deserves."  A10867; *accord* A10622.  These steps were more than

adequate to cure any possible prejudice.  *See Villarini*, 238 F.3d at 537; *United States v. Cunningham*, 423 F.2d 1269, 1276 (4th Cir. 1970).

Any impact from this questioning stemmed from Rembrandt's fixation on it, not from the questioning itself.  Rembrandt chose to make the court's questions the centerpiece of its closing argument, warning the jury in dramatic tones that Facebook was laying a "trap" to exploit Parker's answers.  A10855.  But Facebook never even mentioned the court's questioning of Parker in closing argument, because it was not the strongest evidence of non-infringement and thus was not important to Facebook's defense.  Rembrandt errs in suggesting (Br. 44 n.39) that Facebook's lack of emphasis on this testimony somehow shows its impropriety.  It shows only that Rembrandt's obvious attempt to win a do-over by mischaracterizing the district court's clarifying questions is completely misplaced.

Rembrandt also suggests that "numerous other interventions" by the district court "tilted the trial in Facebook's favor" (Br. 47), but makes no effort to show that these "other interventions" were improper, instead limiting its arguments on appeal to the questioning of Parker.  *See* Br. 2.  Accordingly, Rembrandt has waived any challenge to the trial court's "other interventions."  *See Conopco, Inc. v. May Dep't Stores Co.*, 46 F.3d 1556, 1561 n.1 (Fed. Cir. 1994).  And with good reason:  As the district court found, Rembrandt never objected to the court's "interventions" until *after* trial.  *See* A12650 (noting that this "certainly was not a

concern raised by Rembrandt during trial"). "If a party fails to object to the court's interrogation of a witness at trial, his objection will not be reviewed on appeal." *Stillman v. Norfolk & W. Ry. Co.*, 811 F.2d 834, 839 (4th Cir. 1987). Rembrandt has waived the issue.

It is irrelevant that the district court "interrupted" Rembrandt more than Facebook (Br. 21-22), where there is no showing that the interruptions were unjustified. *See supra* 10-13; *see also* Fed. R. Evid. 611(a)(1)-(2) (district courts "should exercise reasonable control over the mode and order of examining witnesses and presenting evidence" to "make those procedures effective for determining the truth" and "avoid wasting time"). Rembrandt also conducted more and longer examinations (totaling more than 360 transcript pages) than Facebook (approximately 171 pages), thus providing the court more opportunities to intervene. And Rembrandt undercounts the interruptions of Facebook's examinations, as where the court interrupted Facebook's questioning of Klausner to instruct the jury that demonstratives are "not exhibits that are admitted into the record." A10788. These "ordinary efforts at courtroom administration" were perfectly appropriate and belie any claim of bias. *Liteky v. United States*, 510 U.S. 540, 556 (1994).

Finally, Rembrandt asks in passing that the case be reassigned to a different judge in the event of a remand. Requests for reassignment are assessed under

regional circuit law, *see Lazare Kaplan Int'l, Inc. v. Photoscribe Techs., Inc.*, 714 F.3d 1289, 1298 (Fed. Cir. 2013), and the Fourth Circuit applies a three-factor test to such requests, *see United States v. North Carolina*, 180 F.3d 574, 583 (4th Cir. 1999). Because Rembrandt neither acknowledges nor attempts to satisfy that standard, its undeveloped reassignment request is waived. *See SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319-20 (Fed. Cir. 2006). There is no basis for reassignment in any event. Rembrandt has not shown that the district judge would have "substantial difficulty in putting out of his" mind any "previously expressed views." *North Carolina*, 180 F.3d at 583. (Indeed, there is no instance in the record in which the trial judge stated his view on the merits.) Nor is reassignment "advisable to preserve the appearance of justice." *Id.* Reassignment also "would entail waste and duplication out of proportion to any gain," *id.*, because it would require a different judge to become familiar with a record and issues that the original judge capably handled for more than two years. Rembrandt has not raised judicial bias as an issue on appeal, and the court's innocuous questioning of Parker "for the purpose of clarifying matters" (A10823) is a woefully inadequate basis for the extraordinary step of reassignment.[4]

---

[4] The distinguished district judge has been on the bench for decades in a patent-heavy district and has sat by designation on the Federal Circuit. *See, e.g.*, *Abbott Labs. v. Andrx Pharm., Inc.*, 473 F.3d 1196 (Fed. Cir. 2007); *Norsk Hydro Can.,*

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY PRECLUDING REMBRANDT'S INVALIDITY EXPERT FROM CHANGING THE CLAIM CONSTRUCTION

The district court properly precluded Golbeck from testifying to a theory of invalidity based on an impermissible claim construction.

