2014-1812

# United States Court of Appeals
# for the Federal Circuit

_____

REMBRANDT SOCIAL MEDIA, LP,

*Plaintiff-Appellant*,

- v -

FACEBOOK, INC.,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Eastern District of Virginia in Case No. 1:13-CV-00158, Judge T.S. Ellis III.

_____

## REMBRANDT'S MOTION TO ENFORCE ESTOPPEL
## FROM IPR FINAL WRITTEN DECISION

THOMAS M. MELSHEIMER
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX 75201
(214) 747-5070

JOHN A. DRAGSETH
FISH & RICHARDSON P.C.
60 South Sixth Street
Suite 3200
Minneapolis, MN 55402
(612) 335-5070

*Attorneys for Plaintiff-Appellant Rembrandt Social Media, LP*

*(For Continuation of Appearances See Inside Cover)*

July 24, 2015

AHMED J. DAVIS
FISH & RICHARDSON P.C.
1425 K Street, NW, 11th Floor
Washington D.C.  20005
Telephone: (202) 783-5070

JOHN S. GOETZ
FISH & RICHARDSON P.C.
601 Lexington Avenue, 52nd Floor
New York, NY 10022-4611
Telephone: (212) 765-5070

REBECCA CHARNAS GRANT
FISH & RICHARDSON P.C.
500 Arguello Street, Suite D
Redwood City, CA 90463
Telephone: (650) 839-5070

ROBERT E. HILLMAN
LAWRENCE K. KOLODNEY
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02110
(617) 542-5070

*Attorneys for Plaintiff-Appellant Rembrandt Social Media, LP*

# CERTIFICATE OF INTEREST

Counsel for Rembrandt Social Media, LP, certifies the following:

1.      The full name of every party or amicus represented by me is:  Rembrandt Social Media, LP

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:  N/A.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are: None

4.      The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

> Fish & Richardson P.C.:  John A. Dragseth, Robert E. Hillman, Thomas M. Melsheimer, Juanita R. Brooks, Ruffin Cordell, Richard A. Sterba, Clarissa Renee Skinner, Ahmed J. Davis, John S. Goetz, Danielle Williams, Lawrence K. Kolodney, Rebecca C. Grant, Rex A. Mann, Daniel R. Gopenko

Dated:  July 24, 2015

/s/ *John A. Dragseth*
John A. Dragseth

# <u>TABLE OF CONTENTS</u>

<u>**Page(s)**</u>

CERTIFICATE OF INTEREST ........................................................... iii

BACKGROUND ............................................................................. 1

ARGUMENT ................................................................................. 2

I.     IPR Estoppel Takes Effect On The Date the Board Issues a
Final Written Decision ........................................................... 2

II.    Because of the Estoppel, the Judgment of Invalidity Must be
Reversed ................................................................................ 5

CONCLUSION ............................................................................... 11

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp.*,
  968 F.2d 707 (8th Cir. 1992) .......................................................... 7

*Aspex Eyewear, Inc. v. Zenni Optical Inc.*,
  713 F.3d 1377 (Fed. Cir. 2013) ...................................................... 9

*Cotton States Mut. Ins. Co. v. J.O. Anderson*,
  749 F.2d 663 (11th Cir. 1984) ........................................................ 7

*Dana Corp. v. NOK, Inc.*
  882 F.2d 505, 507 (Fed. Cir. 1989) ........................................... 7, 8

*Fresenius USA, Inc. v. Baxter International, Inc.*
  721 F.3d 1330 (Fed. Cir. 2013) ...................................................... 5

*Lesher v. Lavrich*,
  784 F.2d 193 (6th Cir. 1986) .......................................................... 7

*Lujan v. U.S. Dept. of the Interior*,
  673 F.2d 1165 (10th Cir. 1982) ...................................................... 7

*Mendenhall v. Barber-Green Co.*,
  26 F.3d 1573 (Fed. Cir. 1994) ........................................................ 7

*Parklane Hosiery Co. v. Shore*,
  439 U.S. 322 (1979) ........................................................................ 9

*Soverain Software LLC v. Victoria's Secret Direct Brand
  Mgmt., LLC*,
  778 F.3d 1311 (Fed. Cir. 2015) ...................................................... 7

**Statutes**

28 U.S.C. § 1338 ................................................................................. 3

35 U.S.C. § 311(b) .............................................................................. 4

v

# TABLE OF AUTHORITIES

**Page(s)**

35 U.S.C. § 315(a)(1) ................................................................... 2, 10

35 U.S.C. § 315(e)(2) ................................................................ *passim*

35 U.S.C. § 318(a) .......................................................................... 1

## Other Authorities

37 C.F.R. § 42.73 ............................................................................ 1

154 Cong. Rec. S9987 (daily ed. Sep. 27, 2008)................................. 8

157 Cong. Rec. S1375-76 (daily ed. Mar. 8, 2011) ........................ 5, 8

157 Cong. Rec. S952 (daily ed. Feb. 28, 2011)............................. 8, 14

Federal Rule of Appellate Procedure 27 ........................................... 1

H.R. Rep. No. 112-98, pt. 1 (2011) ............................................. 9, 10

## INDEX OF EXHIBITS

**EXHIBIT**            **DESCRIPTION**

A            *Facebook, Inc. v. Rembrandt Social Media, L.P.*, IPR2014-00415, Paper 33 (PTAB June 22, 2015) (Final Written Decision).

B            *Rembrandt Social Media, L.P. v. Facebook, Inc.*, Second Amended Complaint for Patent Infringement.

C            July 29, 2013 Invalidity Rep. of David Klausner.

D            *Facebook, Inc. v. Rembrandt Social Media, L.P.*, IPR2014-00415, Paper 1 (Facebook's Petition for IPR).

E            157 Cong. Rec. S952 (daily ed. Feb. 28, 2011).

F            157 Cong. Rec. S1375-76 (daily ed. Mar. 8, 2011).

G            154 Cong. Rec. S9987 (daily ed. Sep. 27, 2008).

H            H.R. Rep. No. 112-98, pt. 1 (2011).

As a result of the Patent Trial & Appeal Board's ("PTAB") recent Final Written Decision that confirms the validity of claims 1, 4, 17, 18, 20, and 26 of the '316 patent-on-appeal, Rembrandt moves under Federal Rule of Appellate Procedure 27 to enforce the estoppel of 35 U.S.C. § 315(e)(2) and thereby to reverse the district court's judgment finding those claims invalid.  Because this issue is dispositive of the '316 patent's validity, Rembrandt moves here so that the Court may consider this issue concurrently with other issues on appeal.

## BACKGROUND[1]

The patent infringement action that led to this appeal was filed February 4, 2013.  Facebook filed an *Inter Partes* Review (IPR) petition with the PTAB approximately one year later, arguing that claims of the '316 patent—one of the two patents involved in this appeal—were invalid as obvious over various prior art references.  The Board instituted the IPR,[2] and proceeded with a trial that included expert depositions, briefing by both parties, and a hearing.  On June 22, 2015, it issued a Final Written Decision under 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73, upholding the challenged claims:

---

[1] Rembrandt informed Facebook of its intent to file this motion and Facebook has stated that it objects to the motion and will file a response.

[2] *Facebook, Inc. v. Rembrandt Social Media, L.P.*, IPR2014-00415, Paper 9 (PTAB July 7, 2014).

> Petitioner has not shown, by a preponderance of the evidence, that claims 1, 4, 17, 18, 20, and 26 of the '316 patent are unpatentable under 35 U.S.C. § 103. Accordingly, it is ORDERED claims 1, 4, 17, 18, 20, and 26 are not held unpatentable.

(Ex. A.)[3]  The Board thus affirmed the validity of each of the '316 claims in this appeal (claims 4, 20, and 26).

## ARGUMENT

### I.      IPR Estoppel Takes Effect On The Date the Board Issues a Final Written Decision

Congress designed IPR proceedings to give patent challengers an ***alternative*** to litigation for validity challenges based on "paper" prior art, *i.e.*, patents and printed publications.  Thus, if a patent challenger has filed a declaratory judgment action, it may not file an IPR petition—it has selected the alternative of litigation.[4] For the same reason, if a party chooses to file an IPR that results in a final written decision confirming patentability, the statute is clear that the party cannot pursue, in litigation, invalidity grounds it brought or could have brought in the IPR—it has selected the Patent Office alternative.[5]  The statutory text also makes plain that this

---

[3] The final written decision issued on the same day Rembrandt's Reply Brief in this appeal was due.  Facebook has not requested rehearing of the final written decision, and the deadline for doing so has past.  Facebook also has not filed a Notice of Appeal to this Court of the final written decision.

[4] 35 U.S.C. § 315(a)(1).

[5] 35 U.S.C. § 315(e)(2).

estoppel attaches as soon as the Board issues a final written decision in the IPR, and

thus before any appeals of that Board decision:

### 35 U.S. Code § 315 - Relation to other proceedings or actions

* * *

(e) Estoppel.—

* * *

(2) Civil actions and other proceedings.—The petitioner in an *inter partes* review of a claim in a patent under this chapter ***that results in a final written decision under section 318(a)***, or the real party in interest or privy of the petitioner, may not assert either in a civil action arising in whole or in part under section 1338 of title 28 or in a proceeding before the International Trade Commission under section 337 of the Tariff Act of 1930 that the claim is invalid on any ground that the petitioner raised or reasonably could have raised during that inter partes review.[6]

In this case, all of the Section 315 estoppel requirements have been met.  First,

Facebook's IPR petition challenging the validity of each of the asserted claims of

the '316 patent resulted in a final written decision under Section 318(a)—*i.e.*, the

Board's June 22, 2015, Final Written Decision found claims 4, 20, and 26 valid.

(Ex. A.)  Second, this civil action arises under 28 U.S.C. § 1338 because it is a patent

infringement claim that was originally brought in a district court.[7]  Third, Facebook

---

[6] 35 U.S.C. § 315(e)(2) (emphasis added).

[7] 28 U.S.C. § 1338 (providing jurisdiction for any civil action arising under any Act of Congress relating to patents); *see also* Ex. B, 2d. Am. Compl. at ¶ 4; Rembrandt Opening Br. at 1.

reasonably could have raised in the IPR the grounds it raised in this litigation, that the '316 patent was obvious over the Wang and Rasansky patents.[8]  The IPR proceeding is designed precisely to hear such obviousness challenges over "paper" prior art,[9] and Facebook already was asserting Wang and Rasansky against the '316 claims in the district court before it filed the IPR.[10]  Therefore, as of June 22, 2015, Facebook is estopped from challenging the validity of the '316 claims in this action.

Contrary to the intent of the AIA which created IPRs as a lower cost ***alternative*** to civil litigation, Facebook chose to simultaneously pursue ***parallel*** attacks on

---

[8] Rembrandt Opening Br. at 37-40.

[9] 35 U.S.C. § 311(b) ("A petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications.").

[10] July 29, 2013 Invalidity Rep. of David Klausner at ¶ 169 (Ex. C).  Indeed, Facebook presented to the Board some of the prior art references asserted in the district court, but strategically withheld Wang and Rasansky. *Compare id.* at ¶¶ 161-62, 169 (citing the Wang, Rasansky, and Angles references), *with* Facebook Petition for *Inter Partes* Review filed Feb. 6, 2014 (citing only Angles) (Ex. D).  The "could have raised" provision of Section 315 is intended to prevent precisely this type of gamesmanship. *See, e.g.*, 157 Cong. Rec. S952 (daily ed. Feb. 28, 2011) (statement of Sen. Grassley) (Ex. E) ("It also would include a strengthened estoppel standard to prevent petitioners from raising in a subsequent challenge the same patent issues that were raised or reasonably could have been raised in a prior challenge. The bill would significantly ***reduce*** the ability to use post-grant procedures for ***abusive serial challenges to patents***. These new procedures would also provide ***faster, less costly alternatives to civil litigation*** to challenge patents.") (emphasis added).

the '316 claims in court and the Patent Office.  While the AIA may not have prohib-

ited the initiation of such parallel challenges, Congress made clear through the es-

toppel provisions of 35 U.S.C. § 315(e)(2) that such parallel civil litigation chal-

lenges must end upon a final written decision confirming patentability.[11]  Simply

put, having chosen to challenge validity in the Patent Office and lost, Facebook is

estopped from asserting invalidity in this action.

## II.    Because of the Estoppel, the Judgment of Invalidity Must be Reversed

As has long been established in analogous contexts, once estoppel attaches, it

applies to any stage of ongoing non-final litigation, including after a jury trial or

during an appeal.  Because Facebook is now estopped from asserting the '316 pa-

tent's invalidity over the only prior art raised at trial or in this appeal, the judgment

of invalidity of the '316 patent must be reversed.

By direct analogy, in *Fresenius v. Baxter*, the issue was whether to apply a

Patent Office decision from an ex parte reexamination that cancelled the asserted

claims, to estop a patentee in parallel litigation.[12]  The litigation had already been

---

[11] *See* 157 Cong. Rec. S1375-76 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) (Ex. F) ("[I]f an inter partes review is instituted while litigation is pending, that review will completely substitute for at least the patents-and-printed-publications portion of the civil litigation.").

[12] *Fresenius USA, Inc. v. Baxter International, Inc*., 721 F.3d 1330 (Fed. Cir. 2013).

5

through one appeal, a jury had awarded damages on remand, and the district court had entered a "final" judgment.[13]  The Court nonetheless held that the jury verdict and damage award had to be vacated when estoppel from the Patent Office proceeding kicked in,[14] because the litigation was not "final" in the relevant sense—*i.e.*, it had not been finalized through appeal when the Patent Office proceeding ended.[15] The Court also held that there was no Article III impediment to using a Patent Office ruling to collaterally estop court proceedings, even though a jury had found the claims valid and had awarded damages.[16]

Similarly, this Court, like other courts of appeals, has long held that collateral estoppel by another district court case "applies even though the precluding judgment . . . comes into existence while the case as to which preclusion is sought (this

---

[13] *Id.* at 1340.

[14] Unlike the IPR statute in which estoppel attaches as soon as the PTO issues its decision, the ex parte reexamination statute triggers estoppel when the claims are canceled, which occurs after the Federal Circuit affirms the PTO's decision that the involved claims are unpatentable.  *Id.* at 1339-40.

[15] *Id.* at 1340-44.

[16] The Court also noted that "the same rule applies" whether the patentee or the party challenging the patent is benefitting from the estoppel.  *Id.* at 1343.  The Court also rejected Baxter's argument that collateral estoppel should not apply from the Patent Office to litigation, noting that otherwise there would be no way for a reexamination to affect parallel litigation.  *Id.* at 1344.  Here, it is even clearer that the estoppel in Section 315 must be given effect in litigation—the estoppel is explicit in the statute.

case) is on appeal."[17]  For example, in *Dana Corp. v. NOK, Inc.*, the Court reversed

the district court's judgment of no invalidity after ruling the asserted patents invalid

in a co-pending appeal, holding that collateral estoppel applied even though the es-

topping judgment issued while the appeal was pending and most of the briefing had

been concluded:

> In *Blonder–Tongue*, the Supreme Court reversed the rule previously
> enunciated in *Triplett v. Lowell*, and held that *Triplett* is "overruled to
> the extent it forecloses a plea of estoppel by one facing a charge of in-
> fringement of a patent that has once been declared invalid."  Among the
> reasons leading the Court to this holding were the expense and com-
> plexity of patent litigation, and the need for judicial economy.  In view
> of these expressed concerns, we see no reason why estoppel cannot be
> raised during the pendency of an appeal.  The salutary aspects of col-
> lateral estoppel will still obtain, albeit to a lesser degree, when estoppel
> is permitted in the circumstances here present to be raised for the first

---

[17] *Soverain Software LLC v. Victoria's Secret Direct Brand Mgmt., LLC*, 778 F.3d 1311, 1315 (Fed. Cir. 2015) (citing *Mendenhall v. Barber-Green Co.*, 26 F.3d 1573, 1583-84 (Fed. Cir. 1994)); *see also Aetna Cas. & Sur. Co. v. Gen. Dynamics Corp.*, 968 F.2d 707, 711 (8th Cir. 1992) ("General Dynamics may properly raise the col-lateral estoppel defense for the first time on appeal.  Collateral estoppel may be raised at any stage of the proceedings, so long as it is raised at the first reasonable opportunity after the rendering of the decision having the preclusive effect."); *Lesher v. Lavrich*, 784 F.2d 193, 195-96 (6th Cir. 1986) (res judicata defense raised for first time on appeal was not waived where at the time the district court entered its judg-ment, the only relevant state court decision was a decision of a juvenile court and appeal was pending); *Cotton States Mut. Ins. Co. v. J.O. Anderson*, 749 F.2d 663, 665-66 (11th Cir. 1984) (collateral estoppel defense not waived when first raised at oral argument); *Lujan v. U.S. Dept. of the Interior*, 673 F.2d 1165, 1168 (10th Cir. 1982) (collateral estoppel argument not waived when first raised in supplemental appellate brief).

time on appeal.[18]

Those same concerns of judicial economy animated Congress in enacting the express estoppel of Section 315.  Indeed, Congress crafted the estoppel provision of Section 315(e)(2) against this well-known background for common law collateral estoppel, and the language of the statute and of the cases is similar.[19]  Section 315

---

[18] 882 F.2d 505, 507 (Fed. Cir. 1989) (citations omitted); *see also Mendenhall v. Barber–Greene Co.*, 26 F.3d 1573, 1579-80 (Fed. Cir. 1994) ("[O]ur precedent holds that the defense of collateral estoppel based on a final judgment of patent invalidity in another suit can 'be timely made at any stage of the affected proceedings.'").

[19] In fact, an AIA co-sponsor made plain that the statute purposefully used the language of collateral estoppel to incorporate the same common law standards:

> A word about privity: subsections (b)(2) and (d) or section 322 bar second-window proceedings from being instituted or claims from being raised if particular proceedings or claims were pursued by privies to the party now seeking to start proceedings or raise claims.  ***The concept of privity, of course, is borrowed from the common law of judgments.*** . . . ***Privity is essentially a shorthand statement that collateral estoppel is to be applied in a given case***; there is no universally applicable definition of privity.  The concept refers to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is sufficiently close so as to justify application of the doctrine of collateral estoppel.

154 Cong. Rec. S9987 (daily ed. Sep. 27, 2008) (statement of Sen. Kyl) (Ex. G) (emphasis added); *see also* 157 Cong. Rec. S1375-76 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) (Ex. F) (explaining that his comments were also relevant to the provisions for *inter partes* review "particularly to the extent that the comments disclose understandings reached with the Patent Office, conscious use of terms of art, or the reasoning behind various provisions," and including as an example of such relevant comments his comments "about estoppel against parties in privity").

says an unsuccessful IPR petitioner "***may not assert*** . . . that the claim is invalid,"[20] while the Supreme Court has referred to collateral estoppel as precluding a plaintiff "from ***asserting a claim,***"[21] and this Court in *Dana* noted that the defendant could not "***assert[] in this litigation that that patent is valid.***"[22]  In each situation, the fact that the party can no longer assert the claim requires the court to reverse any decision under review finding for the estopped party on that issue (here the invalidity judgment).

This result is not only compelled by the statutory language and precedent but also is fully consistent with Congress's broader purpose in adding IPR proceedings under the AIA.  According to Congress, "the purpose of [Section 315(e)] [is] providing quick and cost effective ***alternatives to litigation***."[23]  The "strengthened estoppel standard" of Section 315(e) was meant to "reduce the ability to use post-grant proceedings for abusive serial challenges to patents," and to "provide faster, less costly

---

[20] 35 U.S.C. § 315(e)(2) (emphasis added).

[21] *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 329 (1979) (emphasis added) (quoted in *Aspex Eyewear, Inc. v. Zenni Optical Inc.*, 713 F.3d 1377, 1380 (Fed. Cir. 2013)).

[22] 882 F.2d at 507 (emphasis added).

[23] H.R. Rep. No. 112-98, pt. 1, at 48 (2011) (emphasis added) (Ex. H.).

*alternatives to civil litigation*.”[24]   Further, AIA co-sponsor Senator Kyl, in discussing the different levels of estoppel Congress considered (whether all grounds, all grounds that could have been raised, or all grounds that reasonably could have been raised), noted “that review will *completely substitute* for at least the patents-and-printed-publications portion of the civil litigation.”[25]   As noted at the outset of this brief, these choices for a party challenging a patent are shown by the mirror-image estoppels in the AIA—a patent challenger that chooses the litigation option by filing a declaratory judgment suit to challenge invalidity is estopped from bringing an IPR,[26] and a defendant that chooses the IPR option is estopped from pursuing “paper” invalidity in the litigation once a Final Written Decision issues.[27]   Facebook chose the Patent Office route, has lost under the terms of Section 315(e)(2), and is now estopped, so the invalidity judgment should be reversed.[28]

---

[24] 157 Cong. Rec. S952 (daily ed. Feb. 28, 2011) (statement of Sen. Grassley) (Ex. E) (emphasis added).

[25] 157 Cong. Rec. S1375–76 (daily ed. Mar. 8, 2011) (statement of Sen. Kyl) (Ex. F) (emphasis added).   Although the statute refers to estoppel in a “civil action,” the legislative history shows Congress using “civil litigation” as a synonym. *E.g.*, H.R. Rep. No. 112-98, pt. 1, at 76 (2011) (Ex. H) (“[I]nter partes petitioners are also estopped from raising *in civil litigation or an ITC proceeding* any issue that they raised or could have raised in the inter partes review.” (emphasis added)).

[26] 35 U.S.C. § 315(a)(1).

[27] 35 U.S.C. § 315(e)(2).

[28] To the extent that Facebook were to argue that IPR estoppel should not attach where the civil litigation has advanced past the district court stage when the final

## CONCLUSION

The prerequisites for estoppel under Section 315(e)(2) have plainly been met, and the effect of the  estoppel in this context is dismissal of the estopped claims.  As a result, Rembrandt requests reversal of the judgment of invalidity and dismissal of Facebook's second affirmative defense of invalidity with respect to the '316 patent in Facebook's Answer to Rembrandt's Second Amended Complaint.

---

written decision issues, such a result would foster the very duplicative litigation that the AIA was intended to prevent by encouraging defendants to time IPRs as late as possible so that the final written decision issued after the district court proceedings concluded.  In any event, such an argument is precluded by the plain language of  35 U.S.C. § 315(e)(2) which specifies that IPR estoppel applies generally to *civil actions* rather than being limited to actions in the *district courts*.

Dated:  July 24, 2015

Respectfully submitted,

/s/ *John A. Dragseth*

John A. Dragseth
FISH & RICHARDSON P.C.
60 South Sixth Street
Suite 3200
Minneapolis, MN 55402
(612) 335-5070

Robert E. Hillman
Lawrence K. Kolodney
FISH & RICHARDSON P.C.
One Marina Park Drive
Boston, MA 02110
Telephone: (617) 542-5070
Facsimile: (617) 542-8906
Hillman@fr.com
Kolodney@fr.com

Thomas M. Melsheimer
FISH & RICHARDSON P.C.
1717 Main Street, Suite 5000
Dallas, TX  75201
Telephone: (214) 747-5070
Facsimile: (214) 747-2091
melsheimer@fr.com

Ahmed J. Davis
FISH & RICHARDSON P.C.
1425 K Street, NW, 11th Floor
Washington D.C.  20005
Telephone: (202) 783-5070
Facsimile: (202) 783-2331
davis@fr.com

John S. Goetz

FISH & RICHARDSON P.C.
601 Lexington Avenue, 52nd Floor
New York, NY 10022-4611
Telephone: (212) 765-5070
Facsimile:  (212) 258-2291
goetz@fr.com

Rebecca Charnas Grant
FISH & RICHARDSON P.C.
500 Arguello Street, Suite D
Redwood City, CA 90463
Telephone: (650) 839-5070
Facsimile: (650) 839-5071
rgrant@fr.com

*Attorneys for Appellant,*
Rembrandt Social Media, LP

## CERTIFICATE OF SERVICE AND FILING

I certify that I electronically filed the foregoing document using the Court's CM/ECF filing system. All counsel of record were served via CM/ECF on July 24, 2015.

Mark R. Weinstein                            *Attorneys for Appellee*
Heidi L. Keefe
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304
mweinstein@cooley.com
hkeefe@cooley.com

Michael G. Rhodes
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111-5800
rhodesmg@cooley.com

Thomas G. Hungar
Lucas C. Townsend
Blair A. Silver
Heidi L. Keefe
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
THungar@gibsondunn.com
LTownsend@gibsondunn.com
BSilver@gibsondunn.com

*/s/ John A. Dragseth*
John A. Dragseth

# EXHIBIT A

Trials@uspto.gov                                                     Paper 33
571-272-7822                                         Entered:  June 22,2015

UNITED STATES PATENT AND TRADEMARK OFFICE
_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD
_____

FACEBOOK, INC.,
Petitioner,

v.

REMBRANDT SOCIAL MEDIA, L.P.,
Patent Owner.

―――――――――

Case IPR2014-00415
Patent 6,415,316 B1

―――――――――

Before PHILLIP J. KAUFFMAN, JENNIFER S. BISK, and
MATTHEW R. CLEMENTS, *Administrative Patent Judges*.

CLEMENTS, *Administrative Patent Judge*.