### A. Legal Standard

"The risk of confusing the jury is high when experts opine on claim construction before the jury," *CytoLogix Corp. v. Vertana Med. Sys., Inc.*, 424 F.3d 1168, 1172 (Fed. Cir. 2005), and opinion testimony based on "an impermissible claim construction" should be excluded, *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1224 n.2 (Fed. Cir. 2006). This Court reviews a district court's evidentiary rulings under regional circuit law. *Sulzer Textil A.G. v. Picanol N.V.*, 358 F.3d 1356, 1363 (Fed. Cir. 2004). The Fourth Circuit reviews the exclusion of evidence for an abuse of discretion. *United States v. Wilkerson*, 84 F.3d 692, 696 (4th Cir. 1996).

### B. Golbeck's Alternative Claim Construction Was Confusing, Prejudicial, And Irrelevant.

The district court adopted the parties' stipulation that "privacy level information" means "[c]onfiguration information that describes or specifies which user(s) or categories of users are permitted to view particular content on a cohesive diary page." A146. The "privacy level information" can include access rights for

---

*Inc. v. United States*, 472 F.3d 1347 (Fed. Cir. 2006); *In re Pennington Seed, Inc.*, 466 F.3d 1053 (Fed. Cir. 2006).

an individual "user" *or* "categories of users."  A146.  Yet Rembrandt's expert, Golbeck, after independently reviewing the intrinsic record, sought to redefine "privacy level information" to exclude access rights for individual users.  She opined that "privacy level information" does not cover "access control based on passwords" (A1627 ¶25), controlled access to "data that can't be shared" (A33), or a database specifying that a particular page "may only be viewed by its owner" (A1652 ¶153).  Instead, she asserted, "privacy level information" requires that there must be "a 'rule' that 'indicates the metes and bounds of who has permission to view particular content.'"  A1627 n.1.

That definition, the district court found, improperly attempted to add a new limitation:  that the privacy level information must not merely identify which users are permitted to view particular content, but also "the universe of those who may and may not access certain content."  A34.  Golbeck's definition was *narrower* than the court's construction because it improperly excluded "privacy level information" that simply "describes a user who is permitted to view particular content."  A33, A34.  The district court did not abuse its discretion in excluding Golbeck's testimony in light of her alternative construction that "impermissibly alters and narrows" the court's claim constriction and was "not relevant and likely to cause jury confusion."  A34.  A district court must enforce its constructions at all stages of the litigation.  *See, e.g., Aero Prods. Int'l, Inc. v. Intex Recreation*

*Corp.*, 466 F.3d 1000, 1012 n.6 (Fed. Cir. 2006). Courts should "refuse[] to allow" experts to opine on claim construction, *CytoLogix*, 424 F.3d at 1172, particularly when those opinions differ from the court's constructions. The district court did not abuse its discretion in enforcing this common-sense rule; indeed, it would have been an abuse of discretion to do otherwise. *See Sulzer Textil*, 358 F.3d at 1367 (expert testimony "contrary to the district court's claim constructions" was "'invited error'").

Rembrandt confusingly argues that the district court, in excluding Golbeck's testimony, was somehow "ignoring the plain meaning of 'which' in the construction." Br. 42. But the word "which" does not imply, much less compel, the definition that Golbeck sought to advance. Rembrandt's entire argument, at bottom, is an impermissible attempt to redefine "information that describes or specifies which user(s) or categories of users are permitted to view particular content" to exclude prior-art systems identifying single users with access rights.