FINAL WRITTEN DECISION
*35 U.S.C. § 318(a) and 37 C.F.R. § 42.73*

IPR2014-00415
Patent 6,415,316 B1

# I.    INTRODUCTION

Facebook, Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claims 1, 4, 17, 18, 20, and 26 ("the challenged claims") of U.S. Patent No. 6,415,316 B1 (Ex. 1001, "the '316 patent").  Paper 1 ("Pet.").  Rembrandt Social Media, L.P. ("Patent Owner") filed a Preliminary Response.  Paper 8 ("Prelim. Resp.").  On July 7, 2014, we instituted an *inter partes* review of the challenged claims of the '316 patent on the alleged grounds of unpatentability.  Paper 9 ("Dec. to Inst.").

After institution of trial, Patent Owner filed a Patent Owner Response (Paper 17, "PO Resp.") to which Petitioner filed a Reply (Paper 20, "Reply").  Patent Owner filed its Observations on the testimony of Petitioner's Expert, Mr. Ed Tittel (Paper 25) to which Petitioner responded (Paper 28).  Patent Owner also filed a Statement Concerning Petitioner's New Argument (Paper 29) to which Petitioner responded (Paper 30).

Oral hearing was held on April 6, 2015.[1]

The Board has jurisdiction under 35 U.S.C. § 6(c).  This Final Written Decision is issued pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.

Petitioner has not shown, by a preponderance of the evidence, that any challenged claim of the '316 patent is unpatentable.

## A.  Related Proceedings

Petitioner and Patent Owner indicate that the '316 patent is involved in one co-pending district court case:  *Rembrandt Social Media, L.P. v. Facebook, Inc.*, Case No. 13-CV-00158 TSE (E.D. Va.), filed February 4,

---

[1] A transcript of the oral hearing is included in the record as Paper 32 ("Tr.").

IPR2014-00415
Patent 6,415,316 B1

2013, and served on February 6, 2013.  Pet. 1; Paper 5, 2.  The case is currently stayed pending an appeal to the U.S. Court of Appeals for the Federal Circuit.  Pet. 1; Paper 5, 2.

## B. The '316 Patent

The '316 patent relates generally to computer networks and, specifically, to a method and apparatus for implementing a diary of web pages on a computer network.  Ex. 1001, 1:19–22.  According to the '316 patent, there was a need for a way for users to keep track of locations that they have visited in a more visual and memorable way.  *Id.* at 1:65–67.

To address this need, the '316 patent discloses a method and apparatus for implementing a web page diary.  *Id.* at Title.  The diary allows a diary owner to organize information, including links to websites and other content, like a book.  *Id.* at 4:62–64.  A diary has a book design that determines the graphics and layout of content within pages of a diary.  *Id.* at 5:9–10.  The book design includes page designs.  *Id.* at 5:11.  Page designs define the visual and audible appearance of the page, provides slots for content entries or objects, and determines the size and location of such slots within the page. *Id.* at 5:14–17.  Diary owners can insert content objects into pages.  *Id.* at 5:18.  When a content object is inserted into a page, it is displayed in one of the slots provided by the page design of the page.  *Id.* at 5:19–20.  A content object can be any type of object, including text, bookmarks, images, programs, movies, etc.  *Id.* at 5:20–22.  The book design and book content are independent.  *Id.* at 5:26–27.  Diary software dynamically combines the diary's book design and book content to present a cohesive view of the "book."  *Id.* at 5:32–34.  The diary may enforce privacy rules on any part or

3

level of the book—i.e., book, section, page, or individual content object. *Id.* at 5:55–57.

Figure 1(b) is reproduced below.



Fig. 1(b)
An Exemplary Diary
Implementation (shows
logical connections)

Figure 1(b) is a block diagram of a computer network in accordance with an embodiment of the invention of the '316 patent that illustrates how a diary is viewed or edited. Ex. 1001, 6:30–32. The system comprises user system 102, diary server 104, and one or more content providers 106. *Id.* at 6:32–34. User system 102 can be the system of the owner of the diary or of a person who wishes to view the diary. *Id.* at 6:34–36. User system 102 includes browser 110, which is shown executing diary applet 112 downloaded from diary server 104, and diary information 114, which contains information about the diary of this diary owner. *Id.* at 6:36–40. Diary applet 112 generates HTML 111 for the web pages of the user's diary, which are preferably displayed by browser 110. *Id.* at 6:40–43.

Diary server 104 includes diary information 122 (including diary information for a plurality of users' diaries), diary software 124, an original copy of diary applet 112, and the HTML needed to display an initial web page. Ex. 1001, 6:44–48.

A user begins viewing or editing a diary by viewing web page 113 available from diary server 104. *Id.* at 6:56–59. Web page 113 allows the user to indicate that he wishes to view or edit a specified diary. *Id.* at 6:59–60. This indication begins execution of diary applet 112, which sends a request 116 to diary server 104 for the contents of the specified diary. *Id.* at 6:60–62. When diary software 124 receives request 116 from browser 110, it sends information 118, including diary information, appropriate for the specified diary to the user system. *Id.* at 6:63–67. Diary applet 112 reads diary information 114 received from diary server 104 and generates HTML 111 for one or more diary pages in accordance with diary information 114. *Id.* at 7:1–3. Diary applet 112 instructs browser 110 to display the diary page(s) in the browser window. *Id.* at 7:3–5.

## C. Illustrative Claim

Of the challenged claims, claims 1 and 17 are independent. Claim 1 is reproduced below:

1.    A method of organizing information for display, comprising:

    sending from a diary server to a user system, a diary program capable of being executed by a browser in the user system;

    sending diary information from the diary server to the user system, the information comprising content data including an associated time, a page design to specify the presentation of the content data, and configuration information for controlling

IPR2014-00415
Patent 6,415,316 B1

> behavior of a cohesive diary page, the configuration information including privacy level information;

> assembling the cohesive diary page by dynamically combining the content data and the page design in accordance with the configuration information for the cohesive diary page to be displayed by the diary program running in the browser;

> receiving by the diary server at least one request for at least one change concerning the diary information, from the diary program in the user system; and

> sending, by the diary server to the user system, new diary information for changing the cohesive diary page.

Ex. 1001, 23:44–65.

### D. Prior Art Supporting the Instituted Challenges

Petitioner relies upon the following references:

| | | | |
|---|---|---|---|
| Salas | US 6,233,600 B1 | May 15, 2001 (filed July 15, 1997) | Ex. 1005 |
| ED TITTEL & STEPHEN N. JAMES, MORE HTML FOR DUMMIES, xv-xxv, 57–84, 153–180, 341–364 (2d ed. 1997) ("Tittel (1997)") | | | Ex. 1006 |
| Parker | US 5,729,734 | Mar. 17, 1998 | Ex. 1011 |
| Angles | US 5,933,811 | Aug. 3, 1999 | Ex. 1012 |

### E. The Instituted Grounds of Unpatentability

We instituted *inter partes* review on the following grounds:

| References | Basis | Claims Challenged |
|---|---|---|
| Salas, Tittel (1997), and Parker | § 103 | 1, 4, 17, 18, and 26 |
| Salas, Tittel (1997), Parker, and Angles | § 103 | 20 |

IPR2014-00415
Patent 6,415,316 B1

## II.   ANALYSIS

### A.  Claim Construction

In an *inter partes* review, claim terms in an unexpired patent are interpreted according to their broadest reasonable construction in light of the specification of the patent in which they appear.  37 C.F.R. § 42.100(b); *see also In re Cuozzo Speed Techs., LLC*, 778 F.3d 1271, 1281–82 (Fed. Cir. 2015) ("Congress implicitly adopted the broadest reasonable interpretation standard in enacting the AIA," and "the standard was properly adopted by PTO regulation.").  Under the broadest reasonable interpretation, claim terms are given their ordinary and customary meaning, as would be understood by one of ordinary skill in the art in the context of the entire disclosure.  *In re Translogic Tech., Inc.*, 504 F.3d 1249, 1257 (Fed. Cir. 2007).

In the Decision to Institute, we interpreted various claim terms of the '316 patent as follows:

| Claim Term (Claims) | Interpretation |
|---|---|
| "cohesive diary page" (1 and 17) | a page in which the content data and the page design are fully integrated for display |
| "configuration information" (1 and 17) | information that determines what information will be displayed to a user who is viewing a cohesive diary page |

*See* Dec. to Inst. 8–9.  The parties do not dispute these interpretations in their Patent Owner Response and Reply.  We adopt the above claim constructions based on our previous analysis, and, based on the complete record now before us, see no reason to deviate from those constructions for purposes of this decision.

In our Decision to Institute, we also construed "privacy level information" to mean "configuration information that describes or specifies

at least one user or category of users permitted to view particular content on a cohesive diary page." Dec. to Inst. 9–10.

Patent Owner argues that our construction "is too broad because it covers information that merely specifies whether a particular individual user has access to certain content, and does not specify a level of access—the universe of users that have access to certain content." PO Resp. 50. According to Patent Owner, "privacy level information" should be construed to mean "configuration information that describes or specifies *the universe of one or more users or categories of users* permitted to view particular content on a cohesive diary page." *Id.* at 49 (emphasis added).

Petitioner counters that (1) the Specification does not use the word "universe;" (2) the claims themselves are written from the perspective of a single "user" system; (3) Figure 4(d) describes an unclaimed feature that should not be read into the claims; and (4) the claims use "level" in singular form and, therefore, information about only one user falls squarely within the broadest reasonable construction of privacy level information. Pet. Reply 1–4.

Having reviewed the parties' arguments and evidence, we are persuaded that our initial construction of "privacy level information" is incorrect. We are not persuaded, however, that a "privacy level" describes or specifies a "universe" or "category" of users permitted to view particular content. Specifically, we disagree with Patent Owner's contention that the examples of privacy levels disclosed in the '316 patent reflect a universe, or level, of permitted users (PO Resp. 51–52 (citing Ex. 1001, Fig. 4d, 10:36–41 ("world, friend, close friend, best friend, and owner"), 18:8–29 ("various classes of persons"))). Patent Owner's construction requires that a "privacy

IPR2014-00415
Patent 6,415,316 B1

level"—e.g., "owner"—specify a universe or category of users—e.g., user1.
The '316 patent, however, describes a "privacy level" as a characteristic of
the diary page, not as a group of users/viewers of the diary page. Ex. 1001,
10:37–39 ("Window 450 allows a user of the diary to set a privacy level *at
which the diary is operating*.") (emphasis added). As described in the '316
patent, the "privacy level" at which the diary page is operating does not
depend upon the identity of the user/viewer of the diary page. For example,
the '316 patent discloses:

> Button 438 allows *any* user to change the privacy level on
> which the diary is operating, provided that the user is able to
> authenticate himself at the desired level. Authentication is
> preferably performed by requiring the user to enter a password
> required to change the privacy level to a certain level.

Ex. 1001, 10:29–33 (emphasis added). The '316 patent further discloses that
"*[a]ny* user can change the privacy level, provided that he is able to
authenticate himself, e.g., via a password supplied in area 456." *Id.* at
10:41–43 (emphasis added). In both passages, the user is required to enter
only a password, not a username. The '316 patent also describes the
following example: "If the user selects the owner privacy level (button 455)
and can supply a correct password in area 45[6], after clicking OK button
45[7], buttons 440, 442, 444, and 446 of FIG. 4*(a)* become available to the
owner." *Id.* at 10:45–48. Thus, any user that can provide the "correct
password" can view the diary at the "owner" privacy level. This is
consistent with the disclosure that the password required to access a given
privacy level does not depend upon the identity of the viewer/user of the
diary page:

> Button 473 [of Fig. 4(f)] allows the owner to change passwords
> for the five privacy levels that are shown in FIG. 4*(d)*. *All users*

IPR2014-00415
Patent 6,415,316 B1

> must enter an appropriate *password* before diary applet 112 will
> generate HTML (for content objects) or otherwise reveal the
> existence of objects having those privacy levels (e.g., for named
> sections in the named section list 404).

Ex. 1001, 11:24–29 (emphases added); *see also id.* at 17:22–23 ("the
passwords required for *users* to access the different privacy levels"
(emphasis added)), 18:25–27 ("The diary applet of the described
embodiment asks for *a password* to determine a privacy level of a person."
(emphasis added)).

Under our initial construction of Patent Owner's proposed
construction, a particular "privacy level" would be available only to a
particular user, or users, within the "universe" or "category" of users
specified for that privacy level.  That is inconsistent, though, with the '316
patent's teaching that a diary page can be set to a privacy level by *any* user
that enters the correct password for that privacy level.  Accordingly, neither
our construction nor Patent Owner's construction can be correct.

The '316 patent uses the term "privacy level" in two contexts:  it
describes a diary page "operating" at a privacy level (Ex. 1001, 10:37–41),
and it describes content objects "having" a privacy level (*id. at* 11:25–29).
The "privacy level information" being claimed is part of "configuration
information for controlling behavior of a cohesive diary page."  Ex. 1001,
Claims 1, 17.  The '316 patent discloses that an owner can assign a "privacy
level" to pages, sections, and content objects to control whether they are
visible at the privacy level at which the diary page is operating.  Ex. 1001,
18:12–15 ("[T]he owner of the diary can control what is presented to various
classes of persons via his diary" by "identify[ing] various pages, sections, or
content objects as having a certain privacy level.").  Only content data with a

IPR2014-00415
Patent 6,415,316 B1

privacy level lower than or equal to the privacy level at which the diary page is operating is displayed. *Id.* at 18:17–20 ("[T]he diary applet generates HTML only for those portions of the diary that have a privacy level lower than or equal to the privacy level of the viewer who is viewing the diary.").[2] Specifically, "[t]he person viewing a diary page can only view that content marked as appropriate for him and other people at his privacy level." *Id.* at 18:23–25. Similarly, "[a]ll users must enter an appropriate password before diary applet 112 will generate HTML (for content objects) or otherwise reveal the existence of objects having those privacy levels (e.g., for named sections in the named section list 404)." *Id.* at 11:25–29. The privacy level information for a content object, therefore, specifies the privacy level at or above which the diary page must be operating in order for that content object to be displayed.

Accordingly, we construe "privacy level information" to mean "configuration information that describes or specifies a level at, or above, which particular content data is displayed as part of a cohesive diary page."

*B. Claims 1, 4, 17, 18, and 26 –*
*Obviousness over Salas, Tittel (1997), and Parker*

Petitioner argues that claims 1, 4, 17, 18, and 26 are unpatentable under 35 U.S.C. § 103(a) as obvious over Salas, Tittel (1997), and Parker. Pet. 24–56. In support of this ground of unpatentability, Petitioner relies upon the Declaration of Edward R. Tittel. *Id.* (citing Ex. 1002).

_____

[2] Although these passages refer to the "privacy level *of the viewer*," the '316 patent clarifies that the "privacy level" at which the diary page operates depends solely upon the password entered, not upon the identity of the viewer. *Id.* at 18:25–27 ("The diary applet of the described embodiment asks for a password to determine a privacy level of a person.").

IPR2014-00415
Patent 6,415,316 B1

Patent Owner argues that (1) neither Salas's access control information nor Parker's modified icons teach "privacy level information," as it was construed in the Decision to Institute (PO Resp. 9–17, 46–47); (2) neither Salas nor Parker teach sending "privacy level information," as properly construed (*id.* at 55); (3) Salas's access control information is not sent to the user system, as required by claims 1 and 17 (*id.* at 18–43); (4) Parker's access privileges are not sent to the user system, as required by claims 1 and 17 (*id.* at 43–45); and (5) a person of ordinary skill in the art would not have combined Salas and Parker because "in Salas every member of the e-room has viewing permission, both of the underlying files and the icons themselves" (*id.* at 56–60).

Upon consideration of the parties' contentions and supporting evidence, we determine that Petitioner has not established, by a preponderance of the evidence, that claims 1, 4, 17, 18, and 26 are unpatentable as obvious over Salas, Tittel (1997), and Parker.

*1. Salas (Exhibit 1005)*

Salas describes a system and method for providing a collaborative work environment that includes servers and client workstations. Ex. 1005, Abstract. Client workstations receive data objects from one or more servers and combine the received data objects with stored templates to render HTML pages representing at least a portion of a common project. *Id.* Users may view, edit, and create common documents for the projects and upload them to the server using a drag-and-drop interface. *Id.*

IPR2014-00415
Patent 6,415,316 B1

Figure 4 of Salas is reproduced below.



Figure 4 depicts an embodiment of eRoom page 60 that a user might encounter while using a browser program. Ex. 1005, 5:21–23. The eRoom page has five major elements: page element 402, navigation bar 404, graphical identifier 406, item box 408, and shortcut list 410. *Id.* at 5:24–27.

Page element 402 may include sub-elements. *Id.* at 5:28. In the embodiment depicted, discussion 420 is embedded within page element 402 and facility 422 allows a viewer to contribute to discussion 420. *Id.* at 5:28–31. Embedded discussion 420 and contribution facility 422 may be implemented as ActiveX controls, a JAVA applet, or other means. *Id.* at 5:31–34.

Graphical identifier 406 is used to pictorially identify the viewed page—e.g., a corporate logo or other organizational identifier. *Id.* at 5:54–56. Graphical identifier 406 may be static or dynamic (such as a javascript or ActiveX control). Ex. 1005, 5:56–58.

IPR2014-00415
Patent 6,415,316 B1

Item box 408 collects and displays items associated with the project represented by page 402.  *Id.* at 5:60–61.  In the embodiment shown in Figure 4, item box 408 contains folder of items 482, notes file 486, spreadsheet file 488, and word processing file 490, each of these being links to other eRoom pages or files.  *Id.* at 5:61–65.  Item box 408 may also include version organizers, discussion, links, vote/poll pages, a facility for creating new items 492, and icons that control how items are displayed in item box 408.  *Id.* at 5:65–6:4.  In Figure 4, three icons are provided:  "icon display" icon 494 (currently selected) which causes items to be displayed as large icons with identifying text underneath; "list display" icon 496 which causes items to be displayed as small icons with identifying text to one side of the icon; and "report display" icon which causes items to be displayed as a list.  *Id.* at 6:4–10.  The displayed list may be alphabetized, ordered by size of item, ordered by creation date, ordered by modification data, or ordered by some other data field associated with each item.  *Id.* at 6:10–13.

When a user requests the URL for an eRoom, the server returns an HTML file, called a "wrapper" file, that contains an object ID that is used by the client workstation to look up the object in the local database stored on the client workstation.  *Id.* at 6:40–52.  The local database includes information about the object, including which eRoom template to use and information regarding any "children" the object may have—e.g., items contained in item box 408.  *Id.* at 6:52–56.

Generation, display, and management of an eRoom are controlled by a "page builder" application residing on the client workstation.  *Id.* at 6:57–59.  In some embodiments, the page builder application may be an ActiveX control or a COM object.  *Id.* at 6:61–63.

14

IPR2014-00415
Patent 6,415,316 B1

### 2. Tittel (1997) (Exhibit 1006)

Tittel (1997) describes the use of style sheets and ActiveX components. Ex. 1006, 58, 176, 341. Tittel (1997) describes how ActiveX components are automatically downloaded from a server if the object is not already on a user's machine. *Id.* at 341. Tittel (1997) also describes how style sheets define a set of layout parameters for a document to ensure that similar elements in the document appear uniformly. *Id.* at 176.

### 3. Parker (Exhibit 1011)

Parker describes a file service administration method in a computer network having an administrator account and a user account. Ex. 1011, Abstract. The computer network includes at least one sharepoint that is selectively accessible through the user account. *Id.* Parker uses the term "sharepoint" to mean an item—e.g., file, folder, volume, hard disk—that is capable of being shared by network users. *Id.* at 2:24–26. The sharepoint is displayed in accordance with the user's privileges by being represented in a first state when the access privilege for the user is enabled and being represented in a second state when the access privilege for the user is not enabled. *Id.* at Abstract.

Figure 7 of Parker is reproduced below.



FIG. 7

15

Figure 7 shows a graphical user interface window in which two sharepoints are displayed in accordance with a user's access privileges. *Id.* at 5:29–32, 11:20–22. As depicted in Figure 7, "test folder-1" (417) is shown as accessible to the user by open lock icon 487 and because it is not ghosted, grayed out, or hidden. *Id.* at 11:40–44. In contrast, "test folder-2" (419) is in a ghosted state indicating that the user does not have access rights to "test folder-2." *Id.* at 11:44–46. In other embodiments, "test folder-2" (419) may be grayed out, shaded, or hidden altogether. *Id.* at 11:46–47.

  *4. Analysis*

  Petitioner has not established, by a preponderance of the evidence, that claims 1, 4, 17, 18, and 26 are unpatentable as obvious over Salas, Tittel (1997), and Parker. Pet. 24–56.

  Independent claim 1 recites "sending diary information from the diary server to the user system, the information comprising content data including an associated time, a page design to specify the presentation of the content data, and configuration information for controlling behavior of a cohesive diary page, the configuration information including privacy level information."

  For "content data including an associated time," Petitioner relies upon entries under "Announcements," and the representations of items in item box 408. *Id.* at 32–33. The entries are time-stamped, and the representations of items include a creation date and a modification date; both, therefore, "includ[e] an associated time," as recited. *Id.* at 33–35.

  For "page design," Petitioner relies upon the "wrapper" file sent by the eRoom server to the user system. *Id.* at 35–36. The "wrapper" file "specif[ies] the presentation of the content data," by specifying an eRoom

template to be used to assemble the page. *Id.* at 35–37. Petitioner also argues that it would have been obvious to modify the "wrapper" file of Salas to include a URL identifying an eRoom template stored on the eRoom server. *Id.* at 37–39 (citing Ex. 1002 (Tittel Decl.) ¶¶ 20–23, 73–75).

For "configuration information including privacy level information," Petitioner relies upon Salas's teaching of entries in a database schema including three separate groups (*see, e.g.*, Ex. 1006, 14:30–54) and upon file metadata. Pet. 40–41. Petitioner further relies upon Salas's teaching that file metadata includes "<u>access information such as which users may open, view and edit the file</u>" and is sent to client workstation 12 when synchronizing "<u>local database metadata</u>." *Id.*

Patent Owner argues that Salas's "access information" is not "privacy level information," as that term was construed in our Decision to Institute, because it does not relate to whether the user may view content on a cohesive diary page. PO Resp. 9. As Patent Owner explains, the "content data" relied upon by Petitioner are the "Announcements" and displayed file icons and associated file information, but not the underlying files themselves. *Id.* at 12–14 (citing Dec. to Inst. 15; Ex. 2013 (Tittel Deposition), 18:14–19:5, 22:25–23:6). According to Patent Owner, Salas's "access information" file metadata—"such as which users may open, view, and edit the file" (Ex. 1006, 13:54–55)—pertains only to the files themselves, and does not concern the whether the user may view the recited "content data"—i.e., the Announcements and the file icons and associated file information. *Id.* at 14–15.

Petitioner counters that Salas discloses "privacy level information" in the form of file metadata that includes "access information such as which

users may open, view, and edit the file." Pet. Reply 5–6 (quoting Ex. 1005, 13:52–57).

We are persuaded by Patent Owner's arguments. As discussed above, we construe "privacy level information" to mean "configuration information that describes or specifies a level at, or above, which particular content data is displayed as part of a cohesive diary page." Salas teaches that file metadata includes "access information such as which users may open, view, and edit *the file*." Ex. 1005, 13:54–55 (emphasis added). As Patent Owner correctly points out, the file is not "particular content on a cohesive diary page," as our construction requires; the only "content on a cohesive diary page" related to the file is an icon. Even if the file was "content on a cohesive diary page," Salas's access information would still not be "privacy level information" because it does not describe or specify a level at, or above, which the file is displayed as part of a cohesive diary page. In that regard, Petitioner relies upon Parker's teaching of visually indicating a user's access level by ghosting out, greying out, shading, or hiding a folder icon and name. Pet. 43–46. According to Petitioner,

> This would predictably result in the eRoom system of Salas in which the ActiveX control running in the web browser obtains the file metadata identifying the access privileges of the user (Salas, 13:52-57), and then uses it to generate the eRoom page with an item box (408) listing each file with a visual indication consistent with the viewing user's access privileges (*e.g.*[,] fully visible, ghosted, grayed out, with a "lock icon," etc.). (Tittel Decl. ¶ 88.)

Pet. 46. Thus, Petitioner contends that by specifying a category of users permitted to open/view/edit non-content (i.e., a file), Salas's access information also specifies a level (e.g., users-with-view-privileges level) at,

or above, which the file is displayed as part of a cohesive diary page. For example, the technique of Parker may be used to hide the icon of a file whose file metadata specifies that the user does not have view privileges (i.e., is not at, or above, the users-with-view-privileges level). Ex. 1011, Figs. 6, 7, 11:4-47.

As an initial matter, Salas's user-based privileges are inconsistent with the description of a "privacy level" in the '316 patent. As discussed above when construing "privacy level information," neither the privacy level at which a content object is viewable nor the the privacy level at which a diary is operating depend upon the identity of a particular user. Ex. 1001, 10:29–33, 10:41–43, 11:24–29, 17:22–23, 18:25–27. The "privacy level information" for a content object specifies a level at which, not a user to whom, the object becomes visible. *Id.* Salas's access information, in contrast, specifies users to whom the file is openable, viewable, and/or editable. Ex. 1005, 13:52–57.