By its terms, the court's construction makes clear that the configuration information need only specify a *single user*; the term "user(s)" can be singular or plural. Rembrandt stipulated to that construction. A13156. Nowhere does the court's construction require the configuration information to specify the "metes and bounds" of the "class" of those who can and cannot view content. Br. 42.

As a last resort, Rembrandt returns to the patent, arguing that "privacy level" must signify "a category such as 'world, friend, close friend, best friend, and owner.'"  Br. 42 (quoting A103).  But this proposed categorical limitation is inconsistent with the claim as construed, which encompasses information describing "user(s) *or* categories of user(s)."  A146 (emphasis added).

Golbeck's attempt to gerrymander the claim construction around the prior art was clearly improper.  The court thus did not abuse its discretion in excluding her confusing and irrelevant testimony.[5]

## V.    MALACKOWSKI'S DAMAGES OPINION WAS PROPERLY EXCLUDED

This Court need not reach Rembrandt's remaining arguments on damages if it upholds either the noninfringement or invalidity verdicts.  *See Mirror Worlds, LLC v. Apple, Inc.*, 692 F.3d 1351, 1357 (Fed. Cir. 2012), *cert. denied*, 133 S. Ct. 2856 (2013).  Those arguments fail regardless.

### A.    The District Court Properly Excluded Malackowski's Unreliable, Prejudicial, And Legally Erroneous Damages Calculations That Were Based On The Value Of Noninfringing Components.

The district court properly excluded Malackowski's damages report as unreliable because it featured a fundamentally unreliable damages calculation.

---

[5]  Rembrandt's statement of issues asserts that in excluding Golbeck's testimony, the district court "read the term 'level' out of 'privacy level information'" in the '316 patent.  Br. 2.  Because that "issue" is not developed in Rembrandt's argument, it is waived.  *See SmithKline Beecham*, 439 F.3d at 1319-20.

**1.** In his damages calculation, Malackowski offered no opinion on what portion, if any, of Facebook's advertising revenue is attributable to the addition of BigPipe and Audience Symbol. A63-64. Rather, he calculated a supposedly reasonable royalty based on an estimate of the total revenue stream from every component of Facebook that utilizes the allegedly infringing add-on technologies—including Timeline and News Feed—as well as *additional* revenue from allegedly related offerings, such as Photo/Video Sharing, that he claimed are "inextricably linked" to Timeline and News Feed. *See* A63-64; A13414; A13420. But these components of the website go far beyond the BigPipe and Audience Symbol add-ons, and indeed were available (and still are available for mobile application users) without BigPipe. Thus, Malackowski's methodology was unreliable, prejudicial, and legally erroneous.

Malackowski began with Facebook's total revenues during the alleged period of infringement, which he discounted to exclude non-infringing mobile applications. A63; A13402-03. Next, Malackowski used the results of customer surveys as a "proxy" for advertising revenue from the accused features (A13419), concluding that over 65% of Facebook's total revenue should be included in the royalty base. A63; A13423.

Then, Malackowski proposed a range of 2.3% to 21.99% for a hypothetical royalty rate. A63. He estimated the lower end of that range based on royalties

from two licenses of supposedly similar technology (A760-61; A13468-69), and the upper end of the range by an "apportionment of Facebook's operating margin" from various features of the website that exist independently of BigPipe and Audience Symbol (A13464-65; *see* A762).   Malackowski purported to apply the factors for determining a reasonable royalty under *Georgia-Pacific v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), again assuming that revenues from components of Facebook that are not themselves alleged to infringe apart from the BigPipe and Audience Symbol add-ons provided the relevant royalty base.   *See* A13452-63.   He concluded that a reasonable royalty rate is 5-6%.  A63; A13470.

Finally, multiplying his estimated royalty rate and his estimated royalty base, Malackowski arrived at what he asserted is a "reasonable royalty" of ████ ████  A46; A13372; A13478.