Even assuming that the group of users who can view *a file* constitutes a "privacy level," Salas's access information still would not be "privacy level information" because it would describe only a level at which non-content (i.e., a file)—not *content* (i.e., the icon associated with that file)—is displayed.

Accordingly, we are not persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that the combination of Salas, Tittel (1997), and Parker teaches "privacy level information," as recited in independent claims 1 and 17.

*a. Alternative construction of "privacy level information"*

Even if we were to modify our construction of "privacy level information" in the Decision to Institute only slightly to mean "configuration information that describes or specifies at least one ~~user or~~ category of users permitted to view particular content on a cohesive diary page," we would still not be persuaded that the combination of Salas and Parker teaches "privacy level information."  Such a construction would be appropriate because our construction of "privacy level information" in the Decision to Institute is too broad.  We agree with Patent Owner that "privacy level information" must be more than a password specific to a single user/viewer. As Patent Owner points out, the '316 patent distinguishes a "privacy level" from a user-specific password.  PO Resp. 50 (citing Ex. 1001, 9:2–4 ("The configuration information, such as privacy level, passwords, or the full name of the user, is user-specific.")); *see also id.* at 50–51 (citing Ex. 1001, 10:29–33, 17:21–23).  Thus, although a privacy level may include only one user—e.g., "owner"—it must be capable of including multiple users, which a user-specific password is not.  The use of "level" in the singular does not suggest otherwise.  The fact that information relating to only one level, as opposed to a plurality of levels, meets the claim limitation does not imply, as Petitioner suggests, that a single user may be a "level."

Even under this alternative construction, we would still be persuaded by Patent Owner's arguments that Salas and Parker do not teach "privacy level information."  Salas teaches that file metadata includes "access information such as which users may open, view, and edit *the file*." Ex. 1005, 13:54–55 (emphasis added).  As Patent Owner correctly points out, the file is not "particular content on a cohesive diary page," as our

IPR2014-00415
Patent 6,415,316 B1

construction requires.  The only "content on a cohesive diary page" related to the file is an icon and metadata (e.g., filename).  The question, then, is whether Salas's access information describes or specifies at least one category of users permitted to view the icon representing the file and/or the file's metadata.  In that regard, Petitioner relies upon Parker's teaching of visually indicating a user's access level by ghosting out, greying out, shading, or hiding a folder icon and name.  Pet. 43–46.  According to Petitioner,

> This would predictably result in the eRoom system of Salas in which the ActiveX control running in the web browser obtains the file metadata identifying the access privileges of the user (Salas, 13:52-57), and then uses it to generate the eRoom page with an item box (408) listing each file with a visual indication consistent with the viewing user's access privileges (*e.g.*[,] fully visible, ghosted, grayed out, with a "lock icon," etc.).  (Tittel Decl. ¶ 88.)

Pet. 46.  Thus, by specifying a category of users permitted to open/view/edit non-content (i.e., a file), Salas's access information also specifies the category of users permitted to view particular content (i.e., the icon representing that file) on a cohesive diary page.  For example, the technique of Parker may be used to hide the icon of a file whose file metadata specifies that the user may not view it.

In the proposed combination, however, the file metadata determines only indirectly which icons ("content") the user is permitted to view.  The file metadata itself describes/specifies access privileges only of non-content—i.e., the files themselves.  It is not enough that that information may be used, in the assembling step, to determine what content (e.g., icon) the user is permitted to view because our construction requires that the

IPR2014-00415
Patent 6,415,316 B1

"privacy level information" describe or specify at least one category of users permitted to view *particular content.* Moreover, it is not enough for the file metadata to determine the appearance of icons, small icons, or lists in item box 408 (e.g., the visual appearance of items in item list box 408 based upon file metadata such as filename, creation date, modified date, and which application should be used to open and edit the file (*see, e.g.*, Ex. 1005, Fig. 4, 6:4–13)), because that information does not describe or specify a category of users permitted to *view* those icons or lists.

Accordingly, even under this alternative construction, we are not persuaded that Petitioner has demonstrated, by a preponderance of the evidence, that the combination of Salas, Tittel (1997), and Parker teaches "privacy level information," as recited in independent claims 1 and 17.

   *5. Conclusion*

Petitioner has not demonstrated, by a preponderance of the evidence, that claims 1, 4, 17, 18, and 26 are unpatentable as obvious over Salas, Tittel (1997), and Parker.

   *C. Claim 20 – Obviousness over Salas, Tittel (1997), Parker, and Angles*

Petitioner argues that claim 20 is unpatentable under 35 U.S.C. § 103(a) as obvious over Salas, Tittel (1997), Parker, and Angles. Pet. 56–59. Claim 20 depends indirectly from independent claim 17. Petitioner has not demonstrated, by a preponderance of the evidence, that independent claim 17 is unpatentable as obvious over Salas, Tittel (1997), and Parker for the reasons discussed above. Petitioner relies upon Angles only for the additional limitation recited in claim 20. *Id.* Because Angles does not cure the deficiency noted above with respect to "privacy level information," Petitioner also has not demonstrated, by a preponderance of the evidence,

IPR2014-00415
Patent 6,415,316 B1

that claim 20 is unpatentable as obvious over Salas, Tittel (1997), Parker, and Angles.

## III.   CONCLUSION

Petitioner has not shown, by a preponderance of the evidence, that claims 1, 4, 17, 18, 20, and 26 of the '316 patent are unpatentable under 35 U.S.C. § 103.

## IV.   ORDER

Accordingly, it is

ORDERED claims 1, 4, 17, 18, 20, and 26 are not held unpatentable; and

FURTHER ORDERED that, because this is a Final Written Decision, the parties to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2014-00415
Patent 6,415,316 B1

For PETITIONER:

Heidi L. Keefe
Mark R. Weinstein
COOLEY LLP
hkeefe@cooley.com
mweinstein@cooley.com
zpatdcdocketing@cooley.com

For PATENT OWNER:

Robert H. Hillman
Lawrence K. Kolodney
John S. Goetz
FISH & RICHARDSON P.C.
hillman@fr.com
kolodney@fr.com
goetz@fr.com
IPR2014-00415@fr.com

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

REMBRANDT SOCIAL MEDIA, LP

          Plaintiff,

   v.

FACEBOOK, INC. and
ADDTHIS, INC.

          Defendants.

Civil Action No.  1:13cv158 TSE/TRJ

**JURY TRIAL DEMANDED**

---

## SECOND AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff, for its second amended complaint,[1] alleges as follows:

## The Parties

1.    Plaintiff Rembrandt Social Media, LP ("Rembrandt") is a Virginia limited partnership having its principal place of business at 401 City Avenue, Suite 900, Bala Cynwyd, Pennsylvania 19004.

2.    Defendant Facebook, Inc. ("Facebook") is a Delaware corporation with its headquarters at 1601 Willow Road, Menlo Park, California 94025.

3.    Defendant AddThis, Inc. ("AddThis") is a Delaware corporation with its headquarters and principal place of business in this district at 1595 Spring Hill Road, Suite 300, Vienna, Virginia 22182.

## Jurisdiction, Venue, and Joinder

4.    This is an action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code.  This Court has subject matter jurisdiction

---

[1]   This Second Amended Complaint is being filed after the Court's Order *granting in part* and *denying in part* Defendants' Motion to Dismiss.  (D.I. 141)  For ease of reference, a redlined version of the First Amended Complaint is attached hereto as **Exhibit A**.

over this action under 28 U. S. C. §§ 1331 and 1338(a).

5.     This Court has personal jurisdiction over Facebook and AddThis (collectively "Defendants") because, among other things, the Defendants have committed acts of infringement in Virginia, including in this district, and have engaged in continuous and systematic activities in Virginia.

6.      Venue is proper in this Court under 28 U.S.C. §§ 1391 and 1400(b) because, among other things, Defendants have committed acts of infringement in this judicial district, and are subject to personal jurisdiction here.

7.     Joinder is proper under 35 U.S.C. § 299 because, as explained in Count II, Facebook and AddThis are jointly and severally liable for infringement arising out of the same series of transactions or occurrences relating to the use of the same system, and questions of fact common to both defendants will arise in the action.

## Facts

8.     Joannes Jozef Everardus Van Der Meer, now deceased, was a computer scientist, a computer programmer, and an inventor.  During the 1990s, at a time when the World Wide Web was in its infancy, Van Der Meer was a pioneer in the development of user-friendly Web-based technologies.

9.     On September 1, 1998, Van Der Meer filed two related patent applications with the United States Patent and Trademark Office ("USPTO").  The first of these applications, entitled "METHOD AND APPARATUS FOR IMPLEMENTING A WEB PAGE DIARY," issued on July 2, 2002 as U.S. Patent No. 6,415,316 ("the '316 patent").  The '316 patent described and claimed a novel technology that gave ordinary people—those without training in the computer arts—the ability to create and use what Van Der Meer called a personal diary, and

what today would be called "social media," on the World Wide Web.  Using his system, ordinary people could collect personal information and third-party content, organize the information chronologically on a personalized web page, and share the information with a selected group of people, such as the end user's friends, through the use of user-settable privacy levels.

10.    Van Der Meer's second application, entitled "SYSTEM AND METHOD FOR GENERATION, TRANSFERRING, AND USING AN ANNOTATED UNIVERSAL ADDRESS," was issued by the USPTO on September 11, 2001 as United States Patent No. 6,289,362 ("the '362 patent").  It described and claimed a related set of technologies that enabled the automatic transfer, at a user's request, of third-party content from a content-provider's website to the user's personal diary page.  These techniques further increased the utility of Van Der Meer's "personal diary" concept, by allowing users to collect interesting content as they browsed the Web, simply by clicking on buttons on the websites that they visited.

11.    While these applications were pending and after they issued as patents, Van Der Meer worked to commercialize his inventions.  He formed a company called AIdministrator Nederland B.V. (which later did business as, and hereinafter will be referred to as, "Aduna") and began work on implementing the ideas contained in his patents.  He registered a domain name—www.surfbook.com—and separately launched a pilot system that utilized some of the innovations described in his patents.  Unfortunately, Van Der Meer passed away in June of 2004, before he was able to fully realize his vision.

12.    After his death, Van Der Meer's family, including his widow, sought a way to achieve the credit and compensation that his inventions—and his pioneering work in the field of

social media—deserved.  To help achieve this goal, the family enlisted the help of Rembrandt IP

Management, LLC, which is an affiliated company to, and acts as an agent for, the plaintiff in

this action.  Rembrandt IP Management, LLC, works to help inventors and patent owners, who

often do not have the requisite capital or expertise, enforce their rights against companies that

use their inventions without paying for them.  The family and Rembrandt are now working

together to enforce the '316 and '362 patents.

13.     Rembrandt is the owner by assignment of both the '316 patent and the '362

patent, copies of which are attached to this First Amended Complaint as Exhibit A and Exhibit

B, respectively.

14.     On or before September 2008, the law firm that had represented Aduna in

connection with the '316 and '362 patents, and had prosecuted the applications for those

patents, took over the prosecution of a Facebook patent application and has since continued to

represent Facebook in patent matters.

15.     On or about May 20, 2011, Facebook was served with a complaint alleging

infringement of U.S. Patent No. 7,933,893 (the '893 patent), which cites the '362 patent as prior

art on its face.  That lawsuit was filed in the District of Delaware, case number 11cv435.

16.     On or about June 2012, Facebook acquired (1) U.S. Patent No. 7,907,966 (the

'966 patent), on the face of which the '362 patent is listed as prior art, and (2) U.S. Patent No.

8,327,275 (the '275 patent), during the prosecution of which an IDS was filed listing published

Van Der Meer European patent application EP 0984370A2, which claimed priority to the patent

applications that issued as the '316 and '362 patents.

17.     In or about July 2012, the law firm that had been representing Aduna and

Facebook for an overlapping period of almost four years terminated its relationship with Aduna.

18.     Today, Facebook owns and operates the famous and widely used social networking service accessible for example on the World Wide Web at the web address of www.facebook.com and through specialized mobile applications (the "Facebook social network").  Although Mark Zuckerberg did not start what became Facebook until 2003, it bears a remarkable resemblance, both in terms of its functionality and technical implementation, to the personal web page diary that Van Der Meer had invented years earlier.

19.     Like the Van Der Meer inventions, the Facebook social network gives ordinary people—those without special training—the ability to create a personal webpage diary, comprised of personal information and third-party content, and to arrange it chronologically. Facebook organizes (or has organized) this information in various presentation formats, including the "wall," the "timeline," and the "news feed," and provides the user with the ability to share specific diary entries with a selected group of people, such as the user's friends, through the use of user-settable privacy levels.

20.     Like the Van Der Meer inventions, the Facebook social network allows Facebook members to customize their individual diary pages using a "cover."   The Van Der Meer patents and Facebook both refer their customization features as "covers" in a non-standard way, to refer to something that does not actually cover anything else up.

21.     In addition, Facebook uses its network to obtain advertising revenue by placing advertisements on millions of personal diary pages.  This advertising feature was envisioned by Van Der Meer, and was described and claimed in the '316 patent.

22.     Moreover, and again like the Van Der Meer inventions, Facebook provides users with the ability to automatically transfer content from third party web sites to their Facebook diaries, simply by clicking a "share" or "like" button on one of those sites.

23.    When a Facebook member visiting a particular web page presses a "like" or "share" button, a Facebook-provided program (hereinafter the "Facebook Transfer Applet") temporarily commandeers the member's web browser, and instructs it to perform all of the underlying technical steps required to transfer information about the page over the internet to databases on Facebook's server.  In addition to transferring the information that the user sees, the program code also causes the browser to collect and transmit to Facebook's server other information, such as information about the identity of the user, which allows Facebook to track the behavior and preferences of its users.

24.    Facebook encourages the use of its "share" and "like" buttons on third party web sites by distributing program code (hereinafter "the Facebook Transfer Script") that allows web site operators to implement these features on their sites.  The Facebook Transfer Script contains instructions that load the Facebook Transfer Applet into the web browser.

25.    Social bookmarking services provide software tools, also known as "widgets," that allow members of social networks to collect or "bookmark" information about web sites that they are viewing to social networking sites, such as Facebook, and thus allow users to make a record, or diary, about the web sites they have visited.  Defendant AddThis is the largest and most widely used social bookmarking service and was an early partner with Facebook.  AddThis makes money by using its widgets to gather insights on what large numbers of Internet users read and share with their friends in real time, and selling that data to companies which can benefit from those insights.

26.    In one particular example, AddThis provides a widget that is specially configured only to bookmark information to Facebook ("the AddThis Facebook widget").  Website operators may include a reference to the AddThis Facebook widget on their web sites, in lieu of

using the Facebook Transfer Script. When a website is loaded into a viewer's web browser, a signal is sent to the AddThis web server, which causes AddThis to download the AddThis Facebook widget into the viewer's web browser, which causes it to be executed. When this widget is executed, it causes the Facebook Transfer Applet to also be loaded into the web browser, and to present to the user the familiar "like" and "share" buttons described above. Facebook and AddThis work together to enable the AddThis Facebook widget, including by ensuring that it is interoperable with Facebook's web servers. Facebook and AddThis thus disseminate and enhance the functionality of the Facebook's "like" and "share" buttons on third party websites. In 2007, Facebook provided AddThis with special access to its developer platform to assist and encourage AddThis to develop the AddThis Facebook widget. The CEO of AddThis, Mr. Ramsey McGrory, has said: "We have a long and positive relationship with Facebook. We were an early partner for them as they were growing to scale. We continue to be on the tool side, on the sharing and tool side."

27.     The AddThis web widget acts like an enhanced version of the Facebook Transfer Script, and is used by third party web site operators in lieu of the transfer script provided by Facebook. Like the Facebook Transfer Script, however, the AddThis web widget relies upon, and cooperates with, the Facebook Transfer Applet, provided by Facebook, to effectuate transfer of content from a given website to Facebook.

### COUNT I
(Facebook's Infringement of the '316 patent)

28.     Rembrandt incorporates paragraphs 1-27 by reference.

### Direct Infringement

29.     Facebook has directly infringed and continues to directly infringe the '316 patent in this judicial district and elsewhere in the United States. Facebook's infringement includes,

without limitation: (1) making and using the apparatus of claims 17 and claims dependent thereon, the computer-code products of claim 28 and claims dependent thereon, and the system of claim 39, and (2) practicing the method of claims 1 and 6 and claims dependent thereon.

30.     Specifically, Facebook's direct infringement includes among other things making and placing into service, and otherwise using, a system by which Facebook displays interactive Facebook diary pages to Facebook members.  This system includes at least computer software (hereinafter "the Facebook page display system") that performs the following activities:

- Sending program code, including code known to Facebook as "BigPipe," from the Facebook servers to an end user's computer browser;

- Sending content to the end user's browser, including the "pagelets" that are used by the BigPipe program;

- Sending a page design template and privacy level information to the end user's browser;

- Assembling the page for display to the end user;

- Allowing the end user to request changes in content information on the page; and

- Sending updated content information to the user in accordance with the user's request.

31.     At least as a result of the computer software and hardware that performs these activities, Facebook is liable for literal direct infringement of the '316 patent pursuant to 35 U.S.C. § 271(a).

32.     To the extent that any fact finder deems any of the elements of the '316 patent claims not literally satisfied by the structure or use of the Facebook social network, these elements are satisfied under the doctrine of equivalents.

33.     Rembrandt has no statutory obligation to mark any products with the number of the '316 patent.  Rembrandt has notified Facebook of the infringement of the '316 patent by

filing the present action for patent infringement, as permitted by 35 U.S.C. § 287(a).

### Indirect Infringement

34.     Alternatively and in addition to its liability for direct infringement of the '316 patent, Facebook is also liable for indirectly infringing the '316 patent in this judicial district and elsewhere in the United States by inducing direct infringement in violation of 35 U.S.C. § 271(b) and contributing to direct infringement in violation of 35 U.S.C. § 271(c).

35.     Facebook has been aware of the '316 patent since at the least February 6, 2013, when it was served with the original Complaint in this action.

36.     Upon information and belief, upon Facebook's gaining knowledge of the '316 patent, it was, or became, apparent to Facebook that the operation of its social network resulted in infringement of the '316 patent.   Upon information and belief, Facebook has continued to engage in the aforementioned activities constituting inducement of infringement, notwithstanding its knowledge (or willful blindness thereto) that the activities it was inducing would result in infringement of the '316 patent.

37.     The direct infringement induced and contributed to by Facebook includes at least the use of the Facebook social network by end users acting alone or, in the case of method claims, in combination with Facebook.   The directly infringing use includes use of the Facebook page display system.

38.     Facebook encourages direct infringement of the '316 patent by at least widely publicizing its social network and by providing on its website tools and instructions for conducting the directly infringing use.

39.     With respect to apparatus claim 17, computer code product claim 28, and system claim 39, and their dependent claims, Facebook induces infringement by at least encouraging,

facilitating and instructing users to use the inventions while they are visiting the Facebook social network. Facebook does this by, without limitation, modifying, in response to user actions, the configuration of user computers and by encouraging users to use their computers, so modified, to interact with the Facebook social network, thereby inducing use of the claimed inventions.

40.    With respect to method claims 1 and 6 and their dependent claims, Facebook induces infringement by at least encouraging and instructing users who visit the Facebook social network to perform some or all of the claimed method steps, while in certain instances performing certain of the method steps itself in coordination with such performance by users.

41.    Facebook's specific intent to cause its users to directly infringe can also be inferred from its knowledge of the '316 patent and from the striking similarity between the '316 patent and the Facebook social network. Both the '316 patent and the Facebook social network feature sending from a server to a user's browser both content and program code for creating a personal diary page, controlling access to the page in accordance with a privacy level set by the user, and updating the page as requested by the user.

42.    Facebook contributes to the direct infringement by at least providing its users with software components for operating its social network and interacting with end user browsers, including the software components comprising at least portions of the Facebook page display system. These software components are known by Facebook to be especially made or adapted for use in the infringing Facebook system. These components are not staple articles of commerce and have no substantial non-infringing use. They are specially designed to work only with the Facebook social network, and their only purpose is to interact with other elements of the Facebook page display system that implements the Facebook member experience which, as

10

described above, directly infringes the claims of the '316 patent.

## 271(f) Infringement

43. Facebook is liable for infringement under 35 U.S.C. § 271(f) when the end users are outside the United States by supplying its software components for combination in browsers located outside the United States.

## Remedy for Facebook's Infringement

44. For past infringement, Rembrandt has been damaged as a result of Facebook's conduct described in this Count. Facebook is therefore liable to Rembrandt under 35 U.S.C. § 284 for past damages in an amount that adequately compensates Rembrandt for Facebook's infringing conduct but no less than a reasonable royalty, together with interest and costs as fixed by this Court.

45. For future infringement, Rembrandt will be irreparably harmed unless this Court issues a permanent injunction prohibiting Facebook, its agents, servants, employees, representatives, and all others acting in active concert with Facebook, from infringing the '316 patent. Alternatively, Rembrandt is entitled to damages in lieu of an injunction, in an amount consistent with the fact that for future infringement Facebook will be an adjudicated infringer of a valid patent.

## COUNT II
(Infringement of the '362 patent by Facebook and AddThis based on the same transactions and occurrences)

46. Rembrandt incorporates paragraphs 1-27 by reference.

**Direct Infringement**

47.     Based on the same transactions and occurrences, Facebook and AddThis have both directly infringed and continue to directly infringe the '362 patent in this judicial district and elsewhere in the United States.

48.     AddThis directly infringes at least claim 7 of the '362 patent by making a distributed computer system (hereinafter the "Facebook-AddThis Transfer System") that facilitates the transfer, from third party web sites to Facebook's servers, of content that a Facebook member has indicated is "liked" or to be "shared."   Facebook and AddThis also directly infringe at least claim 7 of the '362 patent by their placing into service and otherwise using the entire Facebook-AddThis Transfer System.   Upon information and belief, the Facebook-AddThis Transfer System includes at least the following hardware and software elements:

- AddThis memory that stores the AddThis-Facebook widget that, when executed, requests the Facebook Transfer Applet that transfers data that has been "liked" or "shared" by a Facebook member from the member's browser to a Facebook server, where it is stored in a Facebook database;

- Facebook memory for storing a database containing liked or shared content with associated links and the Facebook Transfer Applet;

- A browser on the Facebook member's computer that is coupled to both the AddThis memory and the Facebook memory and which executes the AddThis-Facebook widget and the Facebook Transfer Applet in order to transfer annotated data that has been "liked" or "shared" by a Facebook member from the member's browser to a Facebook server, where it is stored in a Facebook database.

49.     AddThis makes the Facebook-AddThis Transfer System by at least downloading the AddThis-Facebook widget, including a transfer script, into a client web browser, and by controlling the client web browser to download the Facebook Transfer Applet into the client

web browser, thereby configuring the client web browser as required by at least claim 7. Because AddThis makes the entire Facebook-AddThis Transfer System, at least as described above, it is liable for literal direct infringement of the '362 patent pursuant to 35 U.S.C. § 271(a).

50.     Facebook places into service and otherwise uses the Facebook-AddThis Transfer System by controlling the entire system to transfer member-specified content, along with tracking information about Facebook member preferences and web browsing patterns, to Facebook's servers. Facebook uses this collected information to provide content for at least the Facebook social network, and to generate targeted advertising to Facebook members. AddThis places into service and otherwise uses the entire Facebook-AddThis Transfer System by controlling the entire system to collect tracking information about user activities on the web sites of AddThis's website operator customers. AddThis uses this collected information to generate web-analytics reports for its customers.

51.     Because both Facebook and AddThis use the entire Facebook-AddThis Transfer System, at least as described above, they are liable for literal direct infringement of the '362 patent pursuant to 35 U.S.C. § 271(a).

52.     To the extent that any fact finder deems any of the elements of the '362 patent claims not literally satisfied by the above recited hardware and software components, these elements are nevertheless satisfied under the doctrine of equivalents.

53.     Rembrandt has no statutory obligation to mark any products with the number of the '362 patent. Rembrandt has notified Facebook and AddThis of the infringement of the '362 patent by filing the present action for patent infringement, as permitted by pursuant to 35 U.S.C. Section 287(a).

**Indirect Infringement**

54.     Alternatively and in addition to their liability for direct infringement, and based on the same transactions and occurrences, Facebook and AddThis are also both liable for indirectly infringing the '362 patent in this judicial district and elsewhere in the United States by inducing direct infringement in violation of 35 U.S.C. § 271(b) and by contributing to direct infringement in violation of 35 U.S.C. § 271(c).

55.     Facebook's and AddThis's indirect infringement includes inducing and contributing to the making and use of the Facebook-AddThis Transfer System, by Facebook members, AddThis customers, and others.

56.     Facebook and AddThis induce the use of the Facebook-AddThis Transfer System by at least providing components of the Facebook-AddThis Transfer System, by advertising the availability of these components, and by instructing Facebook members and AddThis customers how to use those components to use the Facebook-AddThis Transfer System.  Facebook and AddThis also induce the use of the Facebook-AddThis Transfer System by at least operating one or more web servers that interoperate with the Facebook-AddThis Transfer System, thereby allowing it to perform its intended function.

57.     Facebook encourages AddThis to make and use the Facebook-AddThis Transfer System by at least making its system interoperable with the AddThis Facebook widget, by permitting and encouraging AddThis to use the Facebook Transfer Applet and "like" button icons, and by providing instruction for their use.  Indeed, Facebook aggressively encourages use of its applet by providing instructions on its website to cause its icon to appear on millions of webpages around the world, both directly and through AddThis.