Tellingly, BigPipe is mentioned only five times in Malackowski's 116-page report, and then only to establish the date of a hypothetical negotiation.  A13376, A13379-80, A13398, A13400.  Audience Symbol (also essential to infringement) is likewise barely mentioned.  A13379-80; A13398; A13400 ("story/post specific privacy levels").   Instead, the report focused on the relationship of various Facebook "features" to *Timeline* and *News Feed*—features such as:   Like (External); Share (External); Like (Internal); Share (Internal); Comment (Internal);

Photo/Video Sharing; Add Photos/Videos; Find Friends; Friend Request; and Photo Tagging. A13415-16; A13420. Given that Malackowki's damages calculation essentially ignored the add-ons that allegedly caused Facebook to infringe while improperly capturing the value of irrelevant "features" of the website, the court was within its discretion to exclude Malackowski's damages opinion as unreliable. A70; *see also EEOC v. Freeman*, 778 F.3d 463, 469 (4th Cir. 2015) (Agee, J., concurring) ("[C]ourts have consistently excluded expert testimony that 'cherry-picks' relevant data.").

**2.** Indeed, it would have been legal error for the district court *not* to exclude Malackowski's opinion. "[A] patentee 'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features.'" *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). Here, however, Malackowski's royalty base and rate included the entire value he assigned to News Feed, Timeline, Groups, and Photo/Video Sharing, without any effort to limit the base or rate to revenues attributable to BigPipe and Audience Symbol on those pages. A66-70; A13414-20; A13469. This violated "settled principles of apportionment" and thus was properly not "allowed to reach the jury." *VirnetX*, 767 F.3d at 1328; *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1233 (Fed. Cir. 2014).

In limited circumstances, patentees are permitted to base royalties on the smallest salable patent-practicing unit. *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). But identifying damages associated with the smallest salable patent-practicing unit "is simply a step toward meeting the requirement of apportionment." *VirnetX*, 767 F.3d at 1327; *see also id.* at 1329 (damages base that "still contains significant unpatented features" requires further apportionment); *accord Garretson*, 111 U.S. at 121; *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1337 (Fed. Cir. 2009). In all cases, it is "essential" that "the ultimate reasonable royalty award must be based on the incremental value that the patented invention adds to the end product." *Ericsson*, 773 F.3d at 1226.

There is no dispute that Facebook currently provides News Feed, Timeline, Groups, and Photo/Video Sharing through mobile applications without infringing. *See* Br. 52-53; A69; A10713. And there is no dispute that only BigPipe and Audience Symbol (added in 2009) are what distinguish the allegedly infringing versions of these Facebook web pages from previously (and currently) existing versions of the same pages that do not infringe. A61-62; A69; A4031; A10713-14; A10715. Thus, BigPipe and Audience Symbol are merely improvements added onto the non-infringing Facebook platform, and Rembrandt's damages theory was required to measure "'in what particulars [the] improvement has added to the usefulness of the machine or contrivance.'" *Lucent*, 580 F.3d at 1337 (citation

omitted).  Malackowski failed to do this, and his opinion testimony was therefore inadmissible.

**3.**  Rembrandt's contrary arguments are unavailing.  The district court did not require Malackowski to apportion to a "subset of the claimed invention," as Rembrandt asserts.  Br. 51.  Instead, the court required apportioning the royalty base to include the add-on technologies Rembrandt identified as infringing (BigPipe and Audience Symbol) *as they are used by the accused pages*:  Timeline, News Feed, Photo/Video Sharing, and Groups.  Basing a damages calculation on anything broader, as the court recognized, would necessarily include noninfringing components of those pages, would not reflect the incremental value provided by the claimed invention, and thus would violate the apportionment requirement.

This Court's decision in *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286 (Fed. Cir. 2014), provides no support for Rembrandt's arguments.  This Court reversed the exclusion of Apple's damages expert because the district court (1) had relied on an incorrect claim construction and (2) did not focus on the "full scope of infringement."  *Apple*, 757 F.3d at 1317.  Neither ground is applicable here. Indeed, Rembrandt's posture here is the reverse of Apple's:  Malackowski's apportionment went *beyond* the theory of infringement to encompass many non-infringing features.  *Cf. Univ. of Pittsburgh v. Varian Med. Sys., Inc.*, 561 F. App'x

934, 947 (Fed. Cir. 2014) (nonprecedential) ("Pitt is not attempting to include the value of *unpatented* features within its royalty base.").