58.     Facebook and AddThis have been aware of the '362 patent since at least

February 6, 2013, when they were served with the original Complaint in this action.

59.     Upon information and belief, upon gaining knowledge of the '362 patent, it was, or became, apparent to Facebook and AddThis that the making and use of the Facebook-AddThis Transfer System resulted in infringement of the '362 patent.  Upon information and belief, Facebook continued to engage in activities that induced the making and use of the Facebook-AddThis Transfer System notwithstanding their knowledge (or willful blindness thereto) that the activities they were inducing would result in infringement of the '362 patent.

60.     Facebook's and AddThis's specific intent to cause direct infringements of the '362 patent through making and/or use of the Facebook-AddThis Transfer System can be inferred from their knowledge of the '362 patent and from the striking similarity between that system and the '362 patent.  Both the '362 patent and the Facebook-AddThis Transfer System feature a convenient and automatic way of installing website content to a Facebook member's diary page, by storing and providing on request a transfer applet for carrying out the installation.

61.     Facebook's specific intent to cause AddThis to directly infringe by using the Facebook-AddThis Transfer System can be inferred from its knowledge of the '362 patent and from the striking similarity between the system and the '362 patent.  Both the '362 patent and the Facebook-AddThis Transfer System feature a convenient and automatic way of installing website content to an end user's diary page, by storing and providing on request a transfer applet for carrying out the installation.

62.     Facebook and AddThis also contribute to the direct infringement of end users by at least providing software components of the Facebook-AddThis Transfer System, knowing that that system infringes at least claim 7 of the '362 patent.  These software components are known by Facebook and AddThis to be especially made or adapted for use in the infringing

system.  And these components are not staple articles of commerce and have no substantial non-infringing use as they are necessarily required to interact with the infringing system as whole to perform their very specific functions.  They are specially designed to work only with the Facebook-AddThis Transfer System, or a similarly structured system, and their only purpose is to interact with other elements of the Facebook-AddThis Transfer System, or a similarly structured system, which, as described above, directly infringes at least claim 7 of the '362 patent.

63.    Facebook contributes to AddThis's direct infringement by providing portions of the software components of the Facebook-AddThis Transfer System, knowing that that system infringes at least claim 7 of the '362 patent.  These software components are known by Facebook to be especially made or adapted for use in the infringing system.  And these components are not staple articles of commerce and have no substantial non-infringing use as they are necessarily required to interact with the infringing system as whole to perform their very specific functions.  They are specially designed to work only with the Facebook-AddThis Transfer System, or a similarly structured system, and their only purpose is to interact with other elements of the Facebook-AddThis Transfer System, or a similarly structured system, which, as described above, directly infringes at least claim 7 of the '362 patent.

**Joint Infringement**

64.    Alternatively, the actions alleged above establish joint infringement of at least claim 7 by Facebook and AddThis for which they should be found to be jointly and severally liable.

**271(f) Infringement**

65.    Facebook and AddThis are liable for infringement under 35 U.S.C. § 271(f)

when the end users are outside the United States by supplying their respective software components for combination in browsers located outside the United States.

### Remedy for Defendants' Infringement

66.    For past infringement, Rembrandt has been damaged as a result of Defendants' infringement of the '362 patent by the conduct described in this Count.  The Defendants are therefore jointly and severally liable to Rembrandt for past damages under 35 U.S.C. § 284 in an amount that adequately compensates Rembrandt for their infringing conduct but no less than a reasonable royalty, together with interest and costs as fixed by this Court.

67.    For future infringement, Rembrandt will be irreparably harmed unless this Court issues a permanent injunction prohibiting the Defendants, their respective agents, servants, employees, representatives, and all others acting in active concert with Defendants from infringing the '362 patent.  Alternatively, Rembrandt is entitled to damages in lieu of an injunction, in an amount consistent with the fact that for future infringement the Defendants will be adjudicated infringers of a valid patent.

### COUNT III
(Facebook's separate infringement of the '362 patent)

68.    Rembrandt incorporates paragraphs 1-27 by reference.

### Direct Infringement

69.    Facebook has directly infringed and continues to directly infringe the '362 patent in this judicial district and elsewhere in the United States.

70.    Facebook directly infringes at least claim 7 of the '362 patent by, without limitation, its use of a distributed computer system (hereinafter the "Facebook Transfer System") that transfers, from third party web sites to Facebook's servers, content that a

17

Facebook member has indicated is "liked" or to be "shared." Upon information and belief, this Facebook Transfer System includes at least the following hardware and software elements:

- Third-party content-provider webserver memory that stores the Facebook Transfer Script provided by Facebook that, when executed, requests the Facebook Transfer Applet that transfers data that has been "liked" or "shared" by a Facebook member from the member's Internet browser to a Facebook server, where it is stored in a Facebook database;

- Facebook memory for storing a database containing liked or shared content with associated links and the above-mentioned transfer applet;

- An Internet browser on the Facebook member's computer that is coupled to both the third-party content-provider webserver memory and the Facebook memory and which executes the Facebook Transfer Script and the Facebook Transfer Applet in order to transfer annotated data that has been "liked" or "shared" by a Facebook member from the member's Internet browser to a Facebook server, where it is stored in a Facebook database.

71.     Facebook places into service and otherwise uses the Facebook Transfer System by controlling the entire system to transfer member-specified content, along with user tracking information about Facebook member preferences and web browsing patterns, to Facebook's servers. Facebook uses this collected information to provide content for the Facebook social network, and to generate targeted advertising to Facebook members.

72.     Because Facebook uses the entire Facebook Transfer System, at least as described above, Facebook is liable for literal direct infringement of the '362 patent pursuant to 35 U.S.C. § 271(a).

73.     To the extent that any fact finder deems any of the elements of the '362 patent claims not literally satisfied by the above recited hardware and software components, these element are satisfied under the doctrine of equivalents.

74.     Rembrandt has no statutory obligation to mark any products with the number of the '362 patent. Rembrandt has notified Facebook of the infringement of the '362 patent by

filing the present action for patent infringement, as permitted by pursuant to 35 U.S.C. Section 287(a).

### Indirect Infringement

75.     Alternatively and in addition to its liability for directly infringing the '362 patent, Facebook is liable for indirectly infringing the '362 patent in this judicial district and elsewhere in the United States by inducing direct infringement in violation of 35 U.S.C. § 271(b) and contributing to direct infringement in violation of 35 U.S.C. § 271(c).

76.     Facebook's indirect infringement includes inducing and contributing to the making and use of the Facebook Transfer System by Facebook members, website operators, and others.

77.     Facebook induces the making and use of the Facebook Transfer System by providing components of the Facebook Transfer System, by advertising the availability of these components, and by instructing Facebook members and website operators how to use those components to make and use the Facebook Transfer System.  Facebook also induces the making and use of the Facebook Transfer System by operating one or more web servers that interoperate with the Facebook Transfer System, thereby allowing it to perform its intended function.

78.     Facebook has been aware of the '362 patent since February 6, 2013, when it was served with the original Complaint in this action.

79.     Upon information and belief, upon gaining knowledge of the '362 patent, it was, or became, apparent to Facebook that the making and use of the Facebook Transfer System resulted in infringement of the '362 patent.  Upon information and belief, Facebook continued to engage in activities that induced the making and use of the Facebook Transfer System notwithstanding its knowledge (or willful blindness thereto) that the activities it was inducing

would result in infringement of the '362 patent.

80.     Facebook's specific intent to cause direct infringements of the '362 patent through making and use by others of the Facebook Transfer System can be inferred from its knowledge of the '362 patent and from the striking similarity between the system and the '362 patent.  Both the '362 patent and the Facebook Transfer System feature a convenient and automatic way of installing website content to a Facebook member's diary page, by storing and providing on request a transfer applet for carrying out the installation.

81.     Facebook also contributes to the direct infringement by end users and by third-party website owners by providing software components of the Facebook Transfer System, knowing that that system infringes at least claim 7 of the '362 patent.  These software components are known by Facebook to be especially made or adapted for use in the infringing system.  And these components are not staple articles of commerce and have no substantial non-infringing use as they are necessarily required to interact with the infringing system as whole to perform their very specific functions.  They are specially designed to work only with the Facebook  Transfer System, or a similarly structured system, and their only purpose is to interact with other elements of the Facebook Transfer System, or a similarly structured system, which, as described above, directly infringes at least claim 7 of the '362 patent.

### 271(f) Infringement

82.     Facebook is liable for infringement under 35 U.S.C. § 271(f) when either the end users or the third-party website server is outside the United States by supplying its software components for combination outside the United States.


### Remedy for Facebook's Infringement

83.     For past infringement, Rembrandt has been damaged as a result of Facebook's

infringement of the '362 patent by the conduct described in this Count. Facebook is therefore liable to Rembrandt for past damages under 35 U.S.C. § 284 in an amount that adequately compensates Rembrandt for Facebook's infringing conduct but no less than a reasonable royalty, together with interest and costs as fixed by this Court.

84.    For future infringement, Rembrandt will be irreparably harmed unless this Court issues a permanent injunction prohibiting Facebook, its respective agents, servants, employees, representatives, and all others acting in active concert with Facebook from infringing the '362 patent. Alternatively, Rembrandt is entitled to damages in lieu of an injunction, in an amount consistent with the fact that for future infringement the Facebook will be an adjudicated infringer of a valid patent.

## JURY DEMAND

85.    Rembrandt hereby respectfully demands a jury trial on all issues appropriately triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, Rembrandt prays that it have judgment against Defendants entered as follows:

(1) A decree that Facebook has infringed the '316 and '362 patents, and that such infringement was willful;

(2) A decree that AddThis and Facebook have jointly infringed the '362 patent, and that Facebook's infringement was willful;

(3) A decree addressing future infringement that either (i) awards a permanent injunction enjoining Defendants and their agents, servants, employees, affiliates, divisions, and subsidiaries, and those in association with Defendants, from infringing the '316 and

'362 patents or (ii) awards damages for future infringement in lieu of an injunction, in an amount consistent with the fact that for future infringement the Defendants will be adjudicated infringers of valid patent, and trebles that amount in view of the fact that the future infringement will be willful as a matter of law.

(4) An award of increased damages pursuant to 35 U.S.C. § 284;

(5) A decree that this case is exceptional under 35 U.S.C. § 285;

(6) An award of all costs of this action, including attorneys' fees and interest; and

(7) Such further relief, at law or in equity, to which Rembrandt is entitled.

Dated: June 19, 2013

Respectfully submitted,

FISH & RICHARDSON P.C.

By: _/s/ Ahmed J. Davis_

Ahmed J. Davis (Va. Bar No. 43982)
Daniel R. Gopenko (Va. Bar No. 83932)
1425 K Street N.W., 11th Floor
Washington, D.C. 20005
Telephone: (202) 783-5070
Facsimile: (202) 783-2231

Thomas M. Melsheimer
1717 Main Street, Suite 5000
Dallas, Texas 75201
Telephone: (214) 747-5070
Facsimile: (214) 747-2091

Robert E. Hillman
Lawrence K. Kolodney
One Marina Park Drive
Boston, MA 02110
Telephone: (617) 542-5070
Facsimile: (617) 542-8906

John S. Goetz
601 Lexington Ave., 52nd Floor
New York, NY 10022
Telephone: (212) 765-5070
Facsimile: (212) 258-2291

_Attorneys for Plaintiff Rembrandt Social Media_
_LP_

## **CERTIFICATE OF SERVICE**

I hereby certify that on the 19th day of June, 2013, I will electronically file the foregoing

**SECOND AMENDED COMPLAINT** with the Clerk of the Court using the CM/ECF system,

which will then send a notification of such filing to the following:

| | |
|---|---|
| Phillip E. Morton<br>Stephen R. Smith<br>Jonathan G. Graves<br>**Cooley LLP**<br>Reston Town Center<br>11951 Freedom Drive<br>Reston, VA 20190<br>Telephone: 703-456-8000<br>Facsimile: 703-456-8100<br><br>John S. Kyle<br>Michael G. Rhodes<br>**Cooley LLP**<br>4401 Eastgate Mall<br>San Diego, CA 92121<br>Telephone: 858-550-6000<br>Facsimile: 858-550-6420<br><br>Mark R. Weinstein<br>Heidi Lyn Keefe<br>**Cooley LLP**<br>5 Palo Alto Square<br>3000 El Camino Real<br>Palo Alto, CA 94304<br>Telephone: 650-843-5000<br>Facsimile: 650-849-7400<br><br>*Counsel for Defendant Facebook, Inc.* | Christopher C. Campbell<br>Stephen P. McBride<br>**Cooley LLP**<br>Reston Town Center<br>11951 Freedom Drive<br>Reston, VA 20190<br>Telephone: 703-456-8000<br>Facsimile: 703-456-8100<br><br>*Counsel for Defendant AddThis, Inc.* |

<p style="text-align: right;">/s/ Ahmed J. Davis<br>Ahmed J. Davis</p>

# EXHIBIT C

HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VIRGINIA
### ALEXANDRIA DIVISION

| | |
|---|---|
| REMBRANDT SOCIAL MEDIA, LP, | Civil Action No.  1:13cv158 (TSE/TRJ) |
| Plaintiff, | |
| v. | |
| FACEBOOK, INC. and ADDTHIS, INC., | |
| Defendants. | |

**EXPERT REPORT OF DAVID KLAUSNER**
**RE INVALIDITY OF U.S. PATENT NOS. 6,415,316 AND 6,289,362**

Executed on this 29th day of July, 2013, in East Sussex, England.

_David Klausner_

_____
David Klausner

contacts, and specify on a per-contact basis the subset of information (e.g., birthday notification, work information) that a contact may view.  (*See, e.g.*, Robertson, Abstract, Figs. 7-9.)

## X.  INVALIDITY ANALYSIS AND OPINIONS

157.    In this section, I analyze the validity of the patents-in-suit based on my understanding of the legal requirements and, as I explain below, I conclude that the asserted claims of the patents-in-suit are invalid.

**A.    Patent and Publication References Asserted as Prior Art (35 U.S.C. §§ 102/103)**

158.    As I have explained below, I conclude that the asserted claims of the '316 patent and the '362 patent are anticipated and/or obvious based on my analysis below.

159.    For any asserted claim that is anticipated by a reference, that same claim may also be viewed as obvious over that reference at least in view of knowledge of one of ordinary skill in the art.  Similarly, for any asserted claim or claim element that is obvious over a combination of references, that same claim or claim element may also be viewed as obvious over those references at least in view of knowledge of one of ordinary skill in the art.

160.    As noted previously, the currently asserted claims from the '316 patent against Facebook are claims 4, 20, and 26, and the currently asserted claims from the '362 patent are claims 8 and 20-22.  To the extent the attached charts include or reference claims beyond the list of currently asserted claims, this is a reflection of the fact certain of the currently asserted claims depend on, and therefore include the limitations of, the included or referenced unasserted claims.

**1.    '316 Patent**

161.    For my analysis regarding the '316 patent, I rely principally on the following as primary references:   (1) U.S. Patent No. 5,960,406, entitled "Scheduling System for Use Between Users on the Web," to Rasansky et al., filed January 22, 1998; (2) U.S. Patent No. 6,052,717, entitled "Interactive Web Book System," to Reynolds et al., filed October 23, 1996;

(3) U.S. Patent No. 6,253,216, entitled "Method and Apparatus for Providing a Personal Page," to Sutcliffe et al., filed June 13, 1997; (4) U.S. Patent No. 5,913,212, entitled "Personal Journal," to Sutcliffe et al., filed June 13, 1997; and (5) U.S. Patent No. 5,983,227, entitled "Dynamic Page Generator," to Nazem et al., filed June 12, 1997.

162.    For certain claims and/or claim elements, I have combined the teachings of the above-listed references with teachings from the following other references: (a) U.S. Patent No. 6,018,343, entitled "Web Calendar Architecture and Uses Thereof," to Wang et al., filed September 27, 1996; (b) U.S. Patent No. 6,065,024, entitled "Embedded HTML Documents Downloaded and Displayed Simultaneously with Primary HTML Document," to Renshaw, filed March 24, 1997; (c) U.S. Patent No. 6,023,714, entitled "Method and System for Dynamically Adapting the Layout of a Document to an Output Device," to Hill et al., filed April 24, 1997; and (d) U.S. Patent No. 5,933,811, entitled "System and Method for Delivering Customized Advertisements Within Interactive Communication Systems," to Angles et al., filed August 20, 1996. Because each of the references of this paragraph was filed before the earliest date of invention claimed by Plaintiff in this action, each of these references is available as prior art to the '316 patent.

163.    As stated before, I understand that even if a prior art reference does not expressly disclose a limitation of a later invention, the reference may disclose it inherently, so long as a person of ordinary skill in the art would understand that the limitation is necessarily present in the reference. Asserted claims 20 and 26 of the '316 patent are apparatus claims having limitations relating to a "software portion." To the extent that the prior art references identified above regarding the '316 patent do not expressly disclose a "software portion," each of these references inherently discloses a "software portion." Each of the references describes a

Rasansky, Abstract.) The calendar/diary is presented to the user (at right) in a web-based format, viewable by month, week, and day. (*See, e.g.*, Rasansky, Figs. 16A-C.) Users can create calendar/diary events, such as meetings, invitations and announcements, through a form-based web interface. (*See, e.g.*, Rasansky, Figs. 17A-B, 18A-B; Abstract.) Calendar/diary information, such as appointments, reminders, and other events, is stored in a central database, and delivered to each user as HTML pages viewable in a standard web browser. (*Id.*)

168.    Users may send invitations or announcements to other users by selecting from a list of users and posting that information in the other users' calendars. (*See, e.g.*, Rasansky, Abstract.) The system further provides for placing advertisements. (*See, e.g.*, Rasansky, 10:65-11:10.)

169.    Additional details of Rasansky are disclosed in the chart attached to this Report as Appendix A1.[5] As shown in the attached chart, claims 4 and 20 of the '316 patent are obvious over Rasansky in view of any one of Wang, Renshaw or Hill, and claim 26 is obvious over Rasansky in view of any one of Wang, Renshaw or Hill, in further view of Angles.

**b.    Reynolds (U.S. Patent No. 6,052,717)**

170.    U.S. Patent No. 6,052,717, entitled "Interactive Web Book System," states on its face that it issued from an application filed on October 23, 1996, before the earliest date of

---

[5] In each of the attached charts, citations to specific sections of each prior art reference have been provided to clearly point out how each reference meets the claim elements. However, the listed quotations and excerpts are not meant to be preclusive. The references may, in fact, include similar language in other places or include further support for invalidation. Because the references speak for themselves, I reserve the right to use further quotations and excerpts to make my points, if needed. Additionally, unless noted otherwise, the underlining in the attached charts is provided by me.

# EXHIBIT D

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

Facebook, Inc.
Petitioner

v.

Rembrandt Social Media, L.P.
Patent Owner

U.S. Patent No. 6,415,316
Filing Date: September 1, 1998
Issue Date: July 2, 2002

Title: METHOD AND APPARATUS FOR IMPLEMENTING A WEB PAGE DIARY

_____

**PETITION FOR *INTER PARTES* REVIEW
OF U.S. PATENT NO. 6,415,316**

*Inter Partes* Review No. 2014-\_\_\_

# Table of Contents

**Page**

I.  MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(A)(1) .................................. 1

    A.  Real Party-In-Interest under 37 C.F.R. § 42.8(b)(1) ........................... 1

    B.  Related Matters under 37 C.F.R. § 42.8(b)(2) .................................... 1

    C.  Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3) ................... 1

    D.  Service Information ........................................................................ 2

    E.  Power of Attorney ......................................................................... 2

II.  PAYMENT OF FEES - 37 C.F.R. § 42.103 ...................................................... 3

III.  REQUIREMENTS FOR INTER PARTES REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108 ................................................................................... 3

    A.  Grounds for Standing under 37 C.F.R. § 42.104(a) ........................... 3

    B.  Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested ............................................... 3

    C.  Requirements for Inter Partes Review 37 C.F.R. § 42.108(c) ............. 4

IV.  TECHNOLOGY BACKGROUND RELEVANT TO THE '316 PATENT ................... 5

V.  DESCRIPTION OF THE CLAIMED SUBJECT MATTER ..................................... 11

VI.  CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(B)(3) .......................... 17

    A.  "user system" ................................................................................. 18

    B.  "diary program" .............................................................................. 19

    C.  "content data" and "page design" ..................................................... 19

    D.  "cohesive diary page" ...................................................................... 21

    E.  "configuration" and "privacy level" information ............................... 22

VII.  CLAIMS 1, 4, 17, 18, 20 AND 26 OF THE '316 PATENT ARE UNPATENTABLE ........................................................................................ 24

    A.  Ground 1 – Claims 1, 4, 17, 18 and 26 are Obvious Over Salas In View of Tittel (1997) and Parker ...................................................... 24

        1.  Claim 1 is Obvious Over Salas In View of Tittel (1997) and Parker ................................................................................... 25

**Table of Contents**
(continued)

a.    Claim 1[a] – "Diary Program" ........................................ 26

b.    Claim 1[b] – "Diary Information" .................................. 31

c.    Claim 1[c] – Assembling the "Diary Page" ................... 41

d.    Claim 1[d] – Change of "Diary Information" ............... 47

e.    Claim 1[e] – Sending "New Diary Information" ............ 49

2.    Claim 4 is Obvious Over Salas In View of Tittel (1997) and Parker .................................................................................. 50

3.    Claims 17 and 26 Are Obvious Over Salas In View of Tittel (1997) and Parker for the Same Reasons as Claim 1 ..... 52

4.    Claim 18 Is Obvious Over Salas In View of Tittel (1997) and Parker ............................................................................ 55

B.    Ground 2 – Claim 20 Is Obvious Salas In View of Tittel (1997) and Parker, and Further in View of Angles ....................................... 56

VIII.    CONCLUSION ............................................................................ 59

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

## List of Exhibits

| Exhibit No. | Title of Document |
|:---:|:---|
| **1001** | U.S. Patent No. 6,415,316 to Joannes Van Der Meer |
| **1002** | Declaration of Edward R. ("Ed") Tittel |
| **1003** | Rulings pertaining to claim construction in *Rembrandt Social Media, L.P. v. Facebook, Inc.*, No. 13-CV-00158 TSE (E.D. Va.) |
| **1004** | Transcript of Court Hearing dated June 6, 2013 in *Rembrandt Social Media, L.P. v. Facebook, Inc.*, No. 13-CV-00158 TSE (E.D. Va.) |
| **1005** | U.S. Patent No. 6,233,600 to Pito Salas et al. |
| **1006** | Ed Tittel et al., *More HTML for Dummies* (2d ed 1997), pp. xv-xxv, 57-84, 153-180, 341-364 |
| **1007** | Ed Tittel et al., *Foundations of World Wide Programming with HTML and CGI* (1995), pp. xxi-xxxvi, 125-144 |
| **1008** | William Martiner, *Visual Basic Programmer's Guide to Web Development* (1997), pp. vii-xiii, 47-97 |
| **1009** | David Fox et al., *Web Publisher's Construction Kit with HTML 3.2* (1996), pp. vii-xxv, 5-47, 51-61, 629-655 |
| **1010** | M. Frans Kaashoek et al., *Dynamic Documents: Mobile Wireless Access to the WWW* (1995) |
| **1011** | U.S. Patent No. 5,729,734 to Robert D. Parker et al. |
| **1012** | U.S. Patent No. 5,933,811 to Paul Angles et al. |
| **1013** | U.S. Patent No. 6,289,362 to Joannes Van Der Meer |

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

Petitioner Facebook, Inc. ("Petitioner") respectfully submits this Petition for

*Inter Partes* Review under 35 U.S.C. §§ 311-319 and 37 C.F.R. § 42 of claims 1, 4,

17, 18, 20 and 26 of U.S. Patent No. 6,415,316 **[Ex. 1001]** ("the '316 patent").

## I.    MANDATORY NOTICES UNDER 37 C.F.R. § 42.8(a)(1)

### A.    Real Party-In-Interest under 37 C.F.R. § 42.8(b)(1)

Petitioner, Facebook, Inc. is the real party-in-interest.

### B.    Related Matters under 37 C.F.R. § 42.8(b)(2)

The Petitioner is aware of one pending litigation involving the '316 patent:

*Rembrandt Social Media, L.P. v. Facebook, Inc.*, Case No. 13-CV-00158 TSE (E.D.

Va. filed February 4, 2013), pending in the U.S. District Court for the Eastern

District of Virginia.  The Petitioner was served on February 6, 2013.

The patent owner alleges that the Petitioner infringes claims 4, 20 and 26 of

the '316 patent. The Petitioner has denied infringement and contends that the

asserted claims are invalid. Claim construction proceedings have taken place, as

further explained in **Part VI** below. The litigation is currently stayed pending an

appeal to the U.S. Court of Appeals for the Federal Circuit following the district

court's order excluding the patent owner's damages expert.

### C.    Lead and Back-Up Counsel under 37 C.F.R. § 42.8(b)(3)

Petitioner provides the following designation of counsel.