The district court did not decide that the pre-2009 Facebook system was a "viable non-infringing substitute," as Rembrandt asserts. Br. 53. Instead, the court simply found that Malackowski's damages calculation was "unreliable" and "prejudicial" because it is *undisputed* that the four Facebook components on which he based his calculation do not infringe without the BigPipe and Audience Symbol add-ons. A69. Rembrandt's reliance on *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563 (Fed. Cir. 1996), is therefore misplaced.

The district court properly recognized that Rembrandt's apportionment did not go far enough, and that allowing that analysis to reach a jury "would be a mistake of the same kind as allowing Rembrandt's expert to use the entire value of Facebook." A67-68. The exclusion of Malackowski's prejudicial and unreliable opinion was thus correct as a matter of law and within the court's sound discretion.

**B.    The District Court Properly Excluded Malackowski's Damages Theory Because It Relied On Consumer Surveys That Were Not Tied To Damages.**

Independent of Malackowski's unreliable damages calculation, the district court properly excluded Malackowski's damages report as unreliable because the royalty-base calculation was premised entirely on customer surveys that Malackowski never tied to damages. *See* A12663.

55

Malackowski relied on the results of three surveys—two of Facebook users and one of advertisers—taken by other Rembrandt experts. A13416. In those surveys, respondents were asked to rank the "relative importance" of various components of the Facebook website as a percentage (*see* A13417-19), which Malackowski then averaged across the three surveys (A13423). Malackowski then simply assumed that the weighted average percentage was a "proxy" for the percentage of Facebook revenue that each component generates. A13419. Tellingly, the list of components surveyed did not include BigPipe and Audience Symbol. Adding up the percentages from the survey results for each component, Malackowski concluded that an outlandish "65.22% of demand for Facebook is driven by" the surveyed components that are allegedly infringing or "convoyed" with the infringing components, without ever assessing the perceived "importance" of the BigPipe and Audience Symbol add-ons to customers. A13423; A13426.

Expert testimony must be the product of "reliable principles and methods," Fed. R. Evid. 702(c), and must be "more than subjective belief or unsupported speculation," *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 590 (1993). Yet Malackowski's royalty-base calculation was "connected to existing [survey] data only by the *ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997). There was simply "too great an analytical gap between the data and the opinion offered." *Id.*

As the district court noted, Malackowski offered no explanation for why the perceived "importance of some feature to a user directly correlates to a certain percentage of Facebook's advertising revenue." A71; *see also* A13419. Indeed, there was no discussion of how various website components generate advertising revenue, how changes to the components affected Facebook's advertising revenue, or why the relative "importance" of components correlates to decisions by individuals and advertisers to use Facebook in ways that generate revenue.

Rembrandt's own survey expert, Jerry Wind, cautioned against the very analytic failure committed by Malackowski. At his deposition, Wind testified that "the link between this [survey] data and the revenue question has to be the subject of a separate analysis." A71; A1528-29. Yet Rembrandt's experts did not perform that admittedly necessary "separate analysis." The district court was well within its discretion to exclude Malackowski's report based on this admission alone.

Rembrandt pretends that the district court applied the wrong legal standard by requiring "mathematical exactitude." Br. 55. But the court imposed no such requirement. Rather, it was simply describing the flawed assumption underlying Malackowski's unreliable methodology—namely, that the perceived "importance" percentages produced by the surveys directly correlated with Facebook's revenue—and explaining that Malackowski's assumption lacked the analytical support that Rembrandt's own survey expert testified was needed. A70-71. The

court clearly did not abuse its discretion in excluding Malackowski's *ipse dixit* as suspect and unreliable.  *See Joiner*, 522 U.S. at 146.

Rembrandt insists that Malackowski's use of surveys "follows" from this Court's entire-market-value-rule jurisprudence.  Br. 56.  Because Rembrandt did not press that argument below, it is waived.  It is also irrelevant.  The entire-market-value rule does not require a district court to admit unreliable evidence or overlook glaring analytical gaps in expert reports.  Indeed, Rembrandt's argument would lead to a blanket rule that the results of consumer surveys on product "importance" can automatically be converted to overall revenue for apportionment without further analysis—a result that would undermine the "sound economic and factual predicates" on which the entire-market-value rule is based. *LaserDynamics*, 694 F.3d at 67.