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

| LEAD COUNSEL | BACK-UP COUNSEL |
|---|---|
| Heidi L. Keefe (Reg. No. 40,673)<br>hkeefe@cooley.com<br>zpatdcdocketing@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Ave., NW, Suite 700<br>Washington, DC  20004<br>Tel: (650) 843-5001<br>Fax: (650) 849-7400 | Mark R. Weinstein<br>mweinstein@cooley.com<br>zpatdcdocketing@cooley.com<br>COOLEY LLP<br>ATTN: Patent Group<br>1299 Pennsylvania Ave., NW, Suite 700<br>Washington, DC  20004<br>Tel: (650) 843-5007<br>Fax: (650) 849-7400 |

Petitioner will file a motion to appear *pro hac vice* for proposed back-up counsel, Mark R. Weinstein, an experienced patent litigator and counsel for Petitioner. The earliest date on which such motion may be filed is twenty-one (21) days after service of this Petition on the patent owner.  *See* "Order – Authorizing Motion for Pro Hac Vice Admission," in IPR2013-00639.

D.    **Service Information**

This Petition is being served by Federal Express to the attorney of record for the '316 patent, THOMAS | HORSTEMEYER, LLP, 400 Interstate North Parkway SE, Suite 1500, Atlanta, GA 30039. Facebook may be served at the address provided immediately above in Section I.C. The Petitioner also consents to electronic service by e-mail at the e-mail addresses provided above.

E.    **Power of Attorney**

Filed concurrently with this Petition in accordance with 37 C.F.R. § 42.10(b).

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

## II.  PAYMENT OF FEES - 37 C.F.R. § 42.103

This Petition requests review of six claims of the '316 patent, therefore, no excess claim fees are required.  A payment of $23,000 is submitted herewith.  37 C.F.R. § 42.15.  This Petition meets the fee requirements of 35 U.S.C. § 312(a)(1).

## III.  REQUIREMENTS FOR *INTER PARTES* REVIEW UNDER 37 C.F.R. §§ 42.104 AND 42.108

### A.  Grounds for Standing under 37 C.F.R. § 42.104(a)

The Petitioner certifies that the '316 patent is available for *inter partes* review, and that the Petitioner is not barred or otherwise estopped from requesting *inter partes* review on the grounds identified in the present Petition.

### B.  Identification of Challenge Under 37 C.F.R. § 42.104(b) and Statement of Precise Relief Requested

The Petitioner respectfully requests that the Board initiate *inter partes* review of claims 1, 4, 17, 18, 20 and 26, and find those claims unpatentable.  This Petition cites the following prior art references:

| Exhibit No. | Title of Document |
|:---:|---|
| **1005** | U.S. Patent No. 6,233,600 to Pito Salas et al. ("Salas") |
| **1006** | Ed Tittel et al., *More HTML for Dummies* (2d ed 1997), pp. xv-xxv, 57-84, 153-180, 341-364 ("Tittel (1997)") |
| **1011** | U.S. Patent No. 5,729,734 to Robert D. Parker et al. ("Parker") |
| **1012** | U.S. Patent No. 5,933,811 to Paul Angles et al. ("Angles") |

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

Each of the references listed above qualifies as prior art to the '316 patent under

at least 35 U.S.C § 102(a), § 102(b) or § 102(e)(2) (pre-AIA). The grounds on which

this Petition is based are listed in the table below.

| Ground | Claims | Basis for Challenge |
|--------|--------|---------------------|
| 1 | 1, 4, 17, 18, 26 | Unpatentable over Salas in view of Tittel (1997) and Parker under 35 U.S.C. § 103(a) |
| 2 | 20 | Unpatentable over Salas in view of Tittel (1997) and Parker, and further in view of Angles, under 35 U.S.C. § 103(a) |

A detailed explanation of why each challenged claim is unpatentable under

the statutory grounds identified above is provided in **Part VI** below.

This Petition and the Declaration of Edward R. Tittel ("Tittel Decl.) **[Ex.**

**1002]**, submitted herewith, cite additional prior art materials for purposes of

providing a technology background and describing the state of the art at the time

of the alleged invention. These materials are further discussed in the

accompanying declaration from Mr. Tittel, an expert with more than three

decades of experience in the computer software field.

### C.     Requirements for *Inter Partes* Review 37 C.F.R. § 42.108(c)

*Inter partes* review of claims 1, 4, 17, 18, 20 and 26 should be instituted

because this Petition establishes a reasonable likelihood that the Petitioner will

prevail with respect to at least one claim.  *See* 35 U.S.C. § 314(a).  Each limitation

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

of each challenged claim is disclosed and/or suggested by the prior art.

## IV. TECHNOLOGY BACKGROUND RELEVANT TO THE '316 PATENT

The accompanying Tittel Declaration provides a technology background and describes the state of the art at the time of the alleged invention. (*See* Tittel Decl. ¶¶ 15-36.) This section will provide a summary of that description.

### A. The World Wide Web and HTML

The "World Wide Web" (or "Web") refers to a network of servers connected over the Internet that provide documents typically arranged in a format known as the HyperText Markup Language (HTML). HTML documents, commonly known as "web pages," can be accessed using a "web browser" on the user's computer using a protocol known as the Hypertext Transfer Protocol (HTTP). HTML documents may contain text, images, audio, video, links to other web pages or style sheets, and executable programs or scripts. (Tittel Decl. ¶ 16.)

The two most popular web browsers as of September 1998 were Internet Explorer (from Microsoft) and Navigator (from Netscape). A web browser issues requests to servers called "web servers," which respond by sending information such as HTML documents to the browser. The browser and server, therefore, work together to deliver web pages and display them to a user. (*Id.* ¶ 17.)

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

Navigation through the Web with a web browser typically involves an address, known as a "Uniform Resource Locator" or "URL," that specifies the location of a web page or other resource on the Internet. A URL is a string that follows a specific format (e.g., "http://www.uspto.gov/") that identifies the communication protocol (e.g., "http"), the web server where the resource is located ("uspto.gov"), and may provide additional information such as a directory or name associated with the requested resource. (*Id.* ¶ 18.)

A web page may include various content items such as text, graphics, audio and video. The HTML code on that page tells the web browser generally how the page should appear and how to display the content for the page. The HTML code for a given web page may include information that designates the typeface and style for text, the format and structure of the page, and arrangement of content on the page. A more advanced technique, known as "style sheets," provides even greater control over the appearance of a web page. A style sheet can be used, for example, to provide a set of formatting and display rules that can be applied across certain types of elements. (*Id.* ¶ 20.)

Style sheets can either be embedded within the HTML of a web page or contained in a separate file. In the latter scenario, commonly known as an "external style sheet," the HTML file typically contained a tag known as a <LINK>

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

tag that identified the URL for the style sheet file. When the web browser encountered the <LINK> tag, it downloaded the style sheet file from the server and used it to properly display the web page. (*Id.* ¶ 21.)

Using external style sheets was exceedingly simple. Mr. Tittel's 1997 textbook regarding HTML stated: "When you have all of the pieces and parts of a style sheet, how exactly do you link style definitions to your Web pages?  It's so simple it's scary." (*Id.* ¶ 22 (quoting Ed Tittel et al., More HTML for Dummies (2d ed 1997) **[Ex. 1006]**, at 68).) Linking an external style sheet simply involved adding a single <LINK> tag to the HTML file specifying, among other things, the name of the style sheet file as stored on the web server:

```
<LINK REL=StyleSheet HREF="mystyle" TYPE="text/css" MEDIA=screen>.
```
(*Id*. ¶ 22.)

In the example above, the "HREF" attribute specifies the name and location of the style sheet file. In that example, the sheet named "mystyle" is located in the same directory on the server as the web page, so a fully-qualified URL is unnecessary. If this <LINK> tag were included in a home page located at <http://www.uspto.gov/home.html>, for example, the web browser would find the style sheet at <http://www.uspto.gov/mystyle>. (*Id.* ¶ 23.)

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

B.    **Scripts, Applets and Other Browser-Based Computer Programs**

Although HTML provided a means for defining the layout and format of web-based content for display in a browser, it lacked the ability to make that content interactive. The industry responded by developing a variety of technologies to create and embed downloadable programs into web pages. Two well-known examples that existed prior to September 1998 included Java (from Sun Microsystems) and ActiveX (from Microsoft). For example, programs written in Java, which were typically called *applets*, could be used to create animation, play music, play video games, display real-time video, and perform many other interactive tasks. (*Id.* ¶¶ 26-27.) Java and ActiveX provided a straightforward way to embed an executable computer program in the HTML for a web page, which would cause the browser to download the program from the web server and execute it at the user's computer. (*Id.* ¶ 25.)

"ActiveX" was a similar and competing technology to Java. ActiveX programs were known as "ActiveX controls" or "ActiveX components," and they could be embedded in a web page using techniques exceedingly similar to Java. Suppose a developer wrote a calendar program as an ActiveX control called "Calendar.ocx" (ActiveX controls typically took an ".ocx" or ".cab" extension), and

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

wanted to insert that program into a web page. The following exemplary HTML

could be added to embed that ActiveX control into a web page:

```
<OBJECT CLASSID="clsid:54DDB4E0-829D-11CE-AC36-00AA00B47DD3"
CODEBASE="http://tittel.com/My_Calendar.ocx" HEIGHT=300
WIDTH=200> </OBJECT>
```

When the web browser encounters the <OBJECT> tag above, it downloads

the ActiveX control from the remote server if it has not already been downloaded,

and executes it on the user's computer. The "CLASSID" attribute is typically a

sequence of characters specifying specifies a unique identifier for the ActiveX

control or component. The user's computer uses the "CLASSID" attribute to

determine whether the ActiveX control or component has already been

downloaded. The "CODEBASE" attribute contains a URL identifying the name and

location of the ActiveX control. In this case, the ActiveX control would be located

at <http://tittel.com/My_Calendar.ocx> (*Id.* ¶ 29.)

If the web browser encounters the ActiveX component for the first time,

"the browser must first download and install the component before it is used. For

this reason, when you include an ActiveX component in a Web page, you must

also specify the **CodeBase** (i.e., URL) from which the browser can download the

control." (*Id.* ¶ 29 (quoting William Martiner, *Visual Basic Programmer's Guide to*

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

*Web Development* (1997) **[Ex. 1008]**, p. 77-78) (bold in Martiner).) The ending

</OBJECT> tag signals the end of the information in the <OBJECT> element. (*Id.*)

C.    **Browser-Based Computer Programs That Generate Web Pages**

It was also known prior to September 1998 that computer programs

running locally on the user's computer (such as Java applets or ActiveX

components) could generate HTML for a web page that would be displayed in the

user's web browser. This technology was described in an article published in

1995, M. Frans Kaashoek et al., *Dynamic Documents: Mobile Wireless Access to

the WWW* **[Ex. 1010]** ("Kaashoek"). Kaashoek describes a technique in which a

web browser generates HTML-based web pages in the context of a mobile

computing device. (Tittel Decl. ¶¶ 31-32 (describing Kaashoek).)

Another example of a system that relies on locally-executing software to

generate a web page is disclosed in U.S. Patent No. 6,233,600 to Pito Salas et al.

("Salas") **[Ex. 1005]**. Salas describes a technique for creating an "eRoom," a web-

based collaborative environment for organizing information and sharing it with

other users. The system described in Salas, like that of Kaashoek, relies on

software running in the user's web browser to generate eRoom web pages locally.

(Salas, 2:20-27, 6:64-7:4.) Salas explains that this software in one embodiment

can be implemented as an ActiveX control:

> Generation, display and management of eRooms is controlled by a "page builder" application residing on the client workstation **12'**. The page builder application may be provided as specialized hardware or software operating on a general purpose machine. In some embodiments, the page builder application may be provided as an Active X control or a COM object.

(*Id.*, 6:57-63.)  A detailed explanation of Salas is provided in Part **VII.A** below.

V.    **DESCRIPTION OF THE CLAIMED SUBJECT MATTER**

   A.    **The Specification of the '316 Patent**

The '316 patent, which is entitled "Method and Apparatus for Implementing a Web Page Diary," discloses a technique for creating and displaying a web page that stores web page links and other content. ('316 patent **[Ex. 1001]**, 1:20-23.)   The '316 patent discloses a method and system for organizing and displaying information through a web page referred to in the patent as a "cohesive diary page." As explained in the Summary of the Invention:

> The present invention allows a user to create a "diary" containing multimedia references to Websites. These references (also called "content objects" or "objects") can be addresses or URLs of, for example, text, bookmarks, images, programs, movies, etc. Many content objects are provided via the Websites of "content providers," with the specific intent of making the content objects

available to a user to place in his diary. Other content objects can be copied from the diaries of other users. Still other content objects are entered by the diary owner himself.

(*Id.*, 2:2-11.) In one embodiment described in the specification, the diary page owner selects a visual "theme" for the pages of his or her diary, the theme "reflect[ing] how the diary owner wants to present himself and his diary to the world." (*Id.*, 2:26-29.)

The specification provides a lengthy description of the diary creation system, but the claims address only one aspect of it – the mechanics of actually assembling and displaying the "cohesive diary page" in a user's browser. This section of the Petition will therefore focus on the portions of the '316 specification pertaining to this claimed process.

In order to assemble and display a "cohesive diary page" to the user, the server must send two pieces of information to the user's system: (1) "**diary information**," which described in more detail below, and (2) a "**diary program**" (or "**diary applet**" as it is referenced in the specification), which is an executable computer program that runs in the user's web browser. The purpose of the "diary program," as explained in more detail below, is to generate a diary page based on the "diary information" received from the server. (*Id.*, 7:1-3, 9:7-9.)

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

"Diary information" in the context of the '316 patent comprises three types of information. First, the "diary information" includes the "content data" (or content objects as they are referenced in the specification) that may be displayed to a user. "A content object can be any type of object, including text, bookmarks, images, programs, movies, etc. The set of content objects inserted into the diary by the user is known as the 'book content.'" (*Id.*, 5:21-25.)

Second, the "diary information" includes "page design" information, which is layout or style information that defines (at least in part) the visual appearance of a diary page. (*Id.*, 5:15-18 ("The page design defines the visual and audible appearance of the page. A page design provides slots for content entries or objects. The page design determines the size and location of these slots within the page.").) The specification also uses the terms "presentation context" and "cover" to refer to this page design information. (*Id.*, 8:59-64, 17:60-61.) In one embodiment in the specification, the page design is represented as an HTML file that that provides a template for the diary page. (*Id.*, 17:60-64, Fig. 12.)

The third type of "diary information" is referred to in the specification as "configuration information," which includes "privacy level information." The patent explains that "configuration information" is used to determine whether a user is permitted to view or access content on a diary page. "If a user does not

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

have sufficient permission to view an object in a diary," for example, "the diary may not make the object visible to the user, i.e., the user does not even know that the object exists, or it may present the object using an alternate representation." (*Id*., 5:63-67.) This is accomplished through use of "configuration information," such as passwords, privacy levels or information identifying the authorized user. (*Id*., 9:2-4 ("The configuration information, such as privacy level, passwords, or the full name of the user, is user-specific."), 10:51-54 ("The passwords for a particular user's diary pages are stored as configuration information in that user's diary information **114**.").)

After the "**diary program**" receives the three pieces of "**diary information**" from the diary server, the "diary program" generates HTML for the diary page based on the received diary information. (*Id*., 7:1-3 ("Diary applet **112** reads diary information **114** received from the server and generates HTML **111** for one or more diary pages in accordance with diary information **114**."); *see also id*., 9:7-9.) The "diary program" can be implemented as a Java applet, an ActiveX control, or any other appropriate executable program. (*Id*., 6:52-56.)

Generation of the diary page also takes into account the "**configuration information**" and "**privacy level information**" received from the server. As mentioned previously, this means that if a user does not have permission to view

-14-

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

an object in a diary, "the diary may not make the object visible to the user, i.e.,

the user does not even know that the object exists, or it may present the object

using an alternate representation." (*Id*., 5:63-67; *see also id*., 18:15-20, 17:19-21.)

B.    **The Claims of the '316 Patent**

The two independent claims of the '316 patent addressed in this Petition –

claims 1 and 17 – purport to recite a method and apparatus, respectively, for

implementing the diary page generation process described in the preceding

section. Claim 1 recites:

1.    A method of organizing information for display, comprising:

[a]    sending from a diary server to a user system, a diary program
capable of being executed by a browser in the user system;

[b]    sending diary information from the diary server to the user
system, the information comprising content data including an
associated time, a page design to specify the presentation of
the content data, and configuration information for controlling
behavior of a cohesive diary page, the configuration
information including privacy level information;

[c]    assembling the cohesive diary page by dynamically combining
the content data and the page design in accordance with the
configuration information for the cohesive diary page to be
displayed by the diary program running in the browser;

[d]    receiving by the diary server at least one request for at least
one change concerning the diary information, from the diary
program in the user system; and

[e]    sending, by the diary server to the user system, new diary
information for changing the cohesive diary page.

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

('316, Claim 1.) The bracketed notations (*e.g.,* "[a]," "[b]," etc.) were added to facilitate easier identification of these limitations in this Petition. The other independent claim addressed in this Petition is claim 17. That claim is similar in many respects to claim 1 but was drafted as an apparatus claim:

> 17.    An apparatus that displays and organizes information, comprising:
>
> [a]    a software portion configured to receive, by a user system from a diary server, a diary program capable of being run by a browser in the user system;
>
> [b]    a software portion configured to receive, by the user system from the diary server, diary information comprising content data including an associated time, a page design to specify the presentation of the content data, and configuration information for controlling behavior of a cohesive diary page, the configuration information including privacy level information;
>
> [c]    a software portion configured to assemble the cohesive diary page by dynamically combining the content data and the page design in accordance with the configuration information; and
>
> [d]    a software portion configured to display the cohesive diary page, by the diary program running in the browser.

('316, Claim 17 (bracketed notations added for identification).)

Unlike claim 1, claim 17 does not include the additional steps from claim limitations 1**[d]** and 1**[e]** relating to changing diary information and receiving new diary information for the page. A similar requirement is addressed by claim 26:

-16-

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

     26.    The apparatus of claim **17** further comprising:

        a portion configured to receive, from the diary server, new diary information;

        a portion configured to change content of the diary page without changing a general appearance of the diary page, in accordance with the new diary information.

('316, claim 26.) The additional claims addressed in this Petition, claims 4, 18 and 20, are dependent claims that add nothing of patentable significance. This Petition will address those claims in more detail below.

## VI. CLAIM CONSTRUCTION UNDER 37 C.F.R. § 42.104(b)(3)

A claim subject to *inter partes* review must be given its "broadest reasonable construction in light of the specification of the patent in which it appears." 37 C.F.R. § 42.100(b). As the Federal Circuit has recognized, the "broadest reasonable construction" standard is different from the manner in which the scope of a claim is determined in litigation. *See In re Swanson*, 540 F.3d 1368, 1377-78, 88 U.S.P.Q.2d 1196, 1203 (Fed. Cir. 2008).

As noted in **Part I.B** above, the district court in the copending *Rembrandt Social Media, L.P. v. Facebook, Inc.* patent litigation has issued claim construction rulings with respect to certain terms of the '316 patent that are recited in the challenged claims. A copy of the Court's written rulings on claim construction is attached as **Exhibit 1003**. Attached as **Exhibit 1004** is a transcript of a June 6,

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

2013 conference in which the Court stated the basis for certain of its rulings.

Although the Board is not bound by claim construction rulings by the district court, the Petitioner respectfully requests that the Board adopt those constructions for at least the more significant terms, which are discussed below.[1]

### A.    "user system"

The term "**user system**," which appears throughout independent claims 1 and 17, should be construed as "a computer that executes a browser for use by an end user." The specification describes a "user system" as a conventional data processing system that includes at least a processor and a storage area such as a memory. ('316, 7:32-36; Fig. 2(a).) The storage area in the user system includes "a web browser **210** and diary information **114**. Browser **210** can be any appropriate browser, including but not limited to [Netscape] Navigator and [Microsoft

---

[1] Many of the terms addressed in the district court's claim construction order pertain to terms that are not relevant to this Petition. This is because many of those terms are recited in claims of a different patent (U.S. Patent No. 6,289,362), or in claims of the '316 patent that were withdrawn from the litigation by the patent owner. The discussion in the text, therefore, focuses on the more significant terms recited in the six claims challenged in this Petition.

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

Internet] Explorer." ('316, 7:36-40.) This is consistent with the language of claims 1 and 17, which describe the "user system" as a computer system that runs a browser. ('316, Claim 1[a] ("sending from a diary server to a user system, a diary program capable of being executed by a browser in the user system…").)

B.     **"diary program"**

The term "**diary program**," recited in independent claims 1 and 17 of the '316 patent, should be construed as "a computer program for execution by the browser in the user system that generates a cohesive diary page." The "diary program" is referenced in the specification as a "diary applet" and described as a Java applet, ActiveX control, or other executable program that executes in the browser in the user's system. ('316, 6:52-56.) The purpose of the "diary program" is to generate the HTML for a diary page based on the received diary information. ('316, 7:1-3 ("Diary applet **112** reads diary information **114** received from the server and generates HTML **111** for one or more diary pages in accordance with diary information **114**."); *see also* '316, 9:7-9 ("In step **308** [of Fig 3], diary applet **112** generates one or more pages of the diary in HTML in accordance with the cover, content, and configuration information.").)

C.     **"content data" and "page design"**

The terms "**content data**" and "**page design**" are related in that they

-19-

represent two types of information used to generate the "cohesive diary page" recited in claims 1 and 17. (*See, e.g.*, '316, claim 1[c] ("assembling the cohesive diary page by dynamically *combining the content data and the page design* . . . for the cohesive diary page . . . ."); *see also* Tittel Decl. ¶¶ 43-46.) The specification describes "content data" (referred to in the specification as "content objects") as information, such as text and images, that may be displayed on a diary page. ('316, 5:21-25 ("A content object can be any type of object, including text, bookmarks, images, programs, movies, etc. The set of content objects inserted into the diary by the user is known as the 'book content.'").) "Page design," on the other hand, refers to layout or style information that defines the visual appearance of a diary page. ('316, 5:15-18 ("The page design defines the visual and audible appearance of the page. A page design provides slots for content entries or objects. The page design determines the size and location of these slots within the page.").) The "content data" and the "page design" are "independent" of each other. ('316, 5:26-28 ("Unlike a traditional book, the book design and the book content of a diary are independent. Both of [sic] the book design and the book content may be changed at any point in time.").) The Petitioner therefore requests that the Board interpret these two terms as:

- "content data" − information that may be displayed to a user that is

independent of the page design; and

- "page design" – layout or style information that defines, at least in part, the visual appearance of a cohesive diary page, independent of the particular content of the page.

D.    **"cohesive diary page"**

A "**cohesive diary page**," as recited in claims 1 and 17, represents the result of the step of combining the "content data" and the "page design" information. (*See, e.g.*, '316, claim 1[c] ("assembling the cohesive diary page by dynamically combining the content data and the page design….").) As explained in the specification, "[t]he diary software dynamically combines the diary's book design and book content to present a cohesive view of the 'book.'" ('316, 5:32-34.) The term "cohesive diary page," consistent with the specification and claim language, should be understood as a diary page in which the content data and the page design are fully integrated for display.

The term "**diary page**," a component of the larger term "**cohesive diary page**" discussed above, is simply a page containing content sent by a server to a user system. Although people often think of the word "diary" as referring to a personal and private journal viewed only by a single individual – the owner of the diary – who authors all content in the diary, the '316 patent uses the term in a

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

broader way. (Tittel Decl. ¶ 40.) The content of a diary page may be inserted by

the diary owner or by any other user who has permission to do so.  ('316, 5:19,

6:9-11.)  Additionally, "[t]he diary can be read concurrently by multiple users in

different locations."  ('316, 5:48-49; Tittel Decl. ¶¶ 40-41.) A "**cohesive diary**

**page**" under its broadest reasonable construction, therefore, should be construed

as "a page sent by a server to a user system in which the content data and the

page design are fully integrated for display." (Tittel Decl. ¶¶ 40-41.)

     E.    **"configuration" and "privacy level" information**

     "**Configuration information**" and "**privacy level information**" are two

closely-related terms that appear adjacent to each other in claims 1 and 17.

('316, *e.g.*, Claim 1: "sending diary information from the diary server to the user

system, the information comprising . . . configuration information for controlling

behavior of a cohesive diary page, the configuration information including privacy

level information.").) The patent explains that "**configuration information**" and

"**privacy level information**" refer to information used to determine whether

certain content will be displayed to a user viewing or accessing a cohesive diary

page. "If a user does not have sufficient permission to view an object in a diary,"

for example, "the diary may not make the object visible to the user, i.e., the user

does not even know that the object exists, or it may present the object using an

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

alternate representation." ('316, 5:63-67.) This is accomplished through use of
"configuration information," such as passwords, privacy levels or information
identifying the authorized user. (*Id.*, 9:2-4 ("The configuration information, such
as privacy level, passwords, or the full name of the user, is user-specific."), 10:51-
54 ("The passwords for a particular user's diary pages are stored as configuration
information in that user's diary information **114**."); 17:22-24 ("User settings are
stored as configuration data, which includes the passwords required for users to
access the different privacy levels.").) The related term "**privacy level
information**" refers to configuration information that describes or specifies at
least one user permitted to view particular content on a cohesive diary page.
('316, 2:40-44 ("The diary owner can set various levels of privacy for different
portions of his diary. Thus, certain portions of the diary (for example, a daily entry
or a reminder list) can by [sic] viewed only be [sic] the diary owner, while other
portions of the diary can be viewed by anyone with a Web browser.").)