Rembrandt asserts that the district court "ignored" that Malackowski also considered advertiser surveys (Br. 56), but the court expressly acknowledged that fact (A63), which has no bearing on the court's analysis because Rembrandt failed to link *any* surveys to revenues.  Also irrelevant is Rembrandt's reliance on puffery by Facebook's CEO concerning Timeline and News Feed (Br. 57), which had nothing to do with whether Malackowski's methodology was reliable.  In short, the district court properly discharged its gatekeeping duty to exclude unreliable testimony, and Rembrandt cannot show an abuse of discretion.

**C.    The District Court Properly Exercised Its Discretion In Preventing Rembrandt From Delaying Trial With A New Damages Theory That Rembrandt Had Chosen Not To Present.**

**1.**  Rembrandt argues that Malackowski should have been allowed to submit a supplemental report late in the litigation.  Rembrandt effectively waived this argument, however, by failing to challenge properly the district court's separate order striking Rembrandt's revised damages computation pursuant to Federal Rule of Civil Procedure 26(a)(1)(A)(iii).  *See* A17; Fed. R. Civ. P. 37(c)(1).  The district court provided detailed reasoning for that decision, including a thorough discussion of each factor set forth in *Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 596-99 (4th Cir. 2003), which provides the governing legal standard.  *See* A12468-74.  Specifically, the court found that Facebook was unfairly surprised by Rembrandt's untimely disclosure of a new "click theory of damages" that should have been disclosed many months earlier.  A12470.  The court also found that curing the surprise would require reopening discovery and expert reports, which would disrupt the trial date.  A12470-71.  And the court found that Rembrandt could have advanced its alternative damages theory in November 2013, but chose not to do so.  A12471-72.  After weighing all the factors, the court granted the motion to strike (*see* A12472-73)—hardly the type of "*per se* rule against second chances" that Rembrandt claims the court applied in disallowing Malackowski's supplemental report.  Br. 58.

Rembrandt fails to mention the district court's ruling striking the supplemental damages computation except in a footnote, which asserts in conclusory fashion that the ruling was an "abuse of discretion." Br. 60 n.70. But any challenge to that ruling is waived: It appears nowhere in Rembrandt's statement of issues, and "arguments raised only in footnotes" are "waived." *Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1294 (Fed. Cir. 2012). In addition, because Rembrandt has not identified a single factor misapplied in the district court's *Sherwin-Williams* analysis, there is no basis for overturning the court's order striking Malackowski's supplemental computation. Malackowski's supplemental, one-page report merely "incorporate[d] by reference" "certain portions" of the stricken Rule 26 disclosure as his "alternative and supplemental damages analysis and opinions." A4116. With the Rule 26 supplemental damages disclosure properly stricken, there was nothing left for Malackowski to submit a supplemental report on or testify to.

**2.** On the merits, the district court's decision to disallow Malackowski's supplemental damages report late in the litigation, many months after Rembrandt should have disclosed its alternative theory, was entirely appropriate. The history of the case belies Rembrandt's assertion that the district court applied a "*per se* rule" against supplementation. Br. 58.

After the district court lifted the stay in April 2014, Malackowski offered a supplemental report setting forth his new "click-rate theory" of damages. This "click-rate" theory was based on a 2009 Facebook presentation that Rembrandt allegedly found on the Internet on November 1, 2013, more than a month before the first pretrial hearing. That presentation contained a single statement on which Rembrandt based its "click-rate" theory: "Experiments show that if we reduce the latency by 600ms, the user click rate improves by more than 5%." A4299. Yet Rembrandt waited three months to serve its Second Supplemental Rule 26 disclosures containing this theory, and five months before serving Malackowski's supplemental report.