The district court in the pending litigation identified in **Part I.B** above issued
a claim construction ruling clarifying that "privacy level information" need not
specify the "metes and bounds" or "universe" of users that have permission to
access the content.  (Ex. 1003, at 007 ("According to the Court's construction,
configuration information that describes a user who is permitted to view

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

particular content is privacy level information.").)    Accordingly, the Petitioner

proposes that these terms be construed as:

- "configuration information for controlling behavior of a cohesive diary

  page" – information that determines what information will be displayed

  to a user who is viewing a cohesive diary page; and

- "privacy level information" – configuration information that describes or

  specifies at least one user permitted to view particular content on a

  cohesive diary page.

VII.    CLAIMS 1, 4, 17, 18, 20 AND 26 OF THE '316 PATENT ARE UNPATENTABLE

A.    **Ground 1 – Claims 1, 4, 17, 18 and 26 are Obvious Over Salas In View of Tittel (1997) and Parker**

The alleged inventions of claims 1, 4, 17, 18 and 26 are obvious over U.S.

Patent No. 6,233,600 B1 to Pito Salas et al. ("**Salas**") **[Ex. 1005]** in view of Ed Tittel

et al., *More HTML for Dummies* (2d ed. 1997) ("**Tittel (1997)**") **[Ex. 1006]**,[2] and

U.S. Patent No. 5,729,734 to Robert D. Parker et al. ("**Parker**") **[Ex. 1011]**. Salas

and Parker qualify as prior art under 35 U.S.C. § 102(e) (pre-AIA) because they

---

[2] The Tittel reference cited in the text is referred to as "Tittel (1997)" to avoid

confusion, as this Petition also includes as an exhibit (Ex. 1007) excerpts of an

earlier 1995 book by Mr. Tittel that is used for background purposes.

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

issued from applications filed prior to the filing date of the '316 patent

(September 1, 1998). Tittel (1997) qualifies as prior art under at least § 102(a) and

§ 102(b) (pre-AIA) because it was published prior to the '316 filing date.

This Petition relies on Salas for the vast majority of the limitations in claims

1, 4, 17, 18 and 26. Salas is a sufficiently strong reference, in fact, that it could

have been mapped as an anticipatory reference against these claims. But the

Petitioner is mindful of the Board's desire to avoid potentially redundant grounds,

including multiple grounds based on one or more of the same prior art

references. The Petitioner has accordingly proposed an all-inclusive ground based

on obviousness for these claims to reduce the burden on the Board.

### 1.    Claim 1 is Obvious Over Salas In View of Tittel (1997) and Parker

Although the preamble of claim 1, "[a] method of organizing information

for display," does not appear to recite a claim limitation, Salas nonetheless

discloses it. Salas, entitled "Method and System for Providing a Networked

Collaborative Work Environment," describes a technology known as an "eRoom"

that provides a web-based system for organizing information. As explained in

Salas, "[a]n eRoom is a set of connected HTML pages displayed to a user that

displays project-related files, data and discussion lists." (Salas, 5:6-8.) Figure 4

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

shows an exemplary eRoom page displayed a web browser (*id.*, 5:21-24):



(*Id.*, Fig. 4.)  Additional details about the eRoom system are provided in the claim limitations that follow.

### a.    Claim 1[a] – "Diary Program"

The first limitation of claim 1 recites the step of "sending from a diary server to a user system, a diary program capable of being executed by a browser in the user system." Salas discloses a "**diary server**" in the form of an eRoom server (**14**) that "stores information relating to a project or a set of projects, referred to as a facility, in a database **20.**" (Salas, 3:24-27; Fig. 1 (**14**).)

Salas also discloses a "**user system**" in the form of at least one client

workstation (**12**), connected to the server (**14**) through a network. "Client workstations **12**' are connected to one or more servers **14**." (*Id.*, 3:17-18.) "The network connecting the client workstations **12** and the server **14** may use any physical media, including wireless, provided that the physical media supports the HyperText Transfer Protocol (HTTP)." (*Id.*, 3:20-23.) Salas further explains that the eRoom server (**14**) sends information to the client workstation (**12**), where it can be stored. "Client workstations **12**' generally have local memory elements for storing data objects of files associated with a project that are downloaded from the server **14** as well as one or more eRoom templates." (*Id.*, 5:12-15.)

Salas discloses a "**diary program**" in the form of a software program executed by the user's web browser that generates the HTML for the eRoom page (the "**cohesive diary page**"). (Tittel Decl. ¶ 56.) Salas describes, for example, "a method for locally generating HTML pages for display," based on project data and a HTML web page template. (*Id.*, 2:20-27, 6:64-7:4.) The software that generates the HTML for the eRoom pages is referred to as a "page builder" application:

> Generation, display and management of eRooms is controlled by a "page builder" application residing on the client workstation 12'. The page builder application may be provided as specialized hardware or software operating on a general purpose machine. In some embodiments, the page builder application may be

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

provided as an Active X control or a COM object.

(*Id.*, 6:57-63; *see also* Tittel Decl. ¶ 56.)

Salas discloses other software programs executing in the client workstation (*e.g.* ActiveX controls) that generate and handle other aspects of the eRoom page. (Salas, 5:29-36 (describing ActiveX control for handling embedded discussions), 5:54-59 (describing ActiveX control for providing pictorial identification of the page); 13:23-26 (describing ActiveX control for handling uploading of files).)

The page builder and other ActiveX software programs described in Salas collectively correspond to the "**diary program**" recited in the '316 patent. This is consistent with the '316 patent, which specifically states that a diary program may be implemented using ActiveX controls. ('316, 6:53-56 ("[A]ny appropriate executable program can be used to implement the functionality of the diary applet **112**, including but not limited to JavaScript, ActiveX controls, Visual Basic, and plug-ins.") (underlining added).)

The eRoom page generated by the ActiveX control (e.g. as shown in Fig. 4) qualifies as a "**cohesive diary page**." Users interact with eRooms "by using Web browsers in a traditional manner. That is, users may traverse a hyperlink to access an eRoom, or users may directly enter a URL address into the browser." (*Id.*, 6:40-43.) As explained in **Part VI.D**, above, the "cohesive diary page" of the '316 patent

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

is not limited to a personal and private journal viewed by a single individual. The

diary of the '316 patent, like an eRoom page, "can be read concurrently by

multiple users in different locations." ('316, 5:48-49.) A diary may also contain

placed on the diary page by its owner, or by any other user who has permission to

do so – just like an eRoom page. (*Id.*, 5:19, 6:9-11.) The eRoom page in Salas

therefore meets the requirements of a "cohesive diary page." (*See* Tittel Decl. ¶

54.)  The assembly of the cohesive diary page is further discussed in the discussion

of claim 1**[c]** below.

Salas does not state that the eRoom server (**14**) sends the ActiveX controls

to the client workstation (**12**). Salas instead simply takes for granted that the

ActiveX controls are installed on the client workstation, and does not explain how

they were delivered. As explained in the Tittel Declaration, this simply represents

the omission of a trivial, well-understood detail that would have been readily

apparent to one of ordinary skill in the art. (Tittel Decl. ¶ 58*.*) It was well-known

that ActiveX controls were downloaded to the user's computer from the web

server. (*Id.* ¶¶ 28-29, 58.) In order to embed an ActiveX control in a web page, the

developer was required to expressly insert the URL from which the ActiveX file

could be downloaded into the web page's HTML. (*Id.* ¶¶ 28-29 (description of

<OBJECT> tag), ¶ 58.) One of ordinary skill in the art would therefore have

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

understood that the ActiveX controls in Salas were necessarily downloaded (at least once) from the eRoom web server. (*Id.* ¶ 59.) The ability to download an ActiveX control from the server hosting the web page was so basic to the functionality of ActiveX that one of ordinary skill in the art would have regarded Salas's absence of an express statement to that effect as insignificant, and in fact, as an omission of a detail within the general knowledge of a skilled artisan. (*Id.*)

Even assuming there was some question as to whether Salas inherently discloses that the ActiveX controls are sent by the eRoom server (**14**) to the client workstation (**12**), it would have been obvious to adapt Salas to require the client workstations to obtain the ActiveX controls from the server. As explained in Tittel (1997): "ActiveX objects may reside in stand-alone machines, on a LAN or intranet, or on the Internet.  Specialized for the Internet, <u>ActiveX objects are automatically downloaded if the object is not in the user's machine</u>."  (Tittel (1997), at 341 (definition of "**ActiveX**") (underlining added); *id.* at 176.)  The ability to download an ActiveX control from the web server was built into the <OBJECT> element itself – the very technique by which an ActiveX control was embedded in a page. (Tittel Decl. ¶¶ 28-29, 60.) Adapting these teachings would have predictably resulted in the system of Salas in which the ActiveX controls were downloaded to the client workstation (**12**).

-30-

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

A skilled artisan as of September 1998 would have recognized a number of benefits of downloading ActiveX controls from the web server. First and foremost, it makes installation of ActiveX controls both easy and automatic for users. Software installation prior to the Internet and Web typically involved a user obtaining a CD-ROM or other physical medium and inserting it into the disc drive of the computer, in some cases requiring the assistance of a system administrator. (*Id.* ¶ 61.) These hassles and inconveniences are eliminated by the ability of an ActiveX control to download and install automatically upon the first visit to the web page on which the control has been placed. (*Id.*)

Additionally, using ActiveX download techniques ensured that the user always had the most up-to-date version of the ActiveX control or component. (*Id.* ¶ 62.) ActiveX downloading also provided a performance advantage in that the ActiveX control or component would only be downloaded once to the user's web browser (*e.g.* the first time the user logged onto the page). (*Id.*)

### b.    Claim 1[b] – "Diary Information"

The next limitation of claim 1 recites the step of "sending diary information from the diary server to the user system, the information comprising content data including an associated time, a page design to specify the presentation of the content data, and configuration information for controlling behavior of a cohesive

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

diary page, the configuration information including privacy level information."

This limitation requires the transmission of "diary information" that comprises

three different types of information: **(1)** "content data including an associated

time," **(2)** "a page design," and **(3)** "configuration information . . . including

privacy level information." The Petition will address each component below.

### (1)    "content data including an associated time"

Each eRoom project contains a "project database" that is stored on the

eRoom server (**14**). (Salas, 2:30-32, 3:24-27, Fig. 1 (**14**).) The client workstation

(**12**) stores some subset of the project database, such as "information related to

the project which is relevant to that user's effort on the project." (*Id.*, 2:32-34.)

Those project files were downloaded from the server. As explained in Salas:

"Client workstations **12**' generally have local memory elements for storing data

objects of files associated with a project that are downloaded from the server **14**

as well as one or more eRoom templates." (Salas, 5:12-15 (underlining).) "The

client workstation 12' uses project data received from the server 14 in

combination with one or more template files to create and display to the user . . .

a private, secure collection of HTML pages . . . ." (*Id.*, 4:66-5:2.) These content

objects are represented in Figure 4 below depicting an eRoom:

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316



*FIG. 4*

(Salas, Fig. 4.) As shown in Figure 4 above, the content data includes items such as

entries under "Announcements," the first being a "Staff meeting" entry from

"Julie Armstrong" at "12 Jun 97 1:47 pm." (*Id.* (underlining added).)

Salas discloses at least two other examples of transmission of content data

that includes an associated time. Figure 4 also includes item box (**408**) in the

middle of the page that contains icons for content items, including a notes file

"Press Notes" (**486**), a spreadsheet file "Budget Projections" (**488**), and a word

processing file "Staff Plan" (**490**). (*Id.*, 5:60-64.) Each item has an associated time.

Although those dates or times are not visible in Figure 4, this is because the

current display mode for the item box (**408**) in Figure 4 happens to be set to "icon

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

display," which displays only the icon and name of the item and does not display the date and time. (*Id.*, 6:4-7.) The eRoom page can display files using three different user-selectable viewing modes, one of which provides a list display that shows the date and time associated with each file. (Tittel Decl. ¶ 67.)

In particular, Salas explains that: "In the embodiment shown in FIG. 4, three icons are provided: an 'icon display' icon **494** (currently selected) which causes items to be displayed as large icons with identifying text underneath; a 'list display' icon **496** which causes items to be displayed as small icons with identifying text to one side of the icon; and a <u>'report display' icon which causes items to be displayed as a list</u>." (*Id.*, 6:4-10 (emphasis added).) Selecting the "report display" icon will produce a list of the files in the item box (**408**), which "may be alphabetized, ordered by size of item, <u>ordered by creation date, ordered by modification data [sic; date]</u>, or ordered by some other data field associated with each item." (*Id.*, 6:10-13.) Salas therefore makes clear that each of the files in the item box (**408**) comprises content data that includes an associated time of creation and modification, even though that information was not shown in the "icon mode" display used to create Figure 4. The ability to display the creation and modification dates in the "report display" mode indicates that date information was transmitted to the client workstation (**12**). (Tittel Decl. ¶ 68.)

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

Finally, Salas discloses a technique for displaying the modification time associated with each content item without the user having to change display modes in the item box (**408**).   In particular, an eRoom can be configured to automatically display the content items in "report display" mode and to include columns showing the modification time associated with each item. (Salas, 8:34-38 ("The 'DYNAMIC' section for the example above specifies that the item box in a Folder starts displaying items in <u>Report display</u>, does not show a column for creation date, <u>does show the time along with the date in the Modified</u> column, and has modified column widths.") (underlining added).) This provides yet another example in which content data and an associated time is sent from the server (**14**) to the client workstation (**12**). Any one of these examples would be sufficient to teach sending, from the server to the user system, content data including an associated time. (Tittel Decl. ¶ 69.)

### (2)    "a page design"

Salas also discloses that the eRoom server (**14**) sends "diary information" that includes "a page design to specify the presentation of the content data." The "page design" information in Salas comprises a "wrapper" file which, in turn, identifies a "template" that specifies the layout and style of the eRoom page. The "wrapper" file is retrieved from the server when the user accesses an eRoom by

entering the URL of the eRoom into a web browser. "Regardless of the manner in

which the URL address is accessed, the browser retrieves the HTML file in order to

display it. However, if the URL address is an eRoom, <u>the server of the file returns a

file of control information, referred to as a 'wrapper' file</u>." (Salas, 6:43-47

(underlining added).) This "wrapper" file identifies the eRoom template the page

builder (ActiveX control) will use to generate the eRoom page:

> Referring to FIG. 5, the first step that is taken by the page builder
> application is to <u>retrieve the eRoom template indicated by the
> wrapper file (step **502**). An eRoom template is an HTML file having
> additional eRoom-specific information embedded in it</u>.

(*Id.*, 6:64-7:1 (underlining added).)

The eRoom template contains layout or style information that defines, at

least in part, the visual appearance of the eRoom page. According to Salas,

"eRoom information in a template includes sections controlling the page itself,

the controls on it, <u>and the way the page's data is presented</u> [sic; when] the page is

created or edited." (*Id.*, 7:8-10.) The eRoom template includes a series of

"properties" specifying, for example, the way the items will be displayed on the

page (e.g., in small icon, large icon or report view modes) (*id.*, 8:55-58), the width

of the item box in Figure 4 (*id.*, 9:31-35), whether particular pieces of information

will be displayed (e.g., the size, owner, date of a file) (*id.*, 9:13-24), and how

columns on the eRoom page should be sorted (*id.*, 9:13-30). The "wrapper" and

"template" files are independent of the content data, as they are separate files

and nothing in Salas suggesting that they are embedded within the content files

themselves. (Tittel Decl. ¶ 71.)

Salas makes clear that the "wrapper" file is transmitted from the server (**24**)

to the client workstation (**12**) (Salas, 6:45-47), but reminiscent of the "**diary**

**program**" discussion above, Salas does not specify how the eRoom template

made its way onto the client workstation. Salas states that the "wrapper" file was

downloaded from the server (*id.*, 6:45-47), but the "wrapper" file does not itself

appear to carry the eRoom template. (Tittel Decl. ¶ 72.) But transmission of the

"wrapper" file is itself sufficient to satisfy this claim limitation under its broadest

reasonable construction. This is because the "wrapper" file identifies the

corresponding page design.

Even if the claim language required physical transmission of the actual page

design data itself, adapting the eRoom server (**14**) of Salas to transmit <u>both</u> the

wrapper file <u>and</u> the eRoom template would have been obvious to one of

ordinary skill in the art. (Tittel Decl. ¶ 73.) The ability to reference another file in

the HTML of a web page, which would cause the web browser to download that

file from the server hosting the web page, was well-known to persons of ordinary skill in the art. With respect to page design information (*e.g.* style sheets), in fact, a technique for doing this had already been standardized by 1997. (Tittel Decl. ¶¶ 20-23.) Style sheets serve substantially the same purpose as the templates in Salas – to specify a set of parameters for the appearance of a page. (*See* Tittel (1997), at 58 ("In general, a style sheet defines a set of layout parameters for a document to ensure that similar elements in the document appear uniformly.").)

Accordingly, it would have been obvious to one of ordinary skill in the art to adapt the "wrapper" file of Salas to include a URL identifying an eRoom template stored on the eRoom server (**14**). Salas makes clear that the template file itself is an HTML file. (Salas, 6:66-7:1 ("An eRoom template is <u>an HTML file</u> having additional eRoom-specific information embedded in it.") (underlining added).) The wrapper thus certainly could have included the <LINK> tag discussed in **Part IV.A** above, which was a standard HTML tag at the time of the alleged invention. (Tittel Decl. ¶ 74.) Adding a <LINK> tag to the wrapper HTML file in Salas to identify the location of a template file on the eRoom server (**14**) would have been trivial to implement, and would have predictably resulted in the system of Salas in which the wrapper file *and* the eRoom template file were downloaded from the server to the client when the eRoom is accessed by the web browser.  (*Id.*)

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

Downloading the template file from the eRoom server (**14**) would also have presented several advantages over a system in which the template files must be stored or "pre-loaded" onto the client workstation. (*Id*. ¶ 75.) Many of these advantages are the same as those discussed above for downloading the ActiveX components ("**diary program**") from the server. Salas indicates that the template file is used by the ActiveX control to generate the eRoom web page. (Salas, 6:57-7:1, 10:66-11:3.) The benefits of obtaining the eRoom template from the server, therefore, mirror the advantages of obtaining the ActiveX controls from the server, including: (1) simplifying installation of the ActiveX controls and templates; (2) ensuring that the user has the most up-to-date and correct template for use with the ActiveX controls; and (3) the ability to only download the template once to the user's web browser. (Tittel ¶ 75.) Downloading the template files from the server (**14**) would also allow the user to access an eRoom from a different computer on which the eRoom template files have not yet been installed. This would provide flexibility and reduce administrative costs by avoiding the need to "pre-install" the template files on each computer. (*Id.*)

### (3)    "configuration information"

Finally, Salas discloses that the eRoom server (**14**) sends "diary information" that includes "configuration information for controlling behavior of

a cohesive diary page, the configuration information including privacy level information." As explained above in **Part VI.E** above, "configuration information" and "privacy level information" are used to determine whether a user is permitted to view or access content on a diary page.

Salas explains that "[s]ince every file and eRoom is represented as an object in the database, access of users to each item can be controlled by entries in the database schema." (Salas, 14:37-39.) For example, each file in the database may contain "file metadata" that includes "<u>access information such as which users may open, view and edit the file</u>." (*Id.*, 13:52-55 (underlining added).) This access information can specify whether the requesting user has permission to view and/or edit a particular file. (*Id.*, 12:34-39 ("[T]he access rights of the requesting user are checked. If the user has appropriate access rights, i.e., 'can edit' if the user has indicated editing will occur or 'can view' if the user has indicated only viewing will occur, the user will be allowed to retrieve the file.").)

Salas also makes clear that this privacy level information is transmitted to the client workstation (**12**) prior to the display of the eRoom page. Salas describes a file synchronization technique in which the server sends updated information to the client workstation. (*Id.*, 11:54-60.) This synchronization results in the file metadata – which includes the access rights discussed above – being transmitted

to the user system. "Once synchronization has been accomplished and <u>local</u>
<u>database metadata</u> has been updated, the appropriate data objects are inserted
into the eRoom . . . ." (*Id.*, 12:1-3.) The fact that the file metadata is sent to the
user system prior to display of the eRoom page is also shown in the fact that the
file metadata includes the name of the file (*id.*, 13:52), which is displayed on the
eRoom page. (*Id.*, Fig. 4.) As explained above, the ability to display the date
and/or time of files on the eRoom page also indicates that the file metadata for
was sent by the server to the client workstation. (Tittel Decl. ¶¶ 68, 78.)

### c.    Claim 1[c] – Assembling the "Diary Page"

Claim 1, limitation **[c]**, recites the step of "assembling the cohesive diary
page by dynamically combining the content data and the page design in
accordance with the configuration information for the cohesive diary page to be
displayed by the diary program running in the browser." As mentioned previously,
the "**cohesive diary page**" in Salas is the eRoom page, an example of which is
shown in Figure 4. (Salas, Fig. 4.) The page builder application in Salas ("**diary
program**") assembles the eRoom page (the "**cohesive diary page**") by combining
the project data ("**content data**") and the eRoom template ("**page design**"):

> The client workstation **12**' uses project data received from the server
> **14** in combination with one or more template files to create and

> display to the user of the client workstation a private, secure collection of HTML pages that provide a virtual workroom for members of a team, whatever its size and wherever the members of the team are physically or corporately located, may be referred to throughout as an "eRoom", or an "eRoom page".

(*Id.*, 4:66-5:6; *see also id.*, 6:57-59 ("Generation, display and management of eRooms is controlled by a 'page builder' application residing on the client workstation **12'**.") (underlining added).) Salas explains that the page builder application generates the web page by, among other things, "filling in" replacement properties specified in the eRoom template. (*Id.*, 10:66-11:3.) The process for performing this replacement, in fact, closely mirrors the technique disclosed in the '316 patent. (Tittel Decl. ¶¶ 79-80.)

As explained previously, Salas discloses privacy level information in the form of "file metadata" that includes "access information such as which users may open, view and edit the file." (Salas, 13:52-55.) The displayed eRoom page ensures that each user can access the files based on his or her specific access control setting. As explained in Salas: "Files displayed by an eRoom may be viewed or edited by team members having the appropriate access controls (discussed in more detail below)." (*Id.*, 12:7-9.) The eRoom page in Salas is therefore assembled "in accordance with the configuration information for the

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

cohesive diary page," as recited in the '316 patent.

As explained later in that column of Salas, when a user viewing an eRoom page attempts to access a file, the user's access level is verified to ensure that the user can perform the requested operation:

> [T]he access rights of the requesting user are checked. If the user has appropriate access rights, i.e., "can edit" if the user has indicated editing will occur or "can view" if the user has indicated only viewing will occur, the user will be allowed to retrieve the file.

(*Id.*, 12:34-39.) Salas makes clear, therefore, that the system allows the user to view the list of files in the project but the user may be certain types of access to the file. The access rights verification step described above is performed by a software process ("daemon") on the client workstation. (*Id.*, 12:16-22, 12:23-27.)

The disclosures from Salas discussed above, including the statement that "[f]iles displayed by an eRoom may be viewed or edited by team members having the appropriate access controls" (*id.*, 12:7-9), by itself suffice to disclose the assembly of the cohesive diary page "in accordance with the configuration information," as recited in claim 1. (Tittel Decl. ¶ 83.)

If claim 1 is interpreted to require some kind of <u>*visual*</u> indication on the "cohesive diary page" of the privacy level associated with the viewing user (*id.* ¶¶

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

83, 84), the disclosures of Salas could be combined with U.S. Patent No. 5,729,734

to Robert D. Parker et al. ("Parker") **[Ex. 1011]** to render this limitation obvious to

one of ordinary skill in the art. Parker, entitled "File Privilege Administration

Apparatus and Methods," discloses a series of user interface techniques to

manage user access privileges for a server "sharepoint," which is defined in Parker

as "an item, e.g., a file, a folder, a volume, a hard disk, or the like, that is capable

of being shared by the network users." (Parker, 2:24-26.)

Parker explains that each file or item may be displayed to a user in a way

that visually indicates the privilege or access level granted to that user. This is

shown in Figure 7, which shows a folder listing as it would appear to "**User C**":



(*Id.*, Fig. 7 (partial figure shown).)

Parker explains that the display in Figure 7 shows precisely how "User C"

would see the two folders (**417**, **419**) on its screen. (*Id.*, 11:32-35 ("When the administrator views as user C, the administrator is viewing from user C's perspective (i.e., in accordance with user C's access privileges as if the administrator was sitting at user C's client terminal).").) In the example above, because the administrator did not grant "**User C**" rights to "test folder-2" (**419**), that folder appears grayed out on the screen with a "lock" icon (**488**):

> Since the administrator granted user C read access privileges to test folder-1 (**417**) in FIG. 5, test folder-1 (**417**) is shown to be accessible in FIG. 7 (by open lock icon **487** and by the fact that "test folder-1" is not ghosted, grayed out, or hidden). <u>On the other hand, test folder-2 (**419**) is in a ghosted state indicating no access to test folder-2</u>. In other embodiments, <u>test folder-2 (**419**) may be grayed out, shaded</u>, or <u>hidden altogether</u>.

(*Id.*, 11:40-47 (underlining added).) This is consistent with the '316 patent, which states that a diary page "may not make the object visible to the user, i.e., the user does not even know that the object exists, or it may present the object using an alternate representation." ('316, 5:64-67.)