In reality, Facebook had produced substantially the same document during discovery. A comparison of the front matter from those two documents is shown below:



A4296;



A4357.02.  Both documents reflect the same underlying presentation, were written by the same authors during the same period, and contain substantially similar statements.  Specifically, the substance of the information cited by Rembrandt as the basis for its supplemental report was contained in both the previously produced presentation and an email produced by Facebook during discovery:

Thus, Rembrandt had the information it needed to present its "click-rate" theory well before 2014, but chose not to.[6]

---

[6]  Rembrandt argued below that the terms "click on feeds" and "click rate" were somehow distinct.  But those statements are clearly two ways of saying the same thing,

Far from applying a "categorical exclusion" (Br. 59), the district court merely held Rembrandt to the consequences of its strategic choice "to present only one theory of damages." A21; *see also* A12395 (Rembrandt "put its eggs into that basket, and that's a basket proven to be faulty"); A12462. District courts frequently exercise their discretion not to permit "do-overs" where, as here, a plaintiff chooses to present only one theory or fails to supplement in a timely manner. *E.g.*, *Network Prot. Scis., LLC v. Fortinet, Inc.*, 2013 WL 5402089, at *8 (N.D. Cal. Sept. 26, 2013); *see also*, *e.g.*, *Sherwin-Williams*, 318 F.3d at 596-99. Such decisions are vested in the sound discretion of the trial judge, who is best situated to weigh the equities in light of the history of the case and the demands of the court's docket.

Indeed, *Sherwin-Williams* is instructive. There, the Fourth Circuit affirmed the exclusion of untimely but "important" testimony by an expert, reasoning that the newly disclosed expert opinions were a surprise that could not be cured because discovery had already closed, the trial was set to being in just a few weeks, an extension would have disrupted the trial, and the new methodology was not based on new evidence. *See* 318 F.3d at 598-99. So, too, here: discovery had closed, trial was set to begin shortly, an extension would have disrupted trial, and the information used in the report was not new.

Rembrandt cites *ZF Meritor, LLC v. Eaton Corp.*, 696 F.3d 254, 297 (3d Cir. 2012), for the proposition that district courts in the Third Circuit must give more than "nominal consideration" to a request to supplement.  Br. 58 n.66.  But the district court here did give more than "nominal" consideration to Rembrandt's request to supplement, as shown by its careful application of the Fourth Circuit's *Sherwin-Williams* factors.  *See* A12468-74.  Moreover, in *ZF Meritor* the supplementation would have caused little prejudice or disruption due to the lack of any new methodology or data in the alternate calculation, and the fact that liability and damages were already bifurcated—considerations that do not apply here.  *See* 696 F.3d at 298-99.

**3.**  Rembrandt argues in passing (Br. 61) that the district court abused its discretion when it prevented Rembrandt from offering lay evidence of damages. But Rembrandt does not identify what lay evidence the court abused its discretion in excluding, making it impossible to respond to this argument.  The only timely damages disclosure Rembrandt made under Rule 26(a)(1)(A) was Malackowski's original expert report of July 29, 2013.  Nine months later, Rembrandt sought to have Malackowski testify to portions of his report allegedly not stricken in the district court's original *Daubert* ruling.  *See* A3997-99.  Later still, Rembrandt sought to introduce a hodgepodge of disconnected "pieces of evidence" (A4913) allegedly untethered to any calculation or any reliable analysis as a new damages

theory.  *See* A7641; A15800-02.[7]  Both attempts at "lay" evidence were excluded for violating Rule 26 and failing to apportion damages to the allegedly infringing add-ons.  *See* A12560-64.  Rembrandt fails to explain why either of these rulings was an abuse of discretion.

The district court was well within its discretion to exclude Rembrandt's purported lay evidence of damages.  All of Rembrandt's previously disclosed damages theories and expert testimony had been excluded under *Daubert* and for failure to comply with Rule 26.  Allowing Rembrandt to piece together an untimely damages case based on disconnected pieces of lay evidence at trial could result only in "blind-siding and ambushing" Facebook (A10619) and would violate Rule 26's disclosure requirements.