Parker therefore discloses the creation of a page displayed "<u>in accordance with</u> the configuration information" including "privacy level information," as recited in claim 1**[c]**. Parker specifically states Figure 7 shows a display "from user

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

C's perspective (i.e., <u>in accordance with user C's access privileges . . . .</u>)." (Parker, 11:32-35 (underlining added for emphasis).) Limitation **[c]** of claim 1 is therefore disclosed by Salas in view of Parker. (Tittel Decl. ¶ 87.)

It would have been obvious to add the user interface features of Parker to Salas. Both references disclose similar systems for organizing and displaying files in a networked environment that have access restrictions. (Salas, 12:7-9, 13:52-57; Parker, 1:19-28.) Both systems also employ a similar user interface for displaying files or folders in icon or list form on the user's screen. (Salas, Fig. 4 (**482**, **486**, **488**, **490**); Parker, Fig. 7 (**487**, **488**).) It would have been obvious to one of ordinary skill in the art to add, to the eRoom system of Salas, the user interface technique of Parker in which an item is displayed normally (if access is allowed) or "in a ghosted state," "greyed out, shaded, or hidden altogether" (Parker, 11:44-47), depending on the viewing user's access privileges. This would predictably result in the eRoom system of Salas in which the ActiveX control running in the web browser obtains the file metadata identifying the access privileges of the user (Salas, 13:52-57), and then uses it to generate the eRoom page with an item box (**408**) listing each file with a visual indication consistent with the viewing user's access privileges (*e.g.* fully visible, ghosted, grayed out, with a "lock icon," etc.). (Tittel Decl. ¶ 88.)

A person of ordinary skill in the art would have had several motivations to

make this combination. Parker itself provides a motivation by stating that "it is

envisioned that a user accessing the network via its user privilege, <u>will be able to</u>

<u>distinguish whether the listed sharepoints are inaccessible, or accessible for read</u>

<u>& write, read-only or write only via various access indicating icons</u>." (Parker,

11:50-54 (underlining added).) The addition of this known element from Parker

would provide an improvement to Salas by allowing a user to visually ascertain,

before attempting to access a particular item listed in an eRoom, whether the

requested access is permitted. (Tittel Decl. ¶ 89.) This would also result in a more

streamlined user experience in that the user could preemptively avoid attempting

file accesses that were not permitted. (*Id.*)

### d.    Claim 1[d] – Change of "Diary Information"

The fourth limitation of claim 1 recites the step of "receiving by the diary

server at least one request for at least one change concerning the diary

information, from the diary program in the user system." Salas describes several

features that independently disclose this limitation.

A user of an eRoom can change the project files and other content for the

eRoom ("**diary information**") by modifying an existing file or uploading a new file

to the eRoom. For example, "users may perform work on files and objects locally

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

and upload the modified files and objects to the server **14** for viewing, comment,

or further modification by other project team members." (Salas, 13:7-10.)  The

user accomplishes this by "dragging" a file onto the eRoom:

> Once the user is finished editing the file, it may be uploaded to the
> server **14** to allow other users access to it. The user signals that the
> file should be transmitted to the server **14** by dragging the file onto an
> eRoom displayed by the browser (step **704**). Dropping the file into the
> displayed eRoom invokes an ActiveX control or a background daemon
> process which manages the upload of the file to the server **14**.

(*Id.*, 13:19-26 (underlining added).)

Salas provides another example in which a user can contribute to an on-line

discussion, such as the "Announcements" (**420**) shown in Figure 4. The

announcements feature permits the user to add to the discussion:

> In the embodiment depicted in FIG. 4, a discussion **420** is embedded
> within the page and there is a facility **422** to allow a viewer to
> contribute to the discussion **420**. The embedded discussion **420** and
> the contribution facility **422** may be implemented as ActiveX controls,
> a JAVA applet, or various other means.

(*Id.*, 5:28-34 (underlining added).)

As explained for claim 1**[a]**, the ActiveX controls identified in the quotations

above comprise the recited "diary program." The "request for at least one change

concerning the diary information" in each embodiment, therefore, comes "from

the diary program" as recited in claim 1**[d]**.

### e.    Claim 1[e] – Sending "New Diary Information"

The final limitation of claim 1, limitation **[e]**, recites the step of "sending, by

the diary server to the user system, new diary information for changing the

cohesive diary page." Salas explains that, from time to time, the contents of the

eRoom and the eRoom page need to be updated. "Put another way, the client

workstation's local project database **20**' must be synchronized with the server's

project database **20** to ensure data coherency." (Salas, 11:16-19.)

Salas discloses several techniques for performing synchronization. (*Id.*,

11:19-27.) Each of these techniques relies on a "modification tag value" that is

used by to determine whether an item on the local database is up-to-date. (*Id.*,

11:27-30, 11:42-47.) "If the modification tag value or state bits indicate that the

object needs to be synchronized," Salas explains, "the updated object may be

requested from the server in the foreground or in the background." (*Id.*, 11:30-34;

*see also id.*, 11:34-41.)

Once this "new diary information" is received by the client workstation, it

may be used to change the cohesive diary page. "Once synchronization has been

accomplished and local database metadata has been updated, the appropriate

data objects and values are inserted into the eRoom where indicated by Replace

Properties, <u>and the eRoom is displayed to the user (step **508**) by the browser</u>

<u>application</u> in a traditional manner (refer to FIG. 4)." (*Id.*, 12:1-6 (underlining

added).) Salas therefore discloses "sending, by the diary server to the user

system, new diary information for changing the cohesive diary page."

### 2.    Claim 4 is Obvious Over Salas In View of Tittel (1997) and Parker

Dependent claim 4 recites: "The method of claim **1** wherein the new diary

information is for changing content of the diary page without changing a general

appearance of the diary page." The term "**new diary information**" appears to

refer back to limitation **[e]** of claim 1 reciting the step of "sending, by the diary

server to the user system, <u>new diary information</u> for changing the cohesive diary

page." Salas discloses this additional requirement.

As I explained above for claim 1**[d]** and 1**[e]**, Salas discloses that a user can

change the "diary information" by, among other ways, adding to the "Discussion"

portion of an eRoom or uploading a new file or modifying an existing file. One of

ordinary skill in the art would understand that the result of these actions would

be to add to or modify entries on the eRoom page, but leave the overall look and

appearance of the eRoom page the same. (Tittel Decl. ¶ 98.) This is because the

appearance of the eRoom page is determined by the "template" that specifies how the page will appear to the user. (Salas, e.g., 7:8-10.)

For example, if a user uploaded a new file to the eRoom pictured in Figure 4, for example, this would result in the new file being inserted into the item box (**408**), perhaps as an additional icon, after the client workstation's local database was synchronized. (*Id.*, 12:1-6.) Similarly, if a user contributed new content to the Announcements section (**422**) (*id.*, 5:29-37), this would result in the comment being added to that section. In either case, placement of the content on the page is determined by "filling in" the content in the locations specified by the template. (*Id.*, 10:66-11:3, 10:44-49.) With respect to the addition of new data to the eRoom, for example, "[o]nce synchronization has been accomplished . . . the appropriate <u>data objects and values are inserted into the eRoom where indicated by Replace Properties</u>, and the eRoom is displayed to the user (step **508**) by the browser application in a traditional manner (refer to FIG. 4)." (*Id.*, 12:1-6 (underlining added).) The "Replace Properties" are determined by the template, which does not change with a change in content. Salas therefore discloses that the new diary information is for changing content of the diary page without changing its general appearance, as stated in claim 4.

### 3.    Claims 17 and 26 Are Obvious Over Salas In View of Tittel (1997) and Parker for the Same Reasons as Claim 1

As explained in **Part V.B** above, independent claim 17 is similar in many respects to claim 1 except that it is written as an apparatus claim that recites "a software portion configured to" perform substantially the same steps as claim limitations **1[a]**, 1**[b]** and 1**[c]**. Claim 26 depends from claim 17 and recites functions substantially similar to claim limitations 1**[d]** and 1**[e]** relating to changing diary information and receiving new diary information.

The recitation of a "software portion" in the limitations of claims 17 and 26 does not provide a basis to distinguish the disclosures of Salas discussed above. One of ordinary skill in the art would understand that the eRoom system in Salas, in order to perform the functions recited in claims 17 and 26, would necessarily include software executing on the client workstation (**12**) that was programmed to carry out those functions. (Tittel Decl. ¶ 102.)

Salas also expressly discloses that software. Claim 17**[a]** recites "a software portion configured to receive, by a user system from a diary server, a diary program capable of being run by a browser in the user system." This function is performed in Salas for all of the reasons provided for claim 1**[a]** above. The "software portion" here takes the form of a web browser installed on the user's

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

client workstation. (Salas, 5:21-24.) As explained in Salas, "[t]he browser executing on the client workstation interprets the HTML file that it has received and displays the Web page to the user of the client workstation." (*Id.*, 1:31-34; *see also id.*, 6:40-43.) Because the ActiveX controls that make up the "diary program" in Salas may be embedded in an HTML file (*see* **Part III.B**, above), which is received and interpreted by the web browser, the browser performs this function of receiving the diary program as recited in claim 17**[a]**. This is consistent with the way this step is described in the '316 specification. ('316, 8:35-38 (user starts web browser), 8:42-46 (web browser receives and executes diary program).)

Claim 17**[b]** recites in relevant part "a software portion configured to receive, by the user system from the diary server, diary information . . ." Salas in view of Tittel (1997) discloses the receipt of the recited "diary information" for the reasons explained for claim 1**[b]** above. The "software portion" in Salas includes the web browser and ActiveX controls (including the "page builder application"). (Salas, 6:57-63, 6:64-7:7:2.) Salas also describes a process ("background daemon") running on the client workstation (**12**) that handles the downloading of content from the eRoom server (**14**). (*Id.*, 11:11:12-26.) These software components perform at least the functions recited in claim 17**[b]**.

Claim 17**[c]** recites "a software portion configured to assemble the cohesive

diary page by dynamically combining the content data and the page design in accordance with the configuration information." Salas in view of Parker discloses the assembly of the "cohesive diary page" for the reasons explained for claim 1**[c]** above. The "software portion" here would include the ActiveX control that implements the eRoom "page builder" application. (Salas, 6:57-63, 10:66-11:12.)

Claim 17**[d]** recites "a software portion configured to display the cohesive diary page, by the diary program running in the browser." The "software portion" performing this function would comprise a combination of the "diary programs" (discussed in claim 1**[a]** above), and the web browser itself. (Salas, 12:4-6 ("[T]he eRoom is displayed to the user (step **508**) <u>by the browser application</u> in a traditional manner (refer to FIG. 4).") (underlining added), Fig. 4, 6:57-63.)

Dependent claim 26 recites "a portion configured to receive, from the diary server, new diary information," followed by "a portion configured to change content of the diary page without changing a general appearance of the diary page, in accordance with the new diary information." The software portions for performing these steps are substantially the same as those for claims 17**[b]**, **[c]** and **[d]**. This includes at least the ActiveX page builder application (Salas, 6:57-63, 12:1-6), the ActiveX upload daemon (*id.*, 13:19-26), the ActiveX "Announcements" tool (*id.*, 5:28-34), and the web browser (*id.*, 12:1-6).   Claims 17 and 26 are

therefore obvious over Salas In view of Tittel (1997) and Parker for the same

reasons as claim 1 as discussed above. (Tittel Decl. ¶¶ 101-107.)

### 4.    Claim 18 Is Obvious Over Salas In View of Tittel (1997) and Parker

Claim 18 depends from claim 17 and states: "The apparatus of claim **17**,

further comprising: a portion configured to display contents of the diary page by

the diary program in accordance with a cover for a diary." It is not clear that this

limitation adds anything different to the "page design" information described in

claim 17. As explained in **Part V.A** above, the '316 specification uses the term

"cover" refer to the same information as the "page design." ('316, 9:7-10 ("In step

**308**, diary applet **112** generates one or more pages of the diary in HTML <u>in</u>

<u>accordance with the cover</u>, content, and configuration information. The HTML is

displayed as a diary page by browser **110**.") (underlining added), 17:60-63

("Covers are also called 'presentation contexts.' In one embodiment of the

present invention, the presentation context can consist of HTML files in which 'on

the fly' substitutions by the diary applet are performed.").) The district court's

claim construction order gave identical meanings to "cover" and "page design."

(Order **[Ex. 1003]**, at 002.) The software portion recited in claim 18, therefore, is

disclosed in Salas for the same reasons as the software portion for the "assembly"

and "display" functions in claim 17**[c]** and 17**[d]** above. (Tittel Decl. ¶ 109.)

Even if the "cover" must include layout and style information different from the "page design" of claim 17, the eRoom template in Salas includes so many display, layout and style properties that one could simply select different pieces of information from that template to show the claimed "page design" and "cover." (*Id.* ¶ 111.) One example of style information not identified in the discussion of "page design" above is "Wizard" information that describes the appearance of on-screen controls for creating and editing an eRoom page. (Salas, 9:38-43.) Another example of "cover" information is a "graphical element **406** [that] is used to pictorially identify the viewed page. The graphical element **406** may be a corporate logo or other organizational identifier." (*Id.*, 5:54-59.) This graphical element may be a static image "or it may be a dynamic identifier such as a JAVA script or ActiveX control." (*Id.*, 5:57-59.) In any event, Salas discloses a software portion "configured to display contents of the diary page by the diary program in accordance with a cover for a diary." (Tittel Decl. ¶ 111.)

B.    **Ground 2 – Claim 20 Is Obvious Salas In View of Tittel (1997) and Parker, and Further in View of Angles**

Claim 20 depends from claim 18 and recites: "The apparatus of claim **18**, wherein the cover includes advertisements not requested by a user." This claim

appears to add nothing more than the ability to add an advertisement to the diary page recited in claims 17 and 18. The ability to add advertisements to web pages was well-known prior to September 1998. (Tittel Decl. ¶ 113.)

One example of a Web advertising system is disclosed in U.S. Patent No. 5,933,811 to Paul Angles et al., entitled "System and Method for Delivering Customized Advertisements within Interactive Communication Systems" **[Ex. 1012]**. Angles issued from an application filed on August 20, 1996, more than two years before the application for the '316 patent. Angles discloses an on-line advertising service that can custom tailor specific advertisements to particular consumers. (Angles, 2:46-49.) Angles explains that "there has been a tremendous proliferation of corporate advertising across the Internet. For example, some companies such as Yahoo Corporation offer free services, such as the ability to search for particular sites on the Internet, but post advertising messages to consumers to help offset the cost of their service." (*Id.*, 2:18-27.)

Angles discloses a system that selects an advertisement for the user and then incorporates it into a Web page. (*Id.*, 21:34-52.) The page "appears to the consumer like all other electronic pages **32** on the Internet **33**, except that it contains the customized advertisement **30** which has been pre-selected for that consumer." (*Id.*, 21:49-52.) The selection of the advertisement is "based on the

consumer's profile" (*id.*, 8:58-61), not based on a request by the user.

It would have been obvious to one of ordinary skill in the art to adapt the system of Salas to display the eRoom page in accordance with a cover for a diary that included advertisements not requested by a user. The motivation for such a combination could not be any more clear and compelling – obtaining revenue. That revenue could be used for profit, to defray the costs associated with providing the web site, or to facilitate offering the web site at a reduced fee. (Tittel Decl. ¶ 117.) Angles expressly and repeatedly confirms these motivations. The system of Angles "allows the advertisement provider to monitor the number of advertisements viewed by consumers associated with a particular content provider. With this information, the content providers can receive advertising revenue based on the number of consumers who access their websites." (*Id.*, 4:17-23; *see also id.*, 4:45-47 ("The Internet providers can then use this advertising revenue to reduce consumer access fees.").)

The eRoom system of Salas could be readily adapted to include an advertisement as disclosed in Angles. The eRoom page includes a graphical element (**406**) displayed on the page. (Salas, Fig. 4 (**406**).) "The graphical element **406** may be a corporate logo or other organizational identifier. The graphical element may be static (as depicted in FIG. 4) or it may be a dynamic identifier

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

such as a JAVA script of ActiveX control." (*Id.*, 5:55-59.) One of ordinary skill in the art would have recognized that an advertisement could be placed anywhere on the eRoom page, or could augment or even replace the "cover" information associated with the graphical element (**406**). (Tittel Decl. ¶ 119.) Adding web-based advertising from Angles to the eRoom system of Salas would predictably result in the system of Salas in which the eRoom page (Fig. 4) is displayed in accordance with a cover that includes an advertisement not requested by the user, as recited in claim 20. (*Id*.)

## VIII. CONCLUSION

The Petitioner respectfully requests that the Board institute *inter partes* review of claims 1, 4, 17, 18, 20 and 26 of the '316 patent, and find those claims unpatentable, based on the grounds presented in this Petition.

Dated: February 6, 2014                    Respectfully submitted,

COOLEY LLP
ATTN: Patent Group
1299 Pennsylvania Ave., NW, Suite 700
Washington, DC  20004
Tel: (703) 456-8000
Fax: (202) 842-7899

By:     /Heidi L. Keefe/_____
        Heidi L. Keefe
        Reg. No. 40,673
        Counsel for Petitioner
        Facebook, Inc.

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify, pursuant to 37 CFR sections 42.6 and 42.105, that a complete copy of the attached **PETITION FOR *INTER PARTES* REVIEW OF U.S. PATENT NO. 6,415,316, including all exhibits (Nos. 1001 through 1013)** and related documents, are being served via Federal Express on the 6th day of February, 2014, the same day as the filing of the above-identified document in the United States Patent and Trademark Office/Patent Trial and Appeal Board, upon the patent owner's attorneys of record:

Thomas Horstemeyer LLP
400 Interstate North Parkway SE
Suite 1500
Atlanta, GA 30339


and upon the counsel of record for the patent owner in the litigation before the United States District Court for the Eastern District of Virginia, Case Docket No. 1:13-cv-158-TSE-TRJ entitled *Rembrandt Social Media LP v. Facebook, Inc., and AddThis, Inc.*:

Ahmed J. Davis
Fish & Richardson PC
1452 K Street N.W. 11th Floor
Washington D.C. 20005

Robert E. Hillman
Fish & Richardson PC
One Marina Park Drive
Boston MA 02210

Thomas Melsheimer
Fish & Richardson PC
1717 Main Street, Suite 5000
Dallas, TX  75201

John S. Goetz
Fish & Richardson PC
601 Lexington Avenue 52d Floor
New York, NY 10022


/ Heidi L. Keefe /
Heidi L. Keefe
Reg. No. 40,673

Petition for *Inter Partes* Review of
U.S. Patent No. 6,415,316

COOLEY LLP
ATTN:  Heidi L. Keefe
Patent Docketing
1299 Pennsylvania Ave. NW
Suite 700
Washington, D.C. 20004
Tel:  (650) 843-5001
Fax: (650) 849-7400

# EXHIBIT E

the tools and funding it needs to cut its backlog and process patent applications more quickly.

The improvements to the patent system contained in our bill will help spur economic prosperity and job creation. I am pleased to support it.

Specifically, the bill would improve patent quality by establishing the opportunity for third parties to submit prior art and other information related to a pending application for consideration by a patent examiner. By allowing prior art to be submitted earlier in the process and explained to the office, patent examiners will be able to issue higher quality patents.

The bill would create a "first window" post-grant opposition proceeding open for 9 months after the grant of a patent. This would allow the Patent and Trademark Office to weed out patents that should not have been issued in the first place.

This new post-grant review process—which was recommended in a 2004 report issued by the National Academy of Sciences—would enable early challenges to patents, but also protect the rights of inventors and patent owners against endless litigation. The reason we want to ensure that the Patent and Trademark Office issues high quality patents is to incentivize investment in truly innovative technological advances and provide more certainty for investors in these inventions.

In addition, the bill would improve the current inter partes administrative process for challenging the validity of a patent. It would establish an adversarial inter partes review, with a higher threshold for initiating a proceeding and procedural safeguards to prevent a challenger from using the process to harass patent owners. It also would include a strengthened estoppel standard to prevent petitioners from raising in a subsequent challenge the same patent issues that were raised or reasonably could have been raised in a prior challenge. The bill would significantly reduce the ability to use post-grant procedures for abusive serial challenges to patents. These new procedures would also provide faster, less costly alternatives to civil litigation to challenge patents.

The bill would institute a gatekeeping role for the court to assess the legal basis for damages and jury instructions. This would provide more certainty in damages calculation and promote uniformity and fairness. The bill also would transition the United States to a first-inventor to file system, simplifying the application process and coordinating it with our trading partners. This change will reduce costs and help improve the competitiveness of American inventors abroad.

Further, the bill would provide fee setting authority for the Patent Trademark Office Director to ensure that the Patent and Trademark Office is properly funded and can reduce its current backlog of patent applications.

The bill also would mandate a reduction of fees by 50 percent for small entities and 75 percent for micro-entities.

I want to particularly thank Chairman LEAHY for working with me and Senator BAUCUS on a provision that would curtail patents on tax strategies. These patents encumber the ability of taxpayers and their advisers to use the tax law freely, interfering with the voluntary tax compliance system. Tax strategy patents undermine the fairness of the Federal tax system by removing from the public domain ways to satisfy a taxpayer's legal obligations. If firms or individuals hold patents for these strategies, some taxpayers could face fees simply for complying with the Tax Code. Moreover, tax patents provide windfalls to lawyers and patent holders by granting them exclusive rights to use tax loopholes, which could provide some businesses with an unfair advantage in our competitive market system.

Our provision would ensure that all taxpayers will have equal access to strategies to comply with the Tax Code.

This provision was carefully drafted with the help of the Patent and Trademark Office not to cover software preparation and other software, tools or systems used to prepare tax or information returns or manage a taxpayer's finances.

In conclusion, the America Invents Act will protect inventors' rights and encourage innovation and investment in our economy. The bill will improve transparency and third party participation in the patent application review process. This, in turn, will strengthen patent quality and result in more fairness for both patent holders and patent challengers. The bill will institute beneficial changes to the patent process to curb litigation abuses and improve certainty for investors and innovators. It will help companies do business more efficiently on an international basis.

The bill also will enhance operations of the Patent and Trademark Office with administrative reforms and will give the office fee setting authority to reduce backlogs and better manage its business.

I am pleased to support this hard fought bipartisan legislation, and I urge my colleagues to support it as well.

I yield the floor.

Mr. LEAHY. Mr. President, I thank the distinguished Senator from Iowa. As I noted before he got on the floor, he has been extremely important in working on this issue.

Mr. President, just so I can have a moment to speak with the Senator from Louisiana, I suggest the absence of a quorum.

The PRESIDING OFFICER. The clerk will call the roll.

The legislative clerk proceeded to call the roll.

Mr. VITTER. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded.

The PRESIDING OFFICER. Without objection, it is so ordered.

AMENDMENT NO. 112

Mr. VITTER. Mr. President, pursuant to a conversation with the distinguished committee chairman, I ask unanimous consent to temporarily set aside the pending amendment to call up the Toomey-Vitter amendment.

The PRESIDING OFFICER. Without objection, it is so ordered.

The clerk will report.

The legislative clerk read as follows:

The Senator from Louisiana [Mr. VITTER], for himself and Mr. TOOMEY, proposes an amendment numbered 112.

Mr. VITTER. Mr. President, I ask unanimous consent that reading of the amendment be dispensed with.

The PRESIDING OFFICER. Without objection, it is so ordered.

The amendment is as follows:

(Purpose: To require that the Government prioritize all obligations on the debt held by the public in the event that the debt limit is reached)

At the appropriate place, insert the following:

SEC. ___. FULL FAITH AND CREDIT ACT.

(a) SHORT TITLE.—This section may be cited as the "Full Faith and Credit Act".

(b) PRIORITIZE OBLIGATIONS ON THE DEBT HELD BY THE PUBLIC.—In the event that the debt of the United States Government, as defined in section 3101 of title 31, United States Code, reaches the statutory limit, the authority of the Department of the Treasury provided in section 3123 of title 31, United States Code, to pay with legal tender the principal and interest on debt held by the public shall take priority over all other obligations incurred by the Government of the United States.

Mr. VITTER. Mr. President, this Toomey-Vitter amendment is the Full Faith and Credit Act—the concept that has been discussed for several weeks prior to this week. It is very timely, as we are all rightly focused on the spending and debt issue with the Thursday deadline coming up.

No one that I know of wants the government to be shut down in any way, shape, or form. No one that I know of wants any massive, significant disruption. But lots of people that I know of, including many in Louisiana, want us to change business as usual in Washington, starting with spending and debt. This full faith and credit amendment is an important step in that regard. Because of the time limitations in front of us before we move to other pending business at 4:30, I have agreed to come back at a later time to fully lay out this Toomey-Vitter amendment, as well as a second-degree Vitter amendment that I will advance with regard to Social Security.

It is very important to discuss this spending, to put it on the floor and start this debate with vigor about spending and debt, changing the fiscal policy of this country so that we can get on a more sustainable path. There is only one thing certain about this debate; that is, if we don't change the fiscal path we are on, it will lead to an economic disaster.

# EXHIBIT F

can be challenged on any validity ground during the first nine months after its issue. Challengers who use this proceeding will be estopped in litigation from raising only those issues that were raised and decided in the post-grant review, rather than all issues that could have been raised, the standard employed in inter partes reexamination.