Rembrandt asserts that damages may be proven without an expert.  Br. 61 (citing *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381-82 (Fed. Cir. 2003)).  But *Dow* merely stands for the proposition that expert testimony is not

---

[7]  The "pieces of evidence" included dozens of exhibits supposedly related to damages, including:  exhibits not cited in Malackowski's original report; evidence previously excluded under Fed. R. Evid. 403; prejudicial evidence concerning Facebook's overall advertising revenue numbers; and various licenses.  A5720-39. This "evidence" obviously was being offered to avoid the damages computation disclosure under Rule 26, but, inexplicably, was also being offered to prove a reasonable royalty under *Georgia Pacific* and a lump-sum damages award—both of which necessitate some calculation.  Seeing through Rembrandt's no-theory-of-damages ruse, the district court correctly granted Facebook's motion to exclude this evidence.  A12554; A12562-64; A12572.

always required to establish a reasonable royalty—not that a plaintiff, having had all of its disclosed damages theories excluded and stricken, has a right to cobble together lay evidence of damages at trial without a properly disclosed underlying damages theory.  District courts routinely exclude non-expert theories of damages that were belatedly disclosed or would confuse the jury without expert guidance.  *See*, *e.g.*, *MicroStrategy Inc. v. Bus. Objects, S.A.*, 429 F.3d 1344, 1356 (Fed. Cir. 2005).  If Rembrandt wished to disclose a damages theory based on lay evidence, the time to do so was in 2013—not on the eve of trial.  The district court did not abuse its discretion in recognizing that fact.

## CONCLUSION

For the foregoing reasons, the judgment should be affirmed.

Dated:  May 18, 2015

Heidi L. Keefe
Mark R. Weinstein
COOLEY LLP
3175 Hanover Street
Palo Alto, CA  94304
(650) 843-5000

Michael G. Rhodes
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA  94111
(415) 693-2000

Respectfully submitted,

/s/ *Thomas G. Hungar*

Thomas G. Hungar
    *Principal Attorney*
Lucas C. Townsend
Blair A. Silver
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 955-8500
(202) 530-9696 (fax)
THungar@gibsondunn.com

*Counsel for Facebook, Inc.*

## CERTIFICATE OF SERVICE

I, Thomas G. Hungar, hereby certify that I caused the foregoing NON-CONFIDENTIAL BRIEF OF DEFENDANT-APPELLEE to be filed via the Court's CM/ECF system and served on the following counsel of record who have registered for such service on May 18, 2015.

Thomas M. Melsheimer, Esq.
Fish & Richardson, P.C.
1717 Main Street, Suite 5000
Dallas, TX  75201
Tel:  (214) 292-4001
Fax:  (214) 747-2091
melsheimer@fr.com

Ahmed J. Davis, Esq.
Fish & Richardson, P.C.
1425 K Street, N.W., 11th Floor
Washington, DC  20005
Tel:  (202) 783-5057
Fax: (202)783-2331
adavis@fr.com

John S. Goetz, Esq.
Fish & Richardson, P.C.
601 Lexington Avenue, 52nd Floor
New York, NY  10022
Tel: (212) 641-2277
Fax: (212) 258-2291
goetz@fr.com

Rebecca C. Grant, Esq.
Fish & Richardson, P.C.
550 Arguello Street, Suite D
Redwood City, CA  90463
Tel: (650) 839-5070
Fax: (650) 839-5071
rgrant@fr.com

Lawrence K. Kolodney, Esq.
Robert E. Hillman, Esq.
Fish & Richardson, P.C.
One Marina Park Drive
Boston, MA  02210
Tel:  (617) 542-5070
Fax: (617) 542-8906
kolodney@fr.com

John A. Dragseth, Esq.
Fish & Richardson, P.C.
3200 RBC Plaza, 60 South Street
Minneapolis, MN  55402
Tel: (612) 335-5070
Fax: (612) 288-9696
dragseth@fr.com

*Counsel for Rembrandt Social Media, LP*

/s/ *Thomas G. Hungar*
Thomas G. Hungar
*Counsel for Facebook, Inc.*

## CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 13,997 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b); and

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word 2010 in 14-point Times New Roman font.

Dated:  May 18, 2015

/s/ *Thomas G. Hungar*
_____
Thomas G. Hungar

*Counsel for Facebook, Inc.*