The present bill also softens the could-have-raised estoppel that is applied by inter partes review against subsequent civil litigation by adding the modifier ''reasonably.'' It is possible that courts would have read this limitation into current law's estoppel. Current law, however, is also amenable to the interpretation that litigants are estopped from raising any issue that it would have been physically possible to raise in the inter partes reexamination, even if only a scorched-earth search around the world would have uncovered the prior art in question. Adding the modifier ''reasonably'' ensures that could-have-raised estoppel extends only to that prior art which a skilled searcher conducting a diligent search reasonably could have been expected to discover.

Section 5(a) of the 2009 version of the bill, which would amend section 301, has been modified and moved to section 5(g) of the bill. This provision allows written statements of the patent owner regarding claim scope that have been filed in court or in the Office to be made a part of the official file of the patent, and allows those statements to be considered in reexaminations and inter partes and post-grant reviews for purposes of claim construction. This information should help the Office understand and construe the key claims of a patent. It should also allow the Office to identify inconsistent statements made about claim scope—for example, cases where a patent owner successfully advocated a claim scope in district court that is broader than the ''broadest reasonable construction'' that he now urges in an inter partes review.

The present bill preserves the agreement reached in the 2009 Judiciary Committee mark up to maintain the current scope of inter partes proceedings: only patents and printed publications may be used to challenge a patent in an inter partes review.

One important structural change made by the present bill is that inter partes reexamination is converted into an adjudicative proceeding in which the petitioner, rather than the Office, bears the burden of showing unpatentability. Section 5(c) of the previous bill eliminated language in section 314(a) that expressly required inter partes reexamination to be run as an examinational rather than adjudicative proceeding, but failed to make conforming changes eliminating provisions in section 314(b) that effectively would have required inter partes reexamination to still be run as an examinational proceeding. In the

present bill, section 316(a)(4) gives the Office discretion in prescribing regulations governing the new proceeding. The Office has made clear that it will use this discretion to convert inter partes into an adjudicative proceeding. This change also is effectively compelled by new section 316(e), which assigns to the petitioner the burden of proving a proposition of unpatentability by a preponderance of the evidence. Because of these changes, the name of the proceeding is changed from ''inter partes reexamination'' to ''inter partes review.''

The present bill also makes changes to the petition requirements that appear in new sections 312(a)(5) and 322(a)(5). These sections have been modified to require petitioners to provide to the patent owner the same identification of any real parties in interest or privies that is provided to the Office. The Office anticipates that patent owners will take the initiative in determining whether a petitioner is the real party in interest or privy of a party that is barred from instituting a proceeding with respect to the patent.

Language that previously appeared as the last sentences of what are now sections 312(c) and 322(c), and which stated that failure to file a motion to seal will result in pleadings' being placed in the record, has been struck. At best this sentence was redundant, and at worst it created an ambiguity as to whether material accompanying the pleadings also would be made public absent a motion to seal.

Many of the procedural limits added to inter partes and post-grant review by the present bill are borrowed from S. 3600, the bill that I introduced in the 110th Congress. My comments accompanying the introduction of that bill, at 154 CONGRESSIONAL RECORD S9982–S9993, daily ed. Sept. 27, 2008, are relevant to those provisions of the present bill that are carried over from S. 3600, particularly to the extent that the comments disclose understandings reached with the Patent Office, conscious use of terms of art, or the reasoning behind various provisions. Relevant passages include page S9987's discussion of the use of the adjudicative or oppositional model of post-grant review and estoppel against parties in privity, and page S9988's discussion of what is now section 324(b)'s additional threshold for instituting a post-grant review, the expectation that the Director will identify the issues that satisfied the threshold for instituting an inter partes or post-grant review, the meaning of ''properly filed'' when used in the joinder provisions in sections 315(c) and 325(c), the authorization to consolidate proceedings in sections 315(d) and 325(d), and the standards for determining in sections 316(a)(6) and 326(a)(5). Also relevant is page S9991's discussion of the excesses and effects of inequitable-conduct litigation, which informs this bill's provisions relating to that doctrine.

Among the most important protections for patent owners added by the

present bill are its elevated thresholds for instituting inter partes and post-grant reviews. The present bill dispenses with the test of ''substantial new question of patentability,'' a standard that currently allows 95% of all requests to be granted. It instead imposes thresholds that require petitioners to present information that creates serious doubts about the patent's validity. Under section 314(a), inter partes review will employ a reasonable-likelihood-of-success threshold, and under section 324(a), post-grant review will use a more-likely-than-not-invalidity threshold.

Satisfaction of the inter partes review threshold of ''reasonable likelihood of success'' will be assessed based on the information presented both in the petition for review and in the patent owner's response to the petition. The ''reasonable likelihood'' test is currently used in evaluating whether a party is entitled to a preliminary injunction, and effectively requires the petitioner to present a prima facie case justifying a rejection of the claims in the patent.

Post-grant review uses the ''more likely than not invalid'' test. This slightly higher threshold is used because some of the issues that can be raised in post-grant review, such as enablement and section 101 invention issues, may require development through discovery. The Office wants to ensure that petitioners raising such issues present a complete case at the outset, and are not relying on obtaining information in discovery in order to satisfy their ultimate burden of showing invalidity by a preponderance of the evidence.

Subsections (a) and (b) of sections 315 and 325 impose time limits and other restrictions when inter partes and post-grant review are sought in relation to litigation. Sections 315(a) and 325(a) bar a party from seeking or maintaining such a review if he has sought a declaratory judgment that the patent is invalid. This restriction applies, of course, only if the review petitioner has filed the civil action. These two subsections (a) do not restrict the rights of an accused infringer who has been sued and is asserting invalidity in a counterclaim. That situation is governed by section 315(b), which provides that if a party has been sued for infringement and wants to seek inter partes review, he must do so within 6 months of when he was served with the infringement complaint.

Section 325(b) provides that if a patent owner sues to enforce his patent within three months after it is granted, a court cannot refuse to consider a motion for a preliminary injunction on the basis that a post-grant review has been requested or instituted. A patent owner who sues during this period is likely to be a market participant who already has an infringer intruding on his market, and who needs an injunction in order to avoid irreparable harm.

This provision strengthens and carries over to post-grant review the rule of *Procter & Gamble Co.* v. *Kraft Foods Global, Inc.*, 549 F.3d 842, Fed. Cir. 2008.

Sections 315(c) and 325(c) also under of inter partes and post-grant reviews. The Office anticipates that joinder will be allowed as of right—if an inter partes review is instituted on the basis of a petition, for example, a party that files an identical petition will be joined to that proceeding, and thus allowed to file its own briefs and make its own arguments. If a party seeking joinder also presents additional challenges to validity that satisfy the threshold for instituting a proceeding, the Office will either join that party and its new arguments to the existing proceeding, or institute a second proceeding for the patent. The Director is given discretion, however, over whether to allow joinder. This safety valve will allow the Office to avoid being overwhelmed if there happens to be a deluge of joinder petitions in a particular case.

In the second sentence of section 325(d), the present bill also authorizes the Director to reject any request for ex parte reexamination or petition for post-grant or inter partes review on the basis that the same or substantially the same prior art or arguments previously were presented to the Office. This will prevent parties from mounting attacks on patents that raise issues that are substantially the same as issues that were already before the Office with respect to the patent. The Patent Office has indicated that it currently is forced to accept many requests for ex parte and inter partes reexamination that raise challenges that are cumulative to or substantially overlap with issues previously considered by the Office with respect to the patent.

The second sentence of section 325(d) complements the protections against abuse of ex parte reexamination that are created by sections 315(e) and 325(e). The estoppels in subsection (e) will prevent inter partes and post-grant review petitioners from seeking ex parte reexamination of issues that were raised or could have been raised in the inter partes or post-grant review. The Office has generally declined to apply estoppel, however, to an issue that is raised in a request for inter partes reexamination if the request was not granted with respect to that issue. Under section 325(d), second sentence, however, the Office could nevertheless refuse a subsequent request for ex parte reexamination with respect to such an issue, even if it raises a substantial new question of patentability, because the issue previously was presented to the Office in the petition for inter partes or post-grant review.

Under paragraph (1) of sections 315(e) and 325(e), a party that uses inter partes or post-grant review is estopped from raising in a subsequent PTO proceeding any issue that he raised or reasonably could have raised in the post-

grant or inter partes review. This effectively bars such a party or his real parties in interest or privies from later using inter partes review or ex parte reexamination against the same patent, since the only issues that can be raised in an inter partes review or ex parte reexamination are those that could have been raised in the earlier post-grant or inter partes review. The Office recognizes that it will need to change its regulations and require that ex parte reexamination requesters identify themselves to the Office in order for the Office to be able to enforce this new restriction.

The present bill also incorporates S. 3600's extension of the estoppels and other procedural limits in sections 315 and 325 to real parties in interest and privies of the petitioner. As discussed at 154 CONGRESSIONAL RECORD S9987, daily ed. Sept. 27, 2008, privity is an equitable rule that takes into account the "practical situation," and should extend to parties to transactions and other activities relating to the property in question. Ideally, extending could-have-raised estoppel to privies will help ensure that if an inter partes review is instituted while litigation is pending, that review will completely substitute for at least the patents-and-printed-publications portion of the civil litigation. Whether equity allows extending privity estoppel to codefendants in litigation, however, will depend in large measure upon the actions of the patent owner, and whether he has made it reasonably and reliably clear which patent claims he is asserting and what they mean. If one defendant has instituted an inter partes review, but other defendants do not have an opportunity to join that review before it becomes reasonably clear which claims will be litigated and how they will be construed, it would be manifestly unfair to extend privity estoppel to the codefendants.

The Office also has the authority to address such scenarios via its authority under section 316(a)(5), which gives the Office discretion in setting a time limit for allowing joinder. The Office has made clear that it intends to use this authority to encourage early requests for joinder and to discourage late requests. The Office also has indicated that it may consider the following factors when determining whether and when to allow joinder: differences in the products or processes alleged to infringe; the breadth or unusualness of the claim scope that is alleged, particularly if alleged later in litigation; claim-construction rulings that adopt claim interpretations that are substantially different from the claim interpretation used in the first petition when that petition's interpretation was not manifestly in error; whether large numbers of patents or claims are alleged to be infringed by one or more of the defendants; consent of the patent owner; a request of the court; a request by the first petitioner for termination of the first review in

view of strength of the second petition; and whether the petitioner has offered to pay the patent owner's costs.

Sections 316(a)(6) and 326(a)(5) prescribe standards for discovery. In inter partes review, discovery is limited to deposition of witnesses submitting affidavits or declarations, and as otherwise necessary in the interest of justice. In post-grant review, discovery is broader, but must be limited to evidence directly related to factual assertions advanced by either party. For commentary on these standards, which are adopted from S. 3600, see 154 CONGRESSIONAL RECORD S9988–89, daily ed. Sept. 27, 2008.

Sections 316(a)(12) and 326(a)(11) provide that inter partes and post-grant reviews must be completed within 12 months of when the proceeding is instituted, except that the Office can extend this deadline by 6 months for good cause. Currently, inter partes reexaminations usually last for 3 to 5 years. Because of procedural reforms made by the present bill to inter partes proceedings, the Patent Office is confident that it will be able to complete these proceedings within one year. Among the reforms that are expected to expedite these proceedings are the shift from an examinational to an adjudicative model, and the elevated threshold for instituting proceedings. The elevated threshold will require challengers to front load their case. Also, by requiring petitioners to tie their challenges to particular validity arguments against particular claims, the new threshold will prevent challenges from "mushrooming" after the review is instituted into additional arguments employing other prior art or attacking other claims.

Although sections 316 and 326 do not regulate when and how petitioners will be allowed to submit written filings once a review is instituted, the Office has made clear that it will allow petitioners to do so via the regulations implementing the proceedings. Sections 316 and 326 do clearly allow petitioners to obtain some discovery and to have an oral hearing. Obviously, it would make no sense to do so if petitioners were not also allowed to submit written arguments. The bill conforms to the Office's preference, however, that it be given discretion in determining the procedures for written responses and other filings, in order to avoid the formalism of current chapter 31, which adds substantially to the delays in that proceeding.

The bill also eliminates intermediate administrative appeals of inter partes proceedings to the BPAI, instead allowing parties to only appeal directly to the Federal Circuit. By reducing two levels of appeal to just one, this change will substantially accelerate the resolution of inter partes cases.

Sections 5(c)(2)(C) and 5(c)(3) of the bill provide for a transition from current inter partes reexamination to new inter partes review. To protect the Office from being overwhelmed by the

# EXHIBIT G

proceedings, a first-period proceeding in which any invalidity argument can be presented, and a second-period proceeding that is limited to considering arguments of novelty and nonobviousness that are based on patents or printed publications. The first-window proceeding must be brought within 9 months after the patent is issued. The second window is open for the life of the patent after the 9-month window has lapsed or after any first-period proceeding has concluded.

The bill uses an oppositional model, which is favored by PTO as allowing speedier adjudication of claims. Under a reexam system, the burden is always on PTO to show that a claim is not patentable. Every time that new information is presented, PTO must reassess whether its burden has been met. This model has proven unworkable in inter partes reexam, in which multiple parties can present information to PTO at various stages of the proceeding, and which system has experienced interminable delays. Under an oppositional system, by contrast, the burden is always on the petitioner to show that a claim is not patentable. Both parties present their evidence to the PTO, which then simply decides whether the petitioner has met his burden.

If we expect post grant review proceedings to be completed within particular deadlines, I think that it is obligatory that we consult with the agency that is expected to administer the proceedings. In this case, PTO has expressed a strong preference for an oppositional model, and it believes that it can comply with reasonable deadlines if that model is adopted. The bill's use of an oppositional system thus allows proposed section 329(b)(1) to mandate that post grant review proceedings be completed within one year after they are instituted, with a possible 6-month extension for good cause shown or in the event of second-window joinder.

Section 5 also imposes a number of procedural limitations on post grant review proceedings. Proposed section 321 applies a standing requirement that petitioners must have a substantial economic interest adverse to the patent. This is a relatively low threshold that simply requires a showing that some substantial economic activity of the petitioner's is hindered by the express or implied threat of the patent's monopoly. Nevertheless, the requirement does give patentees a measure of control over when they might be forced to defend themselves in a post grant review proceeding.

Proposed section 322 includes a number of provisions that are designed to limit the use of post grant review proceedings as a delaying tactic and to mitigate these proceedings' negative impact on efforts to enforce a patent. Subsection (a) provides presumptive immunity from post grant review proceedings to a patent that is enforced in court within three months of its issue. A patent asserted in court this early in its life likely is already the subject of

a well-developed commercial dispute. A delay in resolution of the case under these circumstances probably would do unjustified and irreparable harm to one or another party's market share. Such disputes should be resolved as soon as possible, which means hearing all of the case in the one forum capable of hearing all claims, the district court.

Paragraph (1) of subsection (b) bars a party that has filed a declaratory-judgment action challenging the validity of a patent from also challenging the patent in a post grant review proceeding. And paragraph (2) requires a defendant in an infringement action who seeks to open a second-window proceeding to do so within 3 months after his answer to the complaint is due. I think that this is a better rule than one requiring that a petition for a second-window proceeding be filed before an infringement action is filed. Such a restriction might cause parties who think that they may be sued but who are not otherwise inclined to seek post grant review to file defensive petitions for second-period review, lest they later be sued and lose the right to request post grant review.

Subsection (c) of section 322 bars a party that has already sought a post grant review proceeding against a patent from subsequently seeking another post grant review or a reexam with regard to the same patent.

Subsection (d) of section 322 estops a party that has brought a post grant review proceeding against a patent from raising in any subsequent PTO or ITC proceeding or civil action any claim against that patent that it did raise in a post grant proceeding or that it could have raised in a second-window proceeding.

A word about privity: subsections (b)(2) and (d) of section 322 bar second-window proceedings from being instituted or claims from being raised if particular proceedings or claims were pursued by privies to the party now seeking to start proceedings or raise claims. The concept of privity, of course, is borrowed from the common law of judgments. The doctrine's practical and equitable nature is emphasized in a recent California Court of Appeals decision, *California Physicians' Service* v. *Aoki Diabetes Research Institute,* 163 Cal.App.4th 1506 (Cal. App. 2008), which notes, at page 1521, citations omitted, that:

The word ''privy'' has acquired an expanded meaning. The courts, in the interest of justice and to prevent expensive litigation, are striving to give effect to judgments by extending ''privies'' beyond the classical description. The emphasis is not on a concept of identity of parties, but on the practical situation. Privity is essentially a shorthand statement that collateral estoppel is to be applied in a given case; there is no universally applicable definition of privity. The concept refers to a relationship between the party to be estopped and the unsuccessful party in the prior litigation which is sufficiently close so as to justify application of the doctrine of collateral estoppel.

It bears noting that not all parties in privity with a would-be petitioner for

other purposes or by way of various contracts would also be in privity with the petitioner for purposes of estoppel—that is, for purposes of section 322. This limitation on estoppel privity is usefully highlighted in a decision of the Federal circuit, *International Nutrition Co.* v. *Horphag Research, Ltd.,* 220 F.3d 1325 (Fed. Cir. 2000), which notes, at page 1329, that:

One situation in which parties have frequently been held to be in privity is when they hold successive interests in the same property. See, e.g., *Litchfield* v. *Crane,* 123 U.S. 549, 551, 8 S.Ct. 210, 31 L.Ed. 199 (1887) (defining privity to include a ''mutual or successive relationship to the same rights of property''). Thus, a judgment with respect to a particular property interest may be binding on a third party based on a transfer of the property in issue to the third party after judgment. See Restatement (Second) of Judgments §43 (1982) (''A judgment in an action that determines interests in real or personal property . . . [h]as preclusive effects upon a person who succeeds to the interest of a party to the same extent as upon the party himself.''). A corollary of that principle, however, is that when one party is a successor in interest to another with respect to particular property, the parties are in privity only with respect to an adjudication of rights in the property that was transferred; they are not in privity for other purposes, such as an adjudication of rights in other property that was never transferred between the two. See 18 Wright et al., supra, §4462. Put another way, the transfer of a particular piece of property does not have the effect of limiting rights of the transferee that are unrelated to the transferred property. See *Munoz* v. *County of Imperial,* 667 F.2d 811, 816 (9th Cir.1982) (concluding that non-parties were not in privity with a party to litigation because ''[t]he right which the [third parties] seek to litigate is not one which they obtained through contractual relations with [a party to the previous litigation]. It is a completely independent right[.]'').

Proposed section 327 also imposes important limits on post grant review proceedings. Its requirements are designed to protect both patent owners and the PTO. Section 327 establishes a substantial evidentiary threshold for bringing any post grant review proceeding, and it imposes a further elevated threshold against the bringing of a second-period proceeding for a patent that already has become the subject of such a proceeding. Subsection (a) requires that any petition present evidence that, if unrebutted, would show that a claim in the patent is unpatentable. This threshold is designed, among other things, to force a petitioner to present all of his best evidence against a patent up front. His petition itself must present a full affirmative case. It thus reinforces the front-loaded nature of an oppositional system, which is critical to the efficient resolution of proceedings by PTO. This threshold is considerably higher than ''significant new question of patentability,'' and thus, particularly in combination with the mandates of section 329(c), should provide the PTO with sufficient discretion to protect itself against being overwhelmed by a deluge of petitions.

# EXHIBIT H

112TH CONGRESS ⎱
1st Session   ⎰ HOUSE OF REPRESENTATIVES ⎰ REPT. 112–98
⎱ Part 1

## AMERICA INVENTS ACT

───────────────

JUNE 1, 2011.—Committed to the Committee of the Whole House on the State of
the Union and ordered to be printed

───────────────

Mr. SMITH of Texas, from the Committee on the Judiciary,
submitted the following

# R E P O R T

together with

## DISSENTING VIEWS AND ADDITIONAL VIEWS

[To accompany H.R. 1249]

[Including cost estimate of the Congressional Budget Office]

The Committee on the Judiciary, to whom was referred the bill
(H.R. 1249) to amend title 35, United States Code, to provide for
patent reform, having considered the same, reports favorably there-
on with an amendment and recommends that the bill as amended
do pass.

### CONTENTS

|                                                                        | Page |
|------------------------------------------------------------------------|------|
| The Amendment                                                          | 1    |
| Purpose and Summary                                                    | 38   |
| Background and Need for the Legislation                                | 40   |
| Hearings                                                               | 57   |
| Committee Consideration                                                | 58   |
| Committee Votes                                                        | 58   |
| Committee Oversight Findings                                           | 63   |
| New Budget Authority and Tax Expenditures                              | 63   |
| Congressional Budget Office Cost Estimate                              | 63   |
| Performance Goals and Objectives                                       | 73   |
| Advisory on Earmarks                                                   | 73   |
| Section-by-Section Analysis                                            | 73   |
| Agency Views                                                           | 85   |
| Changes in Existing Law Made by the Bill, as Reported                  | 89   |
| Dissenting Views                                                       | 162  |
| Additional Views                                                       | 163  |

99–006

48

challenges to patents, while still protecting the rights of inventors and patent owners against new patent challenges unbounded in time and scope. The Committee believes that this new, early-stage process for challenging patent validity and its clear procedures for submission of art will make the patent system more efficient and improve the quality of patents and the patent system. This new, but time-limited, post-grant review procedure will provide a meaningful opportunity to improve patent quality and restore confidence in the presumption of validity that comes with issued patents in court.

In utilizing the post-grant review process, petitioners, real parties in interest, and their privies are precluded from improperly mounting multiple challenges to a patent or initiating challenges after filing a civil action challenging the validity a claim in the patent. Further, a final decision in a post-grant review process will prevent the petitioner, a real party in interest, or its privy from challenging any patent claim on a ground that was raised in the post-grant review process. The post-grant review procedure is not intended, however, to inhibit patent owners from pursuing the various avenues of enforcement of their rights under a patent, and the amendment makes clear that the filing or institution of a post-grant review proceeding does not limit a patent owner from commencing such actions.

The Committee recognizes the importance of quiet title to patent owners to ensure continued investment resources. While this amendment is intended to remove current disincentives to current administrative processes, the changes made by it are not to be used as tools for harassment or a means to prevent market entry through repeated litigation and administrative attacks on the validity of a patent. Doing so would frustrate the purpose of the section as providing quick and cost effective alternatives to litigation. Further, such activity would divert resources from the research and development of inventions. As such, the Committee intends for the USPTO to address potential abuses and current inefficiencies under its expanded procedural authority.

*Patent Trial and Appeal Board.*

The Act renames the Patent Board the "Patent Trial and Appeal Board" and sets forth its duties, which are expanded to include jurisdiction over the new post-grant review and derivation proceedings. This section strikes references to proceedings eliminated by the Act, including interference proceedings, and updates the various appeals statutes.

*Preissuance submissions by third parties*

After an application is published, members of the public—most likely, a competitor or someone else familiar with the patented invention's field—may realize they have information relevant to a pending application. The relevant information may include prior art that would prohibit the pending application from issuing as a patent. Current USPTO rules permit the submission of such prior art by third parties only if it is in the form of a patent or publication,[43] but the submitter is precluded from explaining why the

---

[43] *See* 35 C.F.R. § 1.99.

76

(b) Inter partes review must be sought by a party within 12 months of the date when the party is served with a complaint for infringement. If a patent owner sues for infringement within 3 months of the patent's issue, a pending petition for post-grant review or the institution of such a proceeding may not serve as a basis for staying the court's consideration of the patent owner's motion for a preliminary injunction.

(c) The Director may allow other petitioners to join an inter partes or post-grant review.

(d) The Director may consolidate multiple proceedings or matters concerning the same patent and decline requests for repeated proceedings on the same question.

(e) Inter partes and post-grant petitioners are estopped from raising in a subsequent Office proceeding any issue that they raised or reasonably could have raised in the inter partes or post grant review, and inter partes petitioners are also estopped from raising in civil litigation or an ITC proceeding any issue that they raised or could have raised in the inter partes review. Post-grant petitioners are only estopped from raising in civil litigation or ITC proceedings those issues that they actually raised in the post-grant review.

(f) Post-grant review may not be used to challenge claims in a reissue patent that are the same as or narrower than claims in the original patent if the time for seeking review of the original patent has lapsed.

§§ 316 and 326. (a) The Director shall prescribe regulations that make the file in proceedings public; define standards for instituting reviews; allow submission of additional information; establish and govern review and its relationship to other proceedings; set a time limit for requesting joinder in inter partes review; set standards for discovery; prescribe sanctions for abuse of the proceedings; provide for protective orders for confidential information; allow the patent owner to file a response after an inter partes review has been instituted; allow the patent owner to amend the patent; provide either party with the right to an oral hearing; and set a 1-year time limit for completion of the proceeding, with a 6-month extension for good cause; and provide the petitioner with at least one opportunity to file written comments after the proceeding is instituted.

(b) In prescribing regulations, the Director shall consider the integrity of the patent system and the efficient operation of the Office.

(c) The Patent Trial and Appeal Board shall conduct review proceedings.

(d) The patent owner may submit one amendment with a reasonable number of substitute claims, and additional amendments either as agreed to by the parties for settlement, for good cause shown in post-grant review, or as prescribed in regulations by the Director in inter partes review.

(e) The challenger shall have the burden of providing unpatentability by a preponderance of the evidence.